1
2
3
4
5 **UNITED STATES DISTRICT COURT**
6 **DISTRICT OF NEVADA**
7
8 MARK ROGERS,                          )
                                        )
9         Petitioner,                   )        3:02-cv-0342-ECR-RAM
                                        )
10 vs.                                  )
                                        )        **ORDER**
11 E.K. McDANIEL, *et al.*,             )
                                        )
12        Respondents.                  )
                                        )
13 _____ /
14
15 Introduction
16         This case is a petition for a writ of habeas corpus by Mark Rogers, a Nevada prisoner
17 sentenced to death.  The case is before the court with respect to the merits of the claims remaining
18 in Rogers' second amended habeas petition.  The court will deny Rogers relief with respect to
19 Grounds 3, 5, 6, 9, 10, 11, 13, 19, 24, and 38 of his second amended petition.  The court will grant
20 Rogers relief with respect to Grounds 20, 21, and 23 of his second amended petition, all of which
21 relate to Rogers' death sentence; accordingly, the court will order that Rogers be granted a new
22 penalty-phase trial, or that his death sentence be vacated and a non-capital sentence imposed upon
23 him, consistent with law.
24 Background Facts and Procedural History
25         In its September 3, 1985 decision affirming Rogers' convictions and sentence, the Nevada
26 Supreme Court described, as follows, the facts of the case as revealed by the evidence:

On December 3, 1980, Frank and Linda Strode returned from a Thanksgiving trip to their home in an isolated part of Pershing County near Majuba Mountain, where they resided with Frank's parents, Emery and Mary Strode, and Frank's sister, Meriam Strode Treadwell. When they entered the parents' trailer, they found the dead bodies of Emery, Mary and Meriam under a blanket in a bedroom. Emery had been shot three times and stabbed twice with a knife which was left in his chest. A pocket watch discovered in Emery's shirt pocket had been struck by one of the bullets; the hour hand of the watch was stopped at one o'clock. Mary had been stabbed in the back and shot in the chest. Meriam, whose wrists were bound with an electric cord, died from a single gunshot wound in her back. Emery and Meriam kept daily diaries. The last entry in both diaries was recorded on the morning of December 2, 1980.

On December 1, 1980, between 4:30 and 5 p.m., Robert Schott gave defendant a ride from Winnemucca to Imlay. As soon as Rogers climbed into Schott's truck, he looked nervously in both the back of the truck and the rear view mirror. Defendant introduced himself as John and claimed that he was a musician going to Reno to look for a job. At one point during the drive, defendant blurted out: "You may not believe it but I am a good American. You may not believe it but I'm on your side. I would fight for my country."

On December 2, 1980, between approximately 12:15 and 12:45 p.m., David Hartshorn, a geologist working at the Majuba Hill Mine, observed Rogers standing alongside a road near Majuba Canyon and offered him a ride. During the ride, Hartshorn gave defendant a can of Seven-Up to drink. Defendant stated that "[s]omebody is shooting rockets ... and one of these days it will hit my pyramid and blow me up." Rogers alighted at the Strode residence with the Seven-Up can in hand.

Between 12:30 and 2 p.m. that same day, Ray Horn, a mechanic at a nearby mine, was driving on a county road near Majuba Mountain. As he passed a dark metallic blue truck, a slender young man driving the truck shot at Horn several times. Between 3:30 and 4 p.m., Earl L. Smith, a highway maintenance worker saw Rogers standing on a road between Denio and Winnemucca and provided him a ride because defendant had run out of gasoline. Rogers was later observed traveling at an extremely high rate of speed in a blue truck, which was identified by its license number as the Strodes' truck.

On December 5, 1980, Rogers was refused entry into Canada. In conversing with a Canadian police officer, Rogers indicated that he was the King of North America. On January 4, 1981, defendant was arrested in Florida when he was seen riding on the bumper of a car, holding on to a luggage rack. After he was arrested, Rogers told police that God knew him and that we were all a part of mother nature. During fingerprinting, defendant refused to speak and wrote on a piece of paper that he belonged to the government. Later at the jail, defendant claimed that he had killed the Strode family in self-defense.

Rogers' fingerprints were lifted from various items in the Strode residence, including a Seven-Up can and a glass jar found in the bedroom under the blanket with the victims' bodies. At trial, the defense presented the testimony of several expert witnesses which indicated defendant was a paranoid schizophrenic at the time of evaluation and that defendant's behavior at the time of the commission of the crimes was consistent with psychotic paranoid delusions, schizophrenia and psychosis and that Rogers could not tell right from wrong or the nature and quality of his acts. One

1    psychologist believed that defendant, who was trained in acting, was faking his
     symptoms.  After finding the defendant guilty of the crimes charged, the jury
2    imposed the death penalty for the three murder convictions, and prison terms for the
     attempted murder and grand larceny.
3

4    *Rogers v. State*, 101 Nev. 457, 705 P.2d 664, 667-68 (1985), *cert. denied*, 476 U.S. 1130 (1986);

5    Exhibit P555.[1]

6           Rogers appealed, and the Nevada Supreme Court affirmed on September 3, 1985.  *Id.*; *see*

7    *also* Exhibits P553, P554.  The United States Supreme Court denied Rogers' petition for a writ of

8    certiorari on May 19, 1986.  *Rogers v. Nevada*, 476 U.S. 1130 (1986).

9           On February 26, 1986, Rogers filed a petition for post-conviction relief in the state district

10   court.  Exhibits P556, P557.  The state district court held an evidentiary hearing, at which Rogers

11   testified.  Exhibit R7, pp. 361-426.[2]  On September 29, 1986, the state district court denied the

12   petition.  Exhibit R7, p. 435.  Rogers appealed.  *See* Exhibit P533.  On June 20, 1987, the Nevada

13   Supreme Court dismissed the appeal.  Exhibit P558.

14          On October 26, 1987, Rogers filed a petition for a writ of habeas corpus in this court,

15   initiating the case of *Rogers v. Whitley,* 3:87-cv-0505-ECR.  Counsel was appointed to represent

16   Rogers.  On July 27, 1989, the court stayed that action so that Rogers could exhaust certain claims in

17   state court.  *Rogers v. Whitley*, 3:87-cv-0505-ECR, docket #53; *see also Rogers v. Whitley*, 717

18   F.Supp. 706 (D.Nev. 1989); *Rogers v. Whitley*, 701 F.Supp. 757 (D.Nev. 1988).

19

20

21          [1]  Unless otherwise stated in this order, the exhibits cited in the form "Exhibit P__," are those
22   filed by Rogers and located in the record at docket #77, #102, and #122, and the exhibits cited in the
     form "Exhibit R__," are those filed by respondents and located in the record at docket #86 through #95.
23   The exhibits originally filed by respondents in support of their answer in Case Number 3:87-cv-0505-
     ECR, which are numbered using roman numerals followed by letters, and which have been made part
24   of the record in this case (*see* docket #134), are located in the record at docket #135 through #144, and
     cited in the form Exhibit __ (*e.g.* "Exhibit X(B)").

25          [2]  Respondents filed their exhibits, in support of a motion to dismiss, in the form of only nine
26   voluminous exhibits (at docket #86 through #95).  Each of those exhibits includes numerous documents.
     The exhibits include page numbering, which the court cites to indicate the location of particular
     documents within those exhibits.

1    On October 15, 1990, Rogers filed, in state court, a second petition for post-conviction relief.

2    Exhibit P559.[3]  On December 24, 1991, that petition was denied.  Exhibit R8, p. 616.  Rogers

3    appealed.  *See* Exhibit P560.  The Nevada Supreme Court dismissed the appeal on May 28, 1993.

4    Exhibit P561.

5    On December 1, 1993, Rogers filed a second federal habeas corpus action in this court:

6    *Rogers v. Angelone*, 3:93-cv-0785-ECR.  Two weeks later, on December 14, 1993, Rogers' first

7    federal habeas action was dismissed.  *See Rogers v. Whitley,* 3:87-cv-0505-ECR, docket #101.

8    The petition in Rogers' second federal habeas action was amended and supplemented, and

9    respondents answered.  *See Rogers v. Angelone*, 3:93-cv-0785-ECR, docket #13, #16, and #29.

10   On March 6, 1997, the court ordered the action dismissed, without prejudice, in order to permit

11   Rogers to further exhaust claims in state court.  *Rogers v. Angelone*, 3:93-cv-0785-ECR, docket #76,

12   #81, #82.

13   On March 24, 1997, Rogers filed, in state district court, a third petition for post-conviction

14   relief.  Exhibit P562.  On March 25, 1998, the State moved to dismiss the petition.  Exhibit R4,

15   p. 678.  On July 13, 1999, the state district court granted that motion in part and denied it in part,

16   dismissing certain of Rogers' claims and ordering the State to answer certain of his claims.  Exhibit

17   R5, pp. 869, 925. On May 1, 2000, the court dismissed the remaining claims.  Exhibit R5, p. 974.

18   Rogers appealed.  *See* Exhibit P563.  The Nevada Supreme Court affirmed on May 13, 2002.

19   Exhibit P564.

20

21

22

23   [3] Between 1967 and 1993, there were two types of post-conviction relief available to petitioners

24   in Nevada: one under NRS Chapter 177 (post-conviction relief), and one under NRS Chapter 34 (habeas corpus).  *See Pellegrini v. State*, 117 Nev. 860, 869-73, 34 P.3d 519, 526-28 (2001) (per curiam) (explaining history of Nevada post-conviction remedies).   Since January 1, 1993, the sole

25   post-conviction remedy available to petitioners in Nevada has been a petition for a writ of habeas corpus, and the procedures for seeking the writ are codified in NRS Chapter 34.  *See id.*  In this order,

26   the court refers to all Rogers' state-court post-conviction actions, whether post-conviction or habeas, as state post-conviction actions.

1    On June 25, 2002, Rogers initiated this, his third, federal habeas action, by filing a

2    "renewed" petition for writ of habeas corpus (docket #11).[4]

3    On November 24, 2004, Rogers moved for a stay of these proceedings, under *Rohan ex rel.*

4    *Gates v. Woodford*, 334 F.3d 803 (9th Cir.), *cert. denied*, 540 U.S. 1069 (2003), contending that he

5    was incompetent to proceed (docket #39).  On September 21 and 22, 2005, the court held an

6    evidentiary hearing on that motion (docket #60, #61).  The court denied the motion in an

7    order entered on October 24, 2005 (docket #58).  On May 18, 2006, the court denied a motion to

8    reconsider (docket #69).

9    On December 14, 2006, Rogers filed a first amended petition (docket #75), and on

10   December 19, 2006, he filed a second amended petition (docket #77).

11   On July 24, 2007, Rogers filed a motion for leave of court to conduct discovery (docket #84).

12   On August 10, 2007, respondents filed a motion to dismiss (docket #85).  On March 24, 2008, the

13   court entered an order (docket #108) denying Rogers' motion for leave to conduct discovery, and

14   granting in part and denying in part the motion to dismiss.  The court dismissed, with prejudice, the

15   following claims in the second amended petition:  Grounds 1, 2, 4, 8, 12, 14, 15, 16, 17, 18, 22, 25,

16   26, 27, 28, 29, 31, 32, 33, 34, 35, 36, and 37.  The court dismissed Ground 30 without prejudice,

17   finding that it was not ripe.  The court found Ground 7 to be unexhausted, and required Rogers to

18   either abandon that claim or have his entire second amended petition dismissed.  On April 24, 2008,

19   Rogers abandoned Ground 7 (docket #109).  This left the following claims in Rogers' second

20   amended petition to be resolved on their merits:  Grounds 3, 5, 6, 9, 10, 11, 13, 19, 20, 21, 23, 24,

21   and 38.

22   Respondents filed an answer (docket #114), on October 23, 2008, responding to the claims

23   remaining in the second amended petition.  On March 6, 2009, Rogers filed a reply (docket #121)

24   and a motion for evidentiary hearing (docket #123), requesting an evidentiary hearing with

25

26   ───────────────

    [4] References to the docket in parentheses indicate the location, in the electronic file for this
    action, of documents mentioned in this order.

respect to Ground 6.  On August 3, 2009, respondents filed a response to the reply (docket #129),

and an opposition to the motion for evidentiary hearing (docket #128).  On August 31, 2009, Rogers

filed a reply in support of the motion for evidentiary hearing (docket #132).  On January 22, 2010,

the court denied the motion for an evidentiary hearing (docket #133).

Standard of Review of the Merits of Rogers' Claims

This action was initiated on June 25, 2002.  Because this action was initiated after

April 24, 1996, the amendments to 28 U.S.C. § 2254 enacted as part of the Antiterrorism and

Effective Death Penalty Act (AEDPA) apply.  *See Lindh v. Murphy,* 521 U.S. 320, 336 (1997);

*Van Tran v. Lindsey*, 212 F.3d 1143, 1148 (9th Cir.2000), overruled on other grounds by *Lockyer v.*

*Andrade*, 538 U.S. 63 (2003); *see also* Reply (docket #121), pp. 16-17 (Rogers concedes that

AEDPA standards apply).

28 U.S.C. § 2254(d) sets forth the standard of review under AEDPA:

> An application for a writ of habeas corpus on behalf of a person in custody
> pursuant to the judgment of a State court shall not be granted with respect to any
> claim that was adjudicated on the merits in State court proceedings unless the
> adjudication of the claim –
>
> (1)  resulted in a decision that was contrary to, or involved an unreasonable
> application of, clearly established Federal law, as determined by the Supreme Court
> of the United States; or
>
> (2)  resulted in a decision that was based on an unreasonable determination of
> the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A decision of a state court is "contrary to" clearly established federal law if the state court

arrives at a conclusion opposite that reached by the Supreme Court on a question of law or if the

state court decides a case differently than the Supreme Court has on a set of materially

indistinguishable facts.  *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000).  An "unreasonable

application" occurs when "a state-court decision unreasonably applies the law of [the Supreme

Court] to the facts of a prisoner's case."  *Id*. at 409.  "[A] federal habeas court may not "issue the

1   writ simply because that court concludes in its independent judgment that the relevant state-court

2   decision applied clearly established federal law erroneously or incorrectly." *Id*. at 411.

3         The Supreme Court has explained that "[a] federal court's collateral review of a state-court

4   decision must be consistent with the respect due state courts in our federal system." *Miller–El v.*

5   *Cockrell*, 537 U.S. 322, 340 (2003). The "AEDPA thus imposes a 'highly deferential standard for

6   evaluating state-court rulings,' and 'demands that state-court decisions be given the benefit of the

7   doubt.'" *Renico v. Lett*, ––– U.S. ––––, ––––, 130 S.Ct. 1855, 1862 (2010) (quoting *Lindh v.*

8   *Murphy*, 521 U.S. 320, 333, n. 7 (1997), and *Woodford v. Viscotti*, 537 U.S. 19, 24 (2002)

9   (per curiam)). "A state court's determination that a claim lacks merit precludes federal habeas relief

10   so long as 'fairminded jurists could disagree' on the correctness of the state court's decision."

11   *Harrington v. Richter*, ––– U.S. ––– , ––––, 131 S.Ct. 770, 786 (2011) (citing *Yarborough v.*

12   *Alvarado*, 541 U.S. 652, 664 (2004)). The Supreme Court has emphasized "that even a strong case

13   for relief does not mean the state court's contrary conclusion was unreasonable." *Id*. (citing *Lockyer*

14   *v. Andrade*, 538 U.S. 63, 75 (2003)); *see also Cullen v. Pinholster*, ––– U.S. –––, ––––, 131

15   S.Ct.1388, 1398 (2011) (describing the AEDPA standard as "a difficult to meet and highly

16   deferential standard for evaluating state-court rulings, which demands that state-court decisions be

17   given the benefit of the doubt") (citing *Harrington*, 131 S.Ct at 786, and *Woodford*, 537 U.S. at 24

18   (internal quotation marks, and citations, omitted)).

19         The analysis under § 2254(d)(1) looks to the law that was clearly established by United

20   States Supreme Court precedent at the time of the state court's decision. *Wiggins v. Smith*, 539 U.S.

21   510, 520 (2003).

22         "[R]eview under § 2254(d)(1) is limited to the record that was before the state court that

23   adjudicated the claim on the merits." *Cullen*, 131 S.Ct. at 1398. In *Cullen*, the Court reasoned that

24   the "backward-looking language" present in § 2254(d)(1) "requires an examination of the state-court

25   decision at the time it was made," and, therefore, the record under review must be "limited to the

26   record in existence at that same time i.e., the record before the state court." *Id*.

1    Analysis

2        Ground 3

3        In Ground 3, Rogers claims that he was denied due process of law because of his alleged

4    incompetence.  Second Amended Petition, pp. 72-97.  Rogers alleges that he "suffers from

5    schizophrenia with frequent eruptions of psychosis" and that "[t]he trial court violated state and

6    federal constitutional protections of due process and fundamental fairness by exercising jurisdiction

7    over him, trying him, and forcing him to proceed through appellate and post-conviction and habeas

8    litigation while insane and incompetent."  *Id*.[5]

9        The trial of an incompetent defendant violates the Due Process Clause of the United States

10   Constitution.  *Indiana v. Edwards*, 554 U.S. 164, 169-70 (2008); *Drope v. Missouri*, 420 U.S. 162,

11   171 (1975).  A defendant is incompetent if "he lacks the capacity to understand the nature and object

12   of the proceedings against him, to consult with counsel, and to assist in preparing his defense."

13   *Drope*, 420 U.S. at 171.

14       Rogers was found competent to stand trial, and was tried and convicted.  The issue of

15   Rogers' competence was not raised on his direct appeal.  *See* Exhibit P553, P554; *see also Rogers v.*

16   *State*, 101 Nev. 457, 705 P.2d 664 (1985).

17       After Rogers filed his first state post-conviction petition, the state district court held an

18   evidentiary hearing to determine whether he was competent to proceed.  *See* Exhibit X(B) (transcript

19   of hearing).  At the conclusion of the hearing, the court found Rogers competent.  *Id*. at 58-59; *see*

20   *also* Exhibit R7, pp. 359-60.  On the appeal in his first state post-conviction action, Rogers conceded

21   that there was substantial evidence to support the finding that he was competent to proceed with that

22

23       [5]  Rogers also includes, in Ground 3, argument that he is not competent to proceed with this
24   federal habeas corpus action.  *See* Second Amended Petition, pp. 95-97.  That contention was the subject
     of a motion to stay litigated between November 2004 and May 2006 (*see* docket #39, #58, #63, #69).
25   This court found Rogers competent to proceed.  Order entered October 24, 2005 (docket #58); *see also*
     Order entered  May 18, 2006 (docket #69) (denying motion to reconsider).  The contention that Rogers
26   is incompetent to proceed with this action is not a cognizable ground for federal habeas corpus relief.
     *See* 28 U.S.C. § 2254(a).  That contention has, at most, only indirect bearing on the cognizable claims
     in Ground 3.

1  action, and that he had no legal authority to support an argument for reversal of that finding.  *See*

2  Exhibit P533, p. 8.  In his first state post-conviction action, Rogers did not make any claim regarding

3  his competence to go to trial in 1981.  *See*  Exhibit P533, P556, P557, P558; Exhibit R7, p. 435-39.

4       In his second state post-conviction action, Rogers made no claim, in either the state district

5  court or the Nevada Supreme Court, regarding his competence at any stage of the proceedings.  *See*

6  Exhibits P559, P560, P561.

7       In his third state post-conviction action, Rogers claimed that he was incompetent and

8  incapable of assisting his counsel at trial, on appeal, and in his post-conviction petitions in the state

9  court.  Exhibit P562, pp. 48-49.  The state district court dismissed that claim on procedural grounds.

10  *See* Exhibit R5, pp. 922-23, 981.  The Nevada Supreme Court affirmed that ruling on appeal.

11  Exhibit P564.

12       Rogers' claim in Ground 3 is a factual argument that Rogers was incompetent during the trial

13  and post-conviction proceedings.[6]  Rogers does not claim any constitutional violation arising from

14  the procedures employed by the state courts to determine his competence.  Rogers only argues that

15  the state courts erred in finding him competent.  To obtain federal habeas relief on such a claim –

16  asserting an erroneous determination of a factual issue by a state court – Rogers must show that the

17  state-court adjudication "resulted in a decision that was based on an unreasonable determination of

18  the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2).

19       There was ample evidence before the trial court indicating that Rogers was competent to

20  stand trial; the trial court's determination in that regard was reasonable in light of the evidence.

21

22

23

24

25  ───────────────
        [6] Respondents, in their answer, for the most part, misapprehend Rogers' claim.  Respondents

26  focus on the question of Rogers' sanity at the time of the crimes.  *See* Answer, pp. 8-17.  That, however, is not an issue raised by Rogers in Ground 3.  Nevertheless, the court can resolve the claim in Ground 3 without further briefing from respondents.

1    It appears[7] that the trial court's determination that Rogers was competent to stand trial

2  was ultimately based upon the reports of three psychiatrists who examined Rogers:  Donald A.

3  Molde, M.D., Jerry A. Howle, M.D., and Philip A. Rich, M.D.  *See* Exhibits P546, P548.  Those

4  psychiatrists unanimously found Rogers competent to stand trial.  *See* Exhibit P548.  Dr. Molde

5  stated in his report:

6              After completing my examination it is my opinion that:

7              (1)  Mr. Rogers is presently of sufficient mentality such that he understands
           the nature of the charges against him;
8
9              (2)  Mr. Rogers is presently of sufficient mentality such that he understands
           the difference between right and wrong particularly with respect to the alleged
           offense.
10
11             (3)  Mr. Rogers is currently of sufficient mentality such that he is able to
           assist his attorney in his own defense or to receive the judgment of the Court.

12  Exhibits P476, P548.  Similarly, both Dr. Howle and Dr. Rich concluded in their reports:

13             I.  Mr. Mark James Rogers is of sufficient mentality to know the difference
           between right and wrong.
14
15             II.  Mr. Mark James Rogers is of sufficient mentality to understand the nature
           of the offense charged.

16             III.  Mr. Mark James Rogers is of sufficient mentality to aid and assist
           counsel in the defense of the offense charged or to show cause why judgement should
17         not be pronounced.

18  Exhibits P475, P477, P548.  In light of the reports of these three psychiatrists appointed by the state

19  trial court to examine Rogers, this court certainly cannot say that the determination that Rogers was

20  competent to stand trial "was based on an unreasonable determination of the facts in light of the

21  evidence presented in the State court proceeding."  *See* 28 U.S.C. § 2254(d)(2).

22    Rogers also argues that he was incompetent to proceed with his state post-conviction actions.

23  Rogers, however, does not cite any precedent holding that it is a violation of the federal

24  _____

25         [7]  In his second amended petition, and his briefing of Ground 3, Rogers does not explain the
     procedure by which he was found competent in state court, he does not identify the evidence relied upon
26   by the state court in making that determination, he does not analyze the state courts' finding, and he does
     not apply the standard imposed by 28 U.S.C. § 2254(d)(2).  *See* Second Amended Petition, pp. 72-97;
     Reply.

10

1  constitutional right to due process of law for a defendant's state post-conviction challenge to

2  proceed while he is incompetent.  Therefore, a fundamental shortcoming of this part of Ground 3 is

3  that Rogers has not demonstrated that a federal right is at stake.  *See* 28 U.S.C. § 2254(a) (federal

4  court to entertain state prisoner's petition for a writ of habeas corpus "only on the ground that he is

5  in custody in violation of the Constitution or laws or treaties of the United States").

6          Moreover, even assuming that there is arguably a right under federal law for a defendant to

7  be competent to proceed with his state post-conviction actions, the state district court's

8  determination that Rogers was competent to proceed with his first state post-conviction proceeding

9  was reasonable.  In Rogers' first state post-conviction action, the state district court held an

10  evidentiary hearing, on September 22, 1986, and, based on the evidence presented, determined that

11  Rogers was competent to proceed.  *See* Exhibit X(B) (transcript of hearing); *see also* Exhibit R7,

12  pp. 359-60 (state district court's order).  At the hearing, Rogers called as a witness Dr. Michael

13  Irwin, a psychiatrist.  *Id*. at 3-24.  Dr. Irwin had examined Rogers and had written a report.  *Id*. at 4;

14  *see also* Exhibit P481 (letter from Dr. Irwin to state court, with report).  Dr. Irwin testified that he

15  believed Rogers had "a paranoid delusional system," and, as a result, although he was able to clearly

16  understand the legal process, because of his "delusional system and his beliefs of influences on the

17  various court participants in the proceedings," he did not believe Rogers to be competent.  Exhibit

18  X(B), pp. 5-6.  On cross-examination, Dr. Irwin stated that he found Rogers to have memory of the

19  trial, and to have opinions regarding his attorneys' use of certain witnesses.  *Id*. at 8, 9, 13, 17.

20  Rogers also called as a witness at the hearing, Dr. Lynn B. Gerow, a psychiatrist.  *Id*. at 24-46.

21  Dr. Gerow examined Rogers, wrote a report, and found Rogers to be competent.  *Id*. at 25; *see also*

22  Exhibit P480 (letter from Dr. Gerow to court, with report).  Dr. Gerow believed that Rogers was

23  malingering.  Exhibit X(B), pp. 34-35.  Dr. Gerow testified that Rogers could describe the appeal

24  process in a capital case, and that Rogers expressed opinions regarding the performance of his

25  counsel.  *Id*. at  32-33, 36.  There was, therefore, some disagreement between the two doctors who

26  testified, regarding Rogers' competence.  Again, however, the question for this court is whether the

11

state court's finding that Rogers was competent "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *See* 28 U.S.C. § 2254(d)(2). This court cannot say that the finding that Rogers was competent to proceed with his post-conviction petition was unreasonable.  Moreover, on the appeal in his first state post-conviction action, Rogers conceded that there was substantial evidence to support the finding that he was competent to proceed, and that he had no legal authority to support an argument for reversal of that finding. *See* Exhibit P533, p. 8.

This court, therefore will deny habeas corpus relief with respect to Ground 3.

Ground 5

In Ground 5, Rogers claims that, in violation of his constitutional right to effective assistance of counsel, his trial counsel rendered ineffective assistance "by not investigating his mental health, or consulting with mental health experts, including but not limited to, Dr. Gutride's reports and possible testimony, because the state offered false and misleading testimony from Dr. Gutride, or because the state withheld and suppressed material evidence in the Lakes Crossing Progress Notes." Second Amended Petition, pp. 105-17.

In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court propounded a two prong test for analysis of claims of ineffective assistance of counsel:  a petitioner claiming ineffective assistance of counsel must demonstrate (1) that the defense attorney's representation "fell below an objective standard of reasonableness," and (2) that the attorney's deficient performance prejudiced the defendant such that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 688, 694.

Rogers did not raise this claim of ineffective assistance of counsel on his direct appeal. *See* Exhibits P553, P554.

Rogers did raise this claim, albeit in a less specific manner, in his first state post-conviction petition. *See* Order entered March 24, 2008 (docket #108), p. 46; *see also* P533, pp. 8-17.  The state

district court held an evidentiary hearing in that case, *see* Exhibits P534, P538, P543, and R7, pp. 361-426, and then denied Rogers' petition.  Exhibit R7, p. 435-39.  Rogers appealed, and the Nevada Supreme Court dismissed the appeal.  Exhibit P558.

In his second state post-conviction action, Rogers did not assert this claim of ineffective assistance of counsel.  *See* Exhibits P559, P560, P561.

In his third state post-conviction action, Rogers raised a claim of ineffective assistance of counsel somewhat similar to the claim in Ground 5.  Exhibit P562, p. 41 (Ground 40I in third state post-conviction petition).  The state district court dismissed that claim on procedural grounds. *See* Exhibit R5, pp. 922-23, 981.  The Nevada Supreme Court affirmed that ruling on appeal. Exhibit P564.

In Ground 5, the essence of Rogers' claim of ineffective assistance of counsel is that his trial counsel did not use records from Lake's Crossing, a mental health facility where Rogers was twice admitted for evaluation of his competence to stand trial, and did not consult experts regarding those records, in order to effectively cross examine Dr. Gutride, the State's expert witness in rebuttal of Rogers' insanity defense.  *See* Second Amended Petition, pp. 105-17.  Seeking to show that Dr. Gutride could have been subjected to effective cross-examination, Rogers relies upon the following exhibits:  Exhibit P227 (declaration of Natalie Novick Brown, Ph.D., dated December 18, 2006); Exhibit P229 (declaration of Raphael Morris, M.D., dated December 13, 2006); Exhibit P231 (declaration of Mitchell Alan Young, M.D., dated December 18, 2006); Exhibit P460 (psychological evaluation by Dr. Gutride, dated March 17, 1981); Exhibit P461 (clinical summary by Dr. Gutride, dated March 18, 1981); Exhibit P462 (addendum to psychiatric evaluation by Dr. Richnak, dated March 19, 1981); Exhibit P473 (Lake's Crossing discharge summary, dated June 12, 1981); Exhibit P524 (records, including progress notes, from Lake's Crossing).  However, there is no indication in the record that any of those materials was ever presented as evidence in state court.  None of these materials was mentioned in Rogers' first state post-conviction petition.  *See* Exhibits P556, P557. None of these materials was offered into evidence in the evidentiary hearing held in state court with

1  respect to Rogers' first state post-conviction petition.  *See* Exhibit R7, pp. 361-426.  After the state

2  district court denied Rogers' first state post-conviction petition (*see* Exhibit R7, p. 435), and Rogers

3  appealed, Rogers did not mention any of these materials in his opening brief on appeal.  *See* Exhibit

4  P533.

5        In *Cullen*, the Supreme Court held that "review under § 2254(d)(1) is limited to the record

6  that was before the state court that adjudicated the claim on the merits." *Cullen*, 131 S.Ct. at 1398.

7  This court, then, defers to the state court, as required by § 2254(d), considering only the evidence

8  that was before the state court when it ruled on Rogers' claim.

9        When given the opportunity at an evidentiary hearing, Rogers offered no evidence at all in

10  state court to support his contention that his trial counsel were ineffective in preparing for and

11  conducting the cross-examination of Dr. Gutride.  *See* Exhibit R7, pp. 361-426 (transcript of

12  evidentiary hearing).  The only evidence presented at the evidentiary hearing in state court was the

13  testimony of Rogers himself, and that testimony had no significant bearing on the claim raised in

14  this case in Ground 5.  *See* Exhibit R7, pp. 363-94.  Given Rogers' failure to substantiate his claim

15  in state court, this court cannot say that the state court's summary rejection of the claim was contrary

16  to, or an unreasonable application of, clearly established federal law, as determined by the Supreme

17  Court, or that the state court's ruling was based on an unreasonable determination of the facts in

18  light of the evidence presented in the state court proceeding.  *See* 28 U.S.C. § 2254(d).

19        The court will deny habeas corpus relief with respect to Ground 5.

20        Ground 6

21        In Ground 6, Rogers claims that he was denied effective assistance of his trial counsel,

22  because counsel did not conduct a sufficient punishment investigation.  Second Amended Petition,

23  pp. 118-68.

24        On his direct appeal, Rogers asserted that the trial court denied him his federal constitutional

25  rights by denying his counsel the opportunity to adequately develop mitigating evidence in

26  preparation for the penalty phase of the trial.  *See* Exhibits P553, pp. 56-58; *see also* Order entered

March 24, 2008 (docket #108), p. 47.  The Nevada Supreme Court ruled that Rogers did not show "prejudice resulting from a lack of funds to prepare mitigating circumstances for the penalty hearing."  *Rogers v. State*, 101 Nev. 457, 467, 705 P.2d 664, 671 (1985); Exhibit P. 555, p. 10.

In his first state post-conviction petition, Rogers claimed that his trial counsel were ineffective for not conducting a sufficient punishment investigation.  Exhibit P557, pp. 2-3.  The state district court held an evidentiary hearing in that case, *see* Exhibits P534, P538, P543, and R7, pp. 361-426, and then denied Rogers' petition.  Exhibit R7, p. 435-39.  Rogers appealed, and raised on appeal the claim that his counsel failed to conduct a sufficient penalty investigation.  *See* P533, pp. 8-17.  The Nevada Supreme Court dismissed the appeal.  Exhibit P558.

In his second state post-conviction action, Rogers did not assert this claim of ineffective assistance of counsel.  *See* Exhibits P559, P560, P561.

In his third state post-conviction action, Rogers raised claims that his trial counsel were ineffective for not conducting a sufficient penalty investigation.  Exhibit P562, p. 42 (Grounds 41A and 41B in third state post-conviction petition).  The state district court dismissed those claims on procedural grounds.  *See* Exhibit R5, pp. 917-18, 981.  The Nevada Supreme Court affirmed that ruling on appeal.  Exhibit P564.

In Ground 6, in this case, Rogers sets forth a great deal of information about his past, supported by declarations of the following witnesses: Tammy Huskey, an investigator employed by Rogers' counsel (Exhibit P212); Lt. Thomas Doyle, of the Eastlake, Ohio, Police Department (Exhibit P212); Yvonne Sampson, Rogers' former wife (Exhibit P204); Robert Reebel, Yvonne Sampson's father (Exhibit P207); Edward Heyduk, Jr., Rogers' brother (Exhibit P202); Susan Erdman, Rogers' mother (Exhibit P201); Kenneth Heyduk, Rogers' brother (Exhibit P205); Edward Heyduk, Sr., Rogers' adoptive father (Exhibit P206); Shirley Halbrook, Rogers' aunt (Exhibit P212); Nicholas Forte, a former narcotics agent in Lake County, Ohio (Exhibit P236); Carl Jerome, a friend of George Douglas ("Doug") Morrison, and an acquaintance of Rogers (Exhibit P209); Ed Reed, a childhood friend of Rogers (Exhibit P210); John Provasoli, a contractor who employed

Rogers for a time (Exhibit P212); Paul Slapnicker, a friend of Rogers (Exhibit P212); Thomas

Altizer, a friend of Rogers (Exhibit P212); Ulysses Altizer, an acquaintance of Rogers (Exhibit

P212); Louis Antenori, a friend of Rogers (Exhibit P212); Timothy Mahaffey, a co-worker with

Rogers (Exhibit P212); Jolie Kanat, an employee at an acting school that Rogers attended (Exhibit

P212); Patty Still, Doug Morrison's ex-wife (Exhibit P212); Faith Croswell, Doug Morrison's

daughter (Exhibit P212); and Patricia Thompson, Rogers' aunt (Exhibit P212).  In addition, Rogers

relies upon documentary exhibits in support of Ground 6, including school records (Exhibit P522),

military records (Exhibit P567), hospital records (Exhibit P570), and police records (Exhibit P519,

P571, P596).  Rogers also proffers a declaration of Virginia Shane, Rogers' trial counsel (Exhibit

P220).  Rogers generally attempts, in offering this evidence, to show that, had a more extensive

penalty investigation been conducted, the outcome of the penalty phase of his trial might have been

different.

    These declarations and documentary exhibits, proffered by Rogers in support of Ground 6,

were not before the state court that ruled on the merits of the claim.  *See* Exhibits P533, P556, P557;

Exhibit R7, pp. 361-426.  At the evidentiary hearing regarding this claim, in state court, the only

evidence offered was the testimony of Rogers himself.  *See* Exhibit R7, pp. 361-426.  Rogers

testified that his attorneys called his mother to testify, in the guilt phase of his trial, against his

wishes.  *Id*. at 366, 370.  Rogers testified that his attorneys never discussed with him anything about

his past or his family that they could use in the penalty phase of the trial.  *Id*. at 366-67.  On cross-

examination, when pressed to identify the witnesses that he believed his attorneys should have called

to testify in the penalty phase of the trial, Rogers initially had difficulty naming any.  *Id*. at 371-72.

Eventually, on cross-examination, Rogers identified four individuals from Los Angeles that he

would call as character witnesses:  Robert Hups, William Lanski, Ted Brady, and John Profesoli. *Id.*

at 372-75.  Rogers testified: "All these people I worked for a stretch of two or three years and I

worked hard and was always there and clean and did my work."  *Id*. at 375.  None of those

individuals are represented in the many declarations now submitted in this case by Rogers.  Rogers

1   also indicated that he might have called Doug Morrison to testify on his behalf; however, Morrison

2   was, in fact, called as a witness at trial, by the prosecution.  *See id*. at 374-76; *see also* Exhibit IV(F),

3   pp. 353-81.  On redirect examination, Rogers testified about the circumstances regarding his prior

4   criminal prosecutions in Ohio.  *See* Exhibit R7, pp. 383-90.[8]  There was no other evidence offered at

5   the evidentiary hearing regarding Rogers' claim that his attorneys conducted an insufficient penalty

6   investigation.

7        Rogers' self-serving testimony that his attorneys could have located and called as witnesses a

8   handful of acquaintances in Los Angeles, and they would generally have said positive things about

9   him, was not compelling evidence that he was prejudiced by his attorneys' failure to conduct a more

10   extensive penalty investigation.

11        As directed by the Supreme Court in *Cullen*, in considering the merits of the claim in

12   Ground 6, this court limits its perspective to the evidence that was before the state court that ruled

13   on the merits of the claim.  In light of the evidence presented at the evidentiary hearing in state

14   court, this court cannot say that court's ruling, that Rogers was not prejudiced by his attorneys'

15   limited penalty investigation, was unreasonable.  In view of the evidence before the state court, that

16   ruling was not contrary to, or an unreasonable application of, clearly established federal law, as

17   determined by the Supreme Court, and was not based on an unreasonable determination of the facts

18   in light of the evidence presented in the state court proceeding.  *See* 28 U.S.C. § 2254(d).  The court

19   will deny habeas corpus relief with respect to Ground 6.[9]

20

21

22

23        [8]  The issue of Rogers' counsel's performance with respect to the use of Rogers' prior criminal
    prosecutions as an aggravating circumstance is raised in more specific terms in Grounds 20 and 21, and

24   that issue is addressed in the discussion of those claims, *infra*.

25        [9]  The court denied Rogers an evidentiary hearing on Ground 6, because Rogers failed to develop
    or present in state court the evidence that he offers in support of the claim in this court.  Order entered

26   January 22, 2010 (docket #133), pp. 7-11; *see* 28 U.S.C. § 2254(e)(2).

1    Ground 9

2         In Ground 9, Rogers claims that his constitutional rights were violated as a result of the trial

3    court's denial of his motion for change of venue.  Second Amended Petition, pp. 176-78.

4         In *Hayes v. Ayers,* 632 F.3d 500 (9th Cir.2011), the court of appeals set forth the law

5    governing such a claim:

6              The Sixth and Fourteenth Amendments "guarantee[ ] to the criminally
         accused a fair trial by a panel of impartial, 'indifferent' jurors." *Irvin v. Dowd*, 366
7         U.S. 717, 722 (1961). When a trial court is "unable to seat an impartial jury because
         of prejudicial pretrial publicity or an inflamed community atmosphere[,] ... due
8         process requires that the trial court grant defendant's motion for a change of venue."
         *Harris v. Pulley*, 885 F.2d 1354, 1361 (9th Cir.1988) (citing *Rideau v. Louisiana*, 373
9         U.S. 723, 726 (1963)).

10             In this circuit, we have identified "two different types of prejudice in support
         of a motion to transfer venue: presumed or actual." *United States v. Sherwood*, 98
11        F.3d 402, 410 (9th Cir.1996). Interference with a defendant's fair-trial right "is
         presumed when the record demonstrates that the community where the trial was held
12        was saturated with prejudicial and inflammatory media publicity about the crime."
         *Harris*, 885 F.2d at 1361. Actual prejudice, on the other hand, exists when voir dire
13        reveals that the jury pool harbors "actual partiality or hostility [against the defendant]
         that [cannot] be laid aside." *Id*. at 1363. The Supreme Court applied this two-pronged
14        analytical approach in a case it decided at the end of its last term. *See Skilling v.
         United States*, 561 U.S. —, 130 S.Ct. 2896, 2907 (2010) (considering, first, whether
15        pretrial publicity and community hostility established a presumption of juror
         prejudice, and then whether actual bias infected the jury).

16                                              *   *   *

17
              "A presumption of prejudice" because of adverse press coverage "attends only
18        the extreme case." *Skilling*, 130 S.Ct. at 2915; *see also Harris*, 885 F.2d at 1361
         ("The presumed prejudice principle is rarely applicable and is reserved for an
19        extreme situation." (citing *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 554 (1976))
         (citation and internal quotation marks omitted)).

20                                              *   *   *

21
              Where circumstances are not so extreme as to warrant a presumption of
22        prejudice, we must still consider whether publicity and community outrage resulted
         in a jury that was actually prejudiced against the defendant. This inquiry focuses on
23        the nature and extent of the voir dire examination and prospective jurors' responses to
         it. *See Skilling*, 130 S.Ct. at 2917-23. Our task is to "determine if the jurors
24        demonstrated actual partiality or hostility [toward the defendant] that could not be
         laid aside." *Harris*, 885 F.2d at 1363.

25

26   *Hayes*, 632 F.3d at 507-11.

                                              18

Before trial, Rogers filed a motion for change of venue.  Exhibit P577.  The motion stated generally that there had been "[e]motionally charged and prejudicial publicity" in local newspapers.  *Id*.  The motion also stated that "[t]he makeup of the community is largely agricultural and mining, with many community members living in remote areas as did the victims."  *Id*.  The motion was supported by an affidavit of Rogers' counsel, in which counsel stated, in relevant part:

> 2.  Your affiant resides in Pershing County, Nevada and has resided in Pershing County, Nevada, throughout the pendency of this action.  During the course of her representation of the defendant herein, and her residence in Pershing County, Nevada, your affiant has been approached on numerous occasions by local citizens who your affiant believes to be registered voters and otherwise qualified to sit on juries in Pershing County, Nevada.
>
> Your affiant has had numerous conversations with local citizens the content of which is as follows: I will be approached by one or more members of the local public.  One or more of them will ask me if I am representing the defendant in the case out of which this action arose.  One or more of the local public will then say to me that the defendant herein should be taken out and hanged, as was done in the old days.
>
> 3.  Your affiant had been informed by the editor/publisher of the local newspaper, the Lovelock Review-Miner, that she and other members of the community had seen the defendant within the community prior to December 1980, fighting in bars, breaking cue sticks in a fit of rage and loitering in mining camp areas.  Your affiant's investigator checked all leads and found that the defendant was not the person observed.
>
> Your affiant has been approached by this same editor/publisher who is on the jury venire who admitted her prejudice and asked for a stipulation that she be removed from the jury.  If the newspaper is biased, then the members of the community who read the newspaper will reflect that bias.
>
> 4.  The members of the community who have been interviewed by the State as witnesses who knew the victims have all expressed their friendly and helpful nature.  In a small community, with many members of the community from whom the jury will be drawn knowing the victims, it will be impossible to select an unbiased jury.
>
> 5.  The Defendant in this action is a young transient who has lived in Hollywood and whose lifestyle is totally foreign to the local community.  Your affiant believes that certain testimony which may come in regarding the Defendant's living arrangements would prejudice a rural jury to the extent that it would prevent a fair trial.

*Id*.  That affidavit of counsel was the only evidence offered in the trial court in support of the motion for change of venue.  The trial court heard argument and denied the motion on November 16, 1981.  *See* Exhibit IV(E), pp. 313-16.

19

1    Rogers raised this issue on his direct appeal to the Nevada Supreme Court.  *See* Exhibit

2    P553, pp. 8-10.  In his opening brief on appeal, Rogers argued:

3          It is submitted that a review of the jury selection process in this case will
       reveal that the appellant did not receive a fair trial.  Given the rural nature of Pershing
4      County and its small population, it would be impossible for an outside "hippy type"
       to receive a fair and impartial trial concerning the murder of local citizens.  The court
5      should have transferred venue.

6    *Id*. at 9-10.

7    The Nevada Supreme Court ruled as follows:

8          Defendant contends that the court erred in denying his motion for change of
       venue because the editor/publisher of a local newspaper, in a conversation with
9      defense counsel, acknowledged her prejudice against defendant. Defendant reasons
       that if the newspaper is biased, then the community must be biased. Counsel's
10     affidavit in support of the motion to change venue was unsupported by any evidence
       which might have demonstrated the extent or inflammatory nature of any pretrial
11     publicity, or whether there was any prejudicial effect on the prospective jurors. Under
       these circumstances, where defendant failed to demonstrate that any pretrial publicity
12     corrupted the trial, the district court did not abuse its discretion in denying
       defendant's motion for change of venue. NRS 174.455; *Kaplan v. State*, 96 Nev. 798,
13     618 P.2d 354 (1980).

14   *Rogers v. State,* 101 Nev. 457, 462, 705 P.2d 664, 668 (1985).

15   Rogers did not raise this issue in his first state post-conviction action. *See* Exhibits P533,

16   P556, P557.  Nor did Rogers raise the issue in his second state post-conviction action.  *See* Exhibits

17   P559, P560, P561.

18   In his third state post-conviction action, Rogers did raise this issue, asserting the following:

19          Petitioner was tried in a rural county, the population of which was small and
       of which Petitioner was not a resident.  The residents of the area engaged primarily in
20     mining and agriculture and many lived in remote areas as did the victims.  Relatively
       few people lived in Pershing County at the time of the murders; their own hard lives
21     were scattered across hundreds of square miles of high desert.  They knew the
       victims; they paid attention when the outside world encroached; they learned about
22     the crime; they talked about the crime; they learned about the suspect; they talked
       about the suspect; they saw artists' renderings of the suspect everywhere; they paid
23     attention to the manhunt; they learned of the Petitioner's arrest; they heard about the
       connections between Petitioner and the crime.  They heard opinions about
24     Petitioner's guilt; they had opinions about the death penalty; and, they believed in an
       "eye for an eye."  When they learned Petitioner had pled "not guilty" by reason of
25     insanity, they saw him as taking advantage of a "loophole" in the law.  This was the
       atmosphere in Pershing County in late 1981.
26

20

1

2          Defense counsel filed a motion of change of venue.  The affidavit which
       defense counsel filed in support of the motion for change of venue stated that she had
3      been approached on numerous occasions by residents of the area who informed her
       that the Petitioner should be hung, as was done in the "old days."  There was
       significant pretrial publicity concerning the crimes charged and the editor/publisher
4      of the local newspaper voluntarily removed herself from the jury venire due to
       admitted prejudice.  In so doing, the editor/publisher informed Petitioner's counsel
5      that she and other members of the community had seen the Petitioner in the
       community prior to the offenses charged and had witnessed, and had discussed
6      witnessing, Petitioner's bawdy behavior.

7          With only one exception, each of the fifty-four potential jurors examined
       about prior knowledge had heard something about the crime and/or the Petitioner.  Of
8      the twelve regular jurors finally empaneled all but one had read, seen, and/or heard
       something about the crime and the defendant; one knew the victims; five were
9      friendly with local law enforcement; seven had difficulties accepting any insanity
       defense; and, two functionally equated first degree murder with mandatory
10     imposition of the death penalty.

11  Exhibit P562, pp. 11-12.  That claim was dismissed by the state district court on procedural grounds.

12  *See* Exhibit R5, pp. 870, 880-81, 911-12, 925.  The state district court's ruling was affirmed on

13  appeal.  *See* Exhibit P564.

14        In this federal habeas corpus action, in Ground 9, Rogers expands significantly upon the

15  argument and evidence that he offered in state court.  Rogers argues that the newspaper in the

16  county where the Strode killings occurred published articles that included "detrimental or biased

17  reporting," that created "tremendous fear throughout the county," and that caused a prejudicial

18  atmosphere preventing Rogers from receiving a fair trial.  *See* Second Amended Petition, pp. 176-

19  78.  Rogers has submitted, as exhibits, copies of newspaper articles published within the two months

20  after the murders, between December 10, 1980, and January 14, 1981.  Exhibits P301, P302, P303,

21  P304.  In addition, Rogers argues that he could not receive a fair trial in Pershing County "because

22  the victims were founding members of the Pershing County chapter of the vigilante group, Posse

23  Comitatus."  Second Amended Petition, pp. 177-78.[10]

24  _____

25        [10] Rogers makes this argument largely by reference to Ground 1.  *See* Second Amended Petition,
     p. 177.  The court has ruled that Ground 1 is both unexhausted and barred by the statute of limitations,
26   and it has been dismissed.  *See* Order entered March 24, 2008 (docket #108), pp. 12-13, 43-44, 56.

1      In state court – before the trial court, on direct appeal, and in three state post-conviction

2  proceedings, over a period of more than twenty years – Rogers never made the argument that his

3  trial was rendered unfair on account of activities of Posse Comitatus.  Moreover, in state court,

4  Rogers never offered the following exhibits, which are now proffered by Rogers in this court:

5  Exhibits P211 (declaration of Russell Beckwith, a bailiff at Rogers' trial (¶5, concerning Posse

6  Comitatus)), P213 (declaration of Suzzet Ramirez), P214 (declaration of Ahtrum L. Thunder), P215

7  (declaration of David VanZant), P218 (declaration of Ken Ellsworth, former sheriff of Pershing

8  County), P220 (declaration of Virginia Shane, Rogers' trial counsel (fifth paragraph, concerning

9  Posse Comitatus)), P223 (declaration of Daniel Levitas, purportedly an expert on Posse Comitatus),

10  P224 (declaration of Kelly D. Miller (¶¶5-7, regarding Posse Comitatus)), P301, P302, P303, P304,

11  P323, P324, P325, P327, P328, P329, P330, P331, P332, P333, P334, P335, P336, P337, P338,

12  P339, P340, P341, P342, P343, P344, P345, P346, P347, P348, P349, P350, P351, P352, P353,

13  P354, P355, P356, P357, P358, P359, P360, P361, P362, P363, P364, P365, P366, P367, P368,

14  P369, P370, P371, P372, P373, P374, P375, P376, P377, P378, P379, P380, P381, P382, P383,

15  P384, P385, P386, P387, P388, P389, P390, P391, P392, P393, P394, P395, P396, P397, P398,

16  P399, P400, P401, P402, P403, P404, P405, P406, P407, P408, P409, P410, P411, P412, P413,

17  P414, P415, P416, P417, P418, P419, P420, P421, P422, P423, P424, P425, P426, P427, P428,

18  P429, P430, P431, P432, P433, P434, P435, P436, P437, P438, P439, P440, P441, P442, P443,

19  P444, P445, P446, P447, P448, P449, P450, P451, P452, P453, P454, P455, P456, and P510.

20  Because this evidence was not before the state courts, it is not considered in this court's analysis

21  under 28 U.S.C. § 2254(d).  *See Cullen*, 131 S.Ct. at 1398.

22      Properly viewed in light of the evidence that was before the state courts, the Nevada

23  Supreme Court's ruling, that there was no error in the denial of the motion to change venue, was not

24  contrary to, or an unreasonable application of, clearly established federal law, as determined by the

25  Supreme Court, and was not based on an unreasonable determination of the facts in light of the

26  evidence presented in the state court proceedings.  *See* 28 U.S.C. § 2254(d).  The anecdotal evidence

22

in the affidavit presented by counsel in state court did not show there to have been either presumed

or actual prejudice warranting a change of venue.  The court will deny habeas corpus relief with

respect to Ground 9.

Ground 10

In Ground 10, Rogers claims that his constitutional rights were violated as a result of the trial

court's denial of his motion to sequester the jury.  Second Amended Petition, pp. 179-80.  Rogers'

claim, in its entirety, is as follows:

> Mr. Rogers is entitled to a new trial and sentencing hearing because the trial
> court's ruling denying Mr. Rogers' motion to sequester the jury denied Mr. Rogers
> his state and federal constitutional rights to due process and fundamental fairness at
> trial.  U.S. Const. Amend. V, VI, XIV.

> * * *

> Trial counsel filed a Motion to Sequester the jury during trial on October 12,
> 1981.  Pet. Ex. 603 [Exhibit P603].  This motion was accompanied by written Points
> and Authorities arguing the sequestration was necessary to protect the fundamental
> fairness of the trial by protecting the jurors from outside, prejudicial influences.  *Id.*
> The trial court heard the argument on October 29, 1981.  TT 10/29/81 at 994-996
> [Exhibit IIB, pp. 64-66].  The prosecutor argued that sequestration would be unfair to
> the jurors.  The court found that rural juries are very competent and generally follow
> his admonitions and denied the motion. TT 10/29/81 at 996 [Exhibit IIB, p. 66].

> The Nevada and Federal Constitution both require that a defendant be tried by
> an impartial panel on evidence presented in court.  These requirements support
> fundamental fairness by giving a defendant an opportunity to understand what
> evidence is condemning him and to contest that evidence before an impartial panel.
> As demonstrated at length in Claim One, Mr. Rogers was unable to receive a fair trial
> in Pershing County because the victims were founding members of the Pershing
> County chapter of the vigilante group, Posse Comitatus.  In an effort to avenge the
> Strodes' death, members of the Posse Comitatus attempted to attend court armed and
> informed the bailiff that they would take matters regarding Mr. Rogers into their own
> hands if the court system did not reach an acceptable result.  Posse members or
> sympathizers sat on Mr. Rogers' jury.  They intentionally failed to disclose their
> affiliation so they could sit on the jury and ensure a death sentence.  Further, Frank
> Strode, the victims' son and brother, openly brandished his own Posse Comitatus
> badge for the jury during direct examination by the district attorney.  Under these
> circumstances, the trial court had a duty to sequester the jury to attempt to limit the
> prejudicial effect of Posse Comitatus on Mr. Rogers' trial.

> Mr. Rogers was also protected by the Nevada Supreme Court's requirement
> that a trial court weigh the defendant's right to a fair trial heavily against jurors'
> rights to daily comforts when determining whether or not to sequester.  This
> requirement protected Mr. Rogers right to a fair trial.  The trial court abridged that

23

1  right to a fair trial by denying the motion to sequester the jury.  Mr. Rogers is entitled
   to relief in the form of a new trial and new sentencing proceeding.  The above stated
2  claim is of obvious merit.  Competent appellate counsel would have raised and
   litigated this meritorious issue on direct appeal and in state post-conviction.  There is
3  no reasonable appellate strategy, reasonably designed to effectuate petitioner's best
   interest, that would justify appellate counsel's failure in this regard.  Petitioner is
4  entitled to relief in the form of a new trial and sentencing hearing.

5  *Id*. (citations to the record in this case, in the form used in this order, added in brackets). [11]

6          Here again, Rogers' argument in Ground 10 relies primarily upon a theory – that

7  sequestration was necessary because of activities of Posse Comitatus – and evidence not offered in

8  state court.

9          In his motion to sequester the jury, in the trial court, Rogers' entire argument was as follows:

10         It is clear from the wording of NRS 175.391 that a jury should be sequestered,
   upon their being sworn, unless the trial court exercises his discretion to let them
11  separate.

12         If any case could *require* sequestration of the jury, the present case is one.
   The present case involves:

13

14         (1) The alleged brutal murder of 3 persons,

15         (2) By a nonresident youth without ties to the community,

16         (3) Involving guns and a knife as weapons,

17         (4) Involving a high degree of publicity,

18         (5) Deep and negative feelings in the community,

19         (6) The State seeks the death penalty.

20         In a capital case the Court must assure that every procedural safeguard is
   employed to protect the defendant.  *Gregg v. Georgia*, 430 U.S. 153 (1976), *Gardner
21  v. Florida*, 430 U.S. 349 (1977), *Beck v. Alabama*, ___ U.S. ___, 65 L.Ed.2d 392
   (1980).

22         The sequestration of the jury is one safeguard designed to protect the
   defendant.  It insulates the jury from influences in the community which may affect
23  the verdict.  No doubt there will be a great deal of publicity at the time of the present
   trial, and it will be most difficult for the twelve selected jurors not to be influenced by
24  the negative feelings present in the community.

25  _____

26  [11]  The date of the oral argument on the motion, as stated by Rogers, is erroneous; the argument
   was held on October 20, 1981.  *See*  Exhibit IIB, pp. 1, 64-66.

1          The prosecutor seeks death.  Mark James Rogers must be given every
2   protection, and sequestration is therefore called for.

3   Exhibit P603, p. 2 (emphasis in original).  Nothing of substance was added in the oral argument

4   regarding this motion, on October 20, 1981.  *See* Exhibit IIB, pp. 1, 64-66.  The trial court denied

5   the motion.  *Id.* at 64.

6          Rogers raised this issue on his direct appeal to the Nevada Supreme Court.  Exhibit P553,

7   pp. 10-12.  In his opening brief on appeal, Rogers argued:

8          In the instant case, Rogers was charged with the brutal murder of three local
       citizens.  The defense attorney had filed an affidavit revealing that rumor and
9       speculation concerning the defendant was being spread throughout the country.  The
       same affidavit revealed the editor/publisher requested to be dropped as a potential
10      juror due to that prejudice.

11          The only objection to sequestration voiced by the prosecution was that it
       would be inconvenient to the jurors.
12
    *Id.*, p. 12;[12] *see also* Exhibit P554.  The Nevada Supreme Court ruled as follows:
13
14          Relying on *Sollars v. State*, 73 Nev. 248, 316 P.2d 917 (1957), Rogers also
       argues that the district court erred by denying his motion to sequester the jurors. In
15      *Sollars*, we reversed a first degree murder conviction because the trial court permitted
       separation of the jury where there was a daily barrage of inflammatory headlines in
16      two daily Las Vegas newspapers. We determined that the court's admonition to the
       jury not to read the newspapers was insufficient because it could be inferred that the
17      jury was exposed to prejudicial communications merely by glancing at any headline.

18          It is true that a trial court must exercise care and sensitivity in granting
       separation over a defendant's objection. We nevertheless conclude that *Sollars* is
19      inapposite to the instant case. The district court's attention was not drawn to any
       newspapers or other forms of communication to which the jurors may have been
20      exposed to the defendant's prejudice. Moreover, the grounds for defendant's motion
       were merely that "[n]o doubt there will be a great deal of publicity at the time of the
21      present trial, and it will be most difficult for the twelve selected jurors not to be
       influenced by the negative feelings present in the community." The jurors were
22      examined on voir dire regarding their exposure to news accounts of the crime. The
       trial court admonished the jury before each separation and in the final jury
23      instructions that they were not to be influenced by public opinion and that they were
       to consider only the evidence produced at trial. As this Court stated in *Crew v. State*,
24      100 Nev. 38, 675 P.2d 986 (1984), the decision of the trial court "will be overturned
       only if appellant demonstrates that either the nature of the publicity or the jury's

25

26      [12]  The affidavit of counsel referred to in this argument was the affidavit filed in support of the
    motion for change of venue, found in Exhibit P577, quoted, *supra*, in the discussion of Ground 9.

1   actual exposure to it created a probability of prejudice." Here, there was simply no
    demonstration that the jurors were exposed to any form of communication that would
2   have adversely impacted their commitments to fairly and impartially weigh the
    evidence adduced at trial. The trial court did not abuse its discretion in denying
3   sequestration. NRS 175.391.

4   *Rogers v. State*, 101 Nev. 457, 462-63, 705 P.2d 664, 668 (1985).

5       Rogers did not raise this claim in his first state post-conviction action or his second state

6   post-conviction action.  *See* Exhibits P533, P556, P557, P560, P561.

7       In his third state post-conviction action, Rogers did raise this issue.  Exhibit P562, p. 12.  His

8   entire argument regarding this issue, in his petition in that action, was as follows:

9           The trial court refused to sequester the jury as requested by the defense.  Prior
            to and during the course of the trial a great deal of unfavorable publicity concerning
10          the Petitioner, the crimes charged and the trial, appeared in the local newspapers.

11  *Id*.  That claim was dismissed by the state district court on procedural grounds.  *See* Exhibit R5,

12  pp. 870, 881-82, 925.  The state district court's ruling was affirmed on appeal.  *See* Exhibit P564.

13      Now, in Ground 10 of his second amended petition in this case, Rogers shifts his focus, and

14  argues that sequestration was necessary on account of the activities of Posse Comitatus.  *See* Second

15  Amended Petition, pp. 179-80.  In state court, Rogers never made the argument that sequestration of

16  the jury was necessary because of Posse Comitatus.  And, Rogers never offered in state court the

17  following exhibits, which he now offers in this court in support of his claim:  Exhibits P211

18  (declaration of Russell Beckwith, a bailiff at Rogers' trial (¶5, concerning Posse Comitatus)), P213

19  (declaration of Suzzet Ramirez), P214 (declaration of Ahtrum L. Thunder), P215 (declaration of

20  David VanZant), P218 (declaration of Ken Ellsworth, former sheriff of Pershing County), P220

21  (declaration of Virginia Shane, Rogers' trial counsel (fifth paragraph, concerning Posse Comitatus)),

22  P223 (declaration of Daniel Levitas, purportedly an expert on Posse Comitatus), P224 (declaration

23  of Kelly D. Miller (¶¶5-7, regarding Posse Comitatus)), P301, P302, P303, P304, P323, P324, P325,

24  P327, P328, P329, P330, P331, P332, P333, P334, P335, P336, P337, P338, P339, P340, P341,

25  P342, P343, P344, P345, P346, P347, P348, P349, P350, P351, P352, P353, P354, P355, P356,

26  P357, P358, P359, P360, P361, P362, P363, P364, P365, P366, P367, P368, P369, P370, P371,

1    P372, P373, P374, P375, P376, P377, P378, P379, P380, P381, P382, P383, P384, P385, P386,

2    P387, P388, P389, P390, P391, P392, P393, P394, P395, P396, P397, P398, P399, P400, P401,

3    P402, P403, P404, P405, P406, P407, P408, P409, P410, P411, P412, P413, P414, P415, P416,

4    P417, P418, P419, P420, P421, P422, P423, P424, P425, P426, P427, P428, P429, P430, P431,

5    P432, P433, P434, P435, P436, P437, P438, P439, P440, P441, P442, P443, P444, P445, P446,

6    P447, P448, P449, P450, P451, P452, P453, P454, P455, P456, and P510.  Because this evidence

7    was not before the state courts, it is not considered in this court's analysis under 28 U.S.C.

8    § 2254(d).  *See Cullen*, 131 S.Ct. at 1398.

9        Viewed in the context of the evidence that was before the state courts, the Nevada Supreme

10   Court's ruling on Rogers' Ground 10 claim was not contrary to, or an unreasonable application of,

11   clearly established federal law, as determined by the Supreme Court, and was not based on an

12   unreasonable determination of the facts in light of the evidence presented in the state court

13   proceedings.  *See* 28 U.S.C. § 2254(d).  The court will deny habeas corpus relief with respect to

14   Ground 10.

15       Ground 11

16       In Ground 11, Rogers claims that he was denied his constitutional rights when the trial court

17   "tried three separate pleadings in a single proceeding."  Second Amended Petition, pp. 181-82.

18   Rogers' claim, as it appears in his second amended petition in its entirety, is as follows:

19       CLAIM ELEVEN

20           Mr. Rogers was denied his state and federal constitutional rights to due
         process and fundamental fairness when the trial court tried three separate pleadings in
21       a single proceeding.  U.S. Const. Amend. VI, VIII, XIV.

22       SUPPORTING FACTS

23           Mr. Rogers was charged with five felonies under three different informations
         with three different case numbers.  One of the informations alleged three counts of
24       murder, another the attempted murder of Ray Horn, and the third, grand larceny by
         stealing the Strodes' automobile.  The record indicates that the prosecutor never filed
25       a motion to consolidate, nor was an order entered consolidating the actions.

26

27

1        Mr. Rogers was convicted of grand larceny and ordered to serve ten years, consecutive to the death sentence.  Pet. Ex. 582 [Exhibit P582].

2

3        Due process and fundamental fairness compelled that each offense charged against Mr. Rogers required distinct consideration and review by the jury.  Due process and fundamental fairness are abused when the State tries an offense for which there is weak evidentiary support with an offense for which there is strong evidentiary support.  Due process and fundamental fairness are vitiated when the joinder may prevent the jury from making a reliable judgment on the weaker case based upon the strength of evidence in the stronger case.

4

5

6        The jury was asked to determine whether Mr. Rogers took the Strodes' automobile with the specific intent to permanently deprive them of such property. Pet. Ex. 576 at LW 4572, 4599 [Exhibit P576].  Evidence was introduced that Mark Rogers killed three persons he did not know while leaving $8,000.00 in cash in the victims' very small home. The nature of the offenses suggests that robbery was not the motive.  There was a myriad of evidence that Mr. Rogers was psychotic at the time of the offense.  See, testimony of Robert Schott, TT 11/17/81 at 459; David Hartshorn, 11/17/81 at 469.  In his psychotic condition, Mr. Rogers could have been taking the truck with the intent of fleeing for his life, and not with the intent of permanently depriving the Strodes or their beneficiaries of the property.  In fact, the testimony that Mr. Rogers even allegedly fired a pistol at, and chased another motorist, again without coherent motive, upon leaving the Strodes' residence. In short, there was no way to determine his motive given his mental illness.  He was certainly experiencing some distortion of reality if he attempted to shoot a total stranger passing him on the road. The evidence supporting any intent by Mr. Rogers of permanently depriving the Strodes of the automobile was very, very weak.

7

8

9

10

11

12

13

14

15   The trial court erred and due process and fundamental fairness were violated by trying the grand larceny information together with the murder and attempted murder charges.

16

17        Mr. Rogers is entitled to relief in the form of a new trial and new sentencing proceeding.  The above stated claim is of obvious merit. Competent appellate counsel would have raised and litigated this meritorious issue on direct appeal and in state post-conviction.  There is no reasonable appellate strategy, reasonably designed to effectuate petitioner's best interest, that would justify appellate counsel's failure in this regard. Petitioner is entitled to relief in the form of a new trial and sentencing hearing.

18

19

20

21   Second Amended Petition, pp. 181-82 (citations to the record in this case, in the form used in this

22   order, added in brackets).  After the respondents answered, Rogers did not further address this claim

23   in his reply.  *See* Reply (docket #121).

24        In the Nevada Supreme Court, on his direct appeal, Rogers argued that the five felonies, in

25   the three separate informations, were improperly joined for trial.  Exhibit, pp. 7-8. The Nevada

26   Supreme Court ruled as follows:

28

1
2
3
4
5
6

> [W]e are advised by the defendant that the criminal informations were improperly joined for trial because there was no express finding that the informations were suitable for joinder. This contention is also meritless. The evidence of grand larceny of the truck and the attempted murder of Ray Horn was admissible as evidence of flight from the scene of the homicides. Thus, the offenses constituted a single or continuing course of conduct that validated the joinder. There was no abuse of discretion. NRS 174.155; 174.165; *Lovell v. State*, 92 Nev. 128, 546 P.2d 1301 (1976). Moreover, defendant did not object to the consolidation of cases below and therefore is precluded from raising the issue for the first time on appeal. *McCullough v. State*, 99 Nev. 72, 657 P.2d 1157 (1983).

7   *Rogers v. State*, 101 Nev. 457, 465-66, 705 P.2d 664, 670 (1985).

8         Rogers did not raise this claim in his first state post-conviction action or his second state

9   post-conviction action. *See* Exhibits P533, P556, P557, P560, P561.

10         In his third state post-conviction action, Rogers did raise this claim. Exhibit P562, p. 11

11   (Ground 1 in third state post-conviction petition). The state district court dismissed that claim on

12   procedural grounds. *See* Exhibit R5, pp. 880, 981. The Nevada Supreme Court affirmed that ruling

13   on appeal. Exhibit P564.

14         Rogers cites to no United States Supreme Court precedent, and he provides no analysis at all

15   to support any argument that the Nevada Supreme Court's ruling was contrary to, or an

16   unreasonable application of, Supreme Court precedent. *See* 28 U.S.C. § 2254(d). The evidence

17   regarding the five charges against Rogers was all cross-admissible, and Rogers has not made any

18   showing how he might have been prejudiced by the joinder of those charges. The court will deny

19   habeas corpus relief with respect to Ground 11.

20         <u>Ground 13</u>

21         In Ground 13, Rogers claims that he was denied his constitutional rights when the trial court

22   limited his counsel's ability to question potential jurors regarding the verdicts they gave in previous

23   jury service. Second Amended Petition, pp. 184-85. Rogers' entire statement of his claim is as

24   follows:

25
26

29

CLAIM THIRTEEN

Mr. Rogers was denied his state and federal constitutional right to the effective assistance of counsel and a fair trial when the trial court limited trial counsel's ability to voir dire the venire. U.S. Const. Amends. V, VI, VIII, & XIV.

SUPPORTING FACTS

The trial court granted the State's motion in limine, preventing trial counsel from asking veniremembers what verdict they gave in their last jury service. TT 10/20/81 at 936 [Exhibit II(B), pp. 54-56]. Trial counsel argued that, as the district attorney personally tried most of the cases in the county, he had personal information regarding who was on what jury and what the verdict was. The trial court declared that the information on prior verdicts was available from the district court clerk, but trial counsel was not going to be allowed to ask the veniremen directly what their last verdict was. *Id.*

The concepts of due process and effective assistance of counsel require that trial counsel be able to get information from potential jurors so trial counsel can intelligently exercise peremptory challenges. A trial court's restriction upon inquiries at the request of counsel are subject to the essential demands of fairness. Trial courts prevent the intelligent exercise of peremptory challenges and deny due process, fairness, and effective assistance by denying trial counsel the opportunity to ask proper, relevant questions. Trial counsel wanted to ask for information from the jurors that the district attorney already possessed and that was readily available through a time-consuming process in the district court clerk's office. The information was relevant to the exercise of a peremptory challenge because it could reveal a bias towards the State. The trial court prevented trial counsel from asking a proper, relevant question and denied Mr. Rogers his state and federal constitutional rights [to] due process and effective assistance of counsel.

Mr. Rogers is entitled to relief in the form of a new trial and new sentencing proceeding. The above stated claim is of obvious merit. Competent appellate counsel would have raised and litigated this meritorious issue on direct appeal and in state post-conviction. There is no reasonable appellate strategy, reasonably designed to effectuate petitioner's best interest, that would justify appellate counsel's failure in this regard. Petitioner is entitled to relief in the form of a new trial and sentencing hearing.

Second Amended Petition, pp. 184-85. After the respondents answered, and Rogers had an opportunity to provide further briefing regarding this claim, Rogers did not further address it in his reply. *See* Reply.

Rogers raised this issue before the trial court by filing a written "Motion for Discovery Prior Jury Service (With Authority)." Exhibit I(I). The trial court entertained oral argument regarding that motion. Exhibit II(B), pp. 54-56. During the argument, the prosecution asked that the defense

1  be precluded from asking the prospective jurors what verdicts they reached during any previous jury

2  service, and the court granted that motion in limine.  *Id.*

3      On his direct appeal to the Nevada Supreme Court, Rogers asserted that the trial court

4  improperly limited the voir dire of prospective jurors by precluding his counsel from inquiring

5  about the verdicts reached by the prospective jurors in their previous jury service.  Exhibit P553,

6  pp. 15-17.  The Nevada Supreme Court ruled as follows:

7          Defendant asserts that by refusing to allow defense counsel to ask each juror
       what his or her individual verdict was in previous jury service the district court
8       unreasonably restricted voir dire.  Defendant has not shown that the court's
       restriction on questioning resulted in the inability of the defense to determine the
9       existence of prejudice on the part of any juror.  NRS 175.031; *Oliver v. State*, 85 Nev.
       418, 456 P.2d 431 (1969).  The court allowed extensive questioning regarding prior
10      jury service, *e.g.*, how many times the jurors had previously served, where they
       served, how long ago they served, whether it was a civil or criminal matter, and
11      whether the jury had arrived at a verdict.  Under these circumstances, the district
       court did not unreasonably restrict the voir dire examination.

12

13  *Rogers v. State*, 101 Nev. 457, 465, 705 P.2d 664, 670 (1985).

14      Rogers did not raise this claim in his first state post-conviction action or his second state

15  post-conviction action.  *See* Exhibits P533, P556, P557, P560, P561.

16      In his third state post-conviction action, Rogers asserted this claim, but it was dismissed on

17  procedural grounds.  *See* Exhibit R5, pp. 870, 882-83, 925.  That ruling was affirmed on appeal.

18  *See* Exhibit P564.

19      With respect to Ground 13, Rogers has cited no precedent at all relative to the claim he

20  asserts, much less any Supreme Court precedent.  There is no showing that the ruling on this claim

21  by the Nevada Supreme Court was contrary to, or an unreasonable application of, Supreme Court

22  precedent.  *See* 28 U.S.C. § 2254(d).  The court will deny relief on Ground 13.

23      Ground 19

24      In Ground 19, Rogers claims that his constitutional right to due process of law was violated

25  by the "trial court's admission of evidence regarding aggravating prior felony convictions."

26

31

1   Second Amended Petition, pp. 195-99.  In particular, Rogers alleges in Ground 19 that he was given

2   inadequate notice of the prosecution's intention to introduce such evidence.  *Id*.

3          On August 19, 1981, about two months before jury selection commenced and over three

4   months before the penalty phase of the trial commenced, the prosecution filed a notice of intent to

5   seek the death penalty, giving notice of four alleged aggravating circumstances.  Exhibit P589.

6   On December 1, 1981, the day the penalty phase of the trial commenced, the prosecution informed

7   the trial court that, six days earlier, on November 25, 1981, they filed notice of an additional

8   aggravating circumstance, and mailed the notice, by certified mail, to defense counsel.  Exhibit

9   P590; *see also* Exhibit V(F), pp. 5-6, 102.  The new aggravating circumstance was "[t]hat the

10  murder was committed by a person who was previously convicted of another murder or of

11  a felony involving the use or threat of violence to the person of another."  Exhibit P590 (citing

12  NRS 200.033(2)).  In addition to the formal notice mailed on November 25, 1981, counsel for both

13  the prosecution and the defense stated on the record that defense counsel had received actual

14  knowledge of the additional aggravating circumstance at least as early as November 12, 1981,

15  approximately two and a half weeks prior to the commencement of the penalty phase of the trial.

16  *See* Exhibit V(E), pp. 1215-16; Exhibit V(F), pp. 7-8.  The trial court found that the defense had

17  received sufficient notice under the Nevada statute, and allowed the prosecution to present evidence

18  of the additional aggravating circumstance.  Exhibit V(F), pp. 8, 102.

19         Rogers raised this issue on his direct appeal to the Nevada Supreme Court.  Exhibit P553,

20  pp. 50-52.  The Nevada Supreme Court ruled as follows:

21             Defendant next asserts that he was denied due process because, pursuant to
        NRS 175.552, one week's notice of the prosecution's intent to present evidence of the
22      aggravating circumstance of prior convictions involving violence was inadequate.
        From the date of the filing of the notice to seek the death penalty to the date of the
23      penalty hearing, defendant had over three months to develop mitigating
        circumstances.  Although he did not receive the formal notice of the aggravating
24      circumstance of prior felony convictions involving violence until approximately one
        week prior to commencement of the penalty phase, defense counsel stated on the
25      record that he had actual knowledge of the additional aggravating circumstance at
        least approximately two and one-half weeks prior to the commencement of the

26

32

1    penalty hearing.  Thus, there was adequate time to prepare a challenge to this
     aggravating circumstance, and this contention is without merit.

2

3    *Rogers v. State*, 101 Nev. 457, 466-67, 705 P.2d 664, 670-71 (1985).

4         Rogers did not raise this claim in his first state post-conviction action or his second state

5    post-conviction action.  *See* Exhibits P533, P556, P557, P560, P561.

6         In his third state post-conviction action, Rogers asserted this claim, but it was dismissed on

7    procedural grounds.  *See* Exhibit R5, pp. 870, 884-87, 925. The state district court's ruling was

8    affirmed on appeal.  *See* Exhibit P564.

9         Here again, in order to show that federal habeas corpus relief is warranted, Rogers must

10   show that the Nevada Supreme Court's ruling was contrary to, or an unreasonable application of,

11   United States Supreme Court precedent, or that it was based on an unreasonable determination of the

12   facts in light of the evidence presented in the state court proceedings.  *See* 28 U.S.C. § 2254(d).

13        With respect to the facts, Rogers does not make any showing that the Nevada courts made

14   any unreasonable finding.  As the Nevada Supreme Court found, the record reveals that Rogers'

15   counsel received actual notice of the fifth aggravating circumstance at least as early as two and a

16   half weeks before the penalty phase of his trial commenced, and that formal notice of the fifth

17   aggravating circumstance was mailed to his counsel six days before the penalty phase commenced.

18   *See* Exhibit V(E), pp. 1215-16; Exhibit V(F), pp. 5-8, 102.  There is no dispute regarding these facts.

19   *See* Second Amended Petition, pp. 195-99.

20        With regard to the law, Rogers does not cite any precedent whatsoever, much less any United

21   States Supreme Court precedent, in support of his claim.  *See* Second Amended Petition, pp. 195-99;

22   *see also* Reply (no discussion of Ground 19 in reply).  Rogers has not shown the ruling of the

23   Nevada Supreme Court regarding this claim to be contrary to, or an unreasonable application of,

24   United States Supreme Court precedent.  The court will, therefore, deny habeas corpus relief with

25   respect to Ground 19.

26

                                                    33

1          Grounds 20, 21, and 23

2          Grounds 20, 21, and 23 concern the two aggravating circumstances found by the jury to be

3   established, and upon which the jury found Rogers eligible for the death penalty.  The court finds

4   that these claims have merit, that Rogers' constitutional rights were violated, that the constitutional

5   errors were not harmless, and that the state courts' rulings to the contrary were an unreasonable

6   application of clearly established federal law, as determined by the Supreme Court of the United

7   States.

8          Grounds 20 and 21 – The Purported Ohio Convictions

9          In Grounds 20 and 21, Rogers claims that his constitutional rights were violated because the

10  State knowingly offered false and misleading evidence in aggravation of murder, and his counsel

11  was ineffective for not challenging that evidence.  Second Amended Petition, pp. 200-08.  The

12  subject of Grounds 20 and 21 is Rogers' alleged prior felony convictions in Ohio, which the

13  prosecution sought to prove in the penalty phase of the trial as an aggravating factor.  Rogers claims

14  that one of the two was, in fact, not a conviction, as he pled guilty in that case but the guilty plea

15  never resulted in a conviction.  *Id*.

16         In the penalty phase of Rogers' trial, the prosecution presented evidence regarding two Ohio

17  criminal cases, primarily through the testimony of Eric Pierson, a probation officer from Ohio.

18  Exhibit V(F), pp. 12-22.  Officer Pierson testified, based upon his review of various documents, that

19  Rogers had pled guilty to a felony aggravated assault charge in 1976 and another in 1977.  *Id*.  He

20  testified that, for the 1976 aggravated assault, Rogers received a sentence of one to five years in

21  prison, and that sentence was suspended and he was placed on one year of probation.  *Id*. at 17.

22  With regard to the 1977 charge, Officer Pierson testified that Rogers pled guilty but failed to appear

23  for a pre-sentence hearing.  *Id*.  There was no mention by Officer Pierson of a sentencing, or a

24  judgment of conviction, with regard to the 1977 case.  *See id*. at 12-22.

25         The jury found established the aggravating circumstance that Rogers had previously been

26  convicted of a felony involving the use or threat of violence to the person, as well as the aggravating

34

circumstance that the murder involved torture, depravity of mind or the mutilation of the victim

(discussed below, with regard to Ground 24).  Exhibit III(F).  The jury found that there were not

mitigating circumstances sufficient to outweigh the aggravating circumstances.  *Id*.  The jury,

therefore, found Rogers eligible for the death penalty and imposed the sentence of death upon him

for each of the three murder convictions.  *Id*.

   Rogers did not raise, on his direct appeal to the Nevada Supreme Court, any of the issues he

raises in Grounds 20 and 21.  *See* Exhibit P553.  Pursuant to NRS 177.055, however, on the direct

appeal, the Nevada Supreme Court was automatically charged with reviewing the record to

determine, among other things, "[w]hether the evidence supports the finding of an aggravating

circumstance or circumstances," NRS 177.055(2)(c), and the Nevada Supreme Court ruled as

follows in that regard:

>   The jury found as aggravating circumstances that the murders were committed
> by a person who was previously convicted of a felony involving the use or threat of
> violence to the person of another, NRS 200.033(2), and that the murders involved
> torture, depravity of mind or the mutilation of the victims, NRS 200.033(8).  The jury
> found no mitigating circumstances sufficient to outweigh the aggravating
> circumstances.  The prior aggravated assault convictions were felonies involving
> violence which would support the finding of that aggravating circumstance.  *Bolden
> v. State*, 97 Nev. 71, 624 P.2d 20 (1982).  The evidence of physical abuse in the
> stabbing of Emery and Mary, the execution of Miriam, and the struggle with Emery
> before he and the other victims were shot supports the finding that the murders
> involved torture, depravity of mind or the mutilation of the victims.  *Cf. Godfrey v.
> Georgia*, 446 U.S. at 420, 100 S.Ct. at 1759 (1980).

*Rogers v. State*, 101 Nev. 457, 470, 705 P.2d 664, 673 (1985).

   In Rogers' first petition for post-conviction relief in state court, he claimed that his trial

counsel were ineffective for not adequately investigating his background in Ohio, including his

purported felony convictions.  *See* Exhibit P557.  The state district court denied that petition,

without any discussion of trial counsel's failure to challenge the alleged Ohio convictions.  Exhibit

R7, pp. 435-39.  Rogers appealed, and the Nevada Supreme Court dismissed the appeal.  Exhibit

P533, P558.  The court did not address the issue of trial counsel's failure to contest the alleged prior

convictions; rather, as on the direct appeal, the court appears to have assumed that there were two

valid convictions in Ohio, and that there was no harm in counsel's failure to challenge them. *See* Exhibit P558, pp. 2-3 ("In the post-conviction relief hearing, Rogers explained his side of his prior felony convictions in Ohio which were used as aggravating circumstances for the penalty hearing.").

In Rogers' second state post-conviction action, he did not raise, before the Nevada Supreme Court, any of the issues raised in Grounds 20 and 21 of his second amended habeas petition in this case. *See* Exhibits P560, P561.

In Rogers' third state post-conviction action, he claimed that the 1977 case in Ohio did not result in a conviction. Exhibit P562, pp. 24-27. And, in that third state post-conviction petition, Rogers also claimed that his trial counsel were ineffective for failing to investigate his purported prior convictions and for failing to ascertain that he had not been convicted in the 1977 case. *Id*. at 42. The State moved to dismiss the petition on procedural grounds. Exhibit R4, p. 678. On July 13, 1999, the state district court granted that motion in part and denied it in part, dismissing certain of Rogers' claims and ordering the State to answer certain of his claims. Exhibit R5, p. 869. In the July 13, 1999 order, the state district court ruled that certain of Rogers' claims regarding the purported Ohio convictions could be relitigated, and the State was ordered to answer those claims. *See* Exhibit R5, pp. 31-35, 55-57. On May 1, 2000, the state district court dismissed all Rogers' remaining claims, and, in that order, the court concluded as follows, regarding Rogers' claims concerning his alleged prior convictions:

> This claim alleges that there was insufficient evidence that Rogers had previously been convicted of a felony involving the use or threat of violence against another person. Specifically, that there was not proper or sufficient evidence regarding the two "convictions" from Ohio.
>
> The court discussed these issues at pp. 32-35 of the July 13, 1999, Order. The court concluded that Rogers arguably suffered actual prejudice because there may not have been a valid aggravator. Furthermore, there was a possibility of a fundamental miscarriage of justice at the penalty hearing. The court believes these are valid concerns. Nevertheless, there is sufficient evidence to uphold one of the prior Ohio convictions, and, therefore, the Petition must fail.

36

1      The Warden has made very good procedural arguments regarding the ability of Rogers to raise the issue at this time. *See* Answer, pp. 16-20. This court concludes that those arguments are valid with regard to the Ohio offenses. Moreover, the substantive arguments are also valid with regard to the 1976 conviction. The Nevada Supreme Court has already ruled that sufficient credible, admissible evidence was presented at the sentencing hearing to support the finding of prior felony convictions for crimes of violence. *Rogers v. State*, 101 Nev. 457, 466 (1985).

      The Court did not discuss each prior offense. The Court lumped them together. It appears obvious now that only one conviction had been entered. The use of the word "convictions" was imprecise. The Court, however, apparently focused on the circumstances of the prior convictions. Therefore, the more accurate description would have been prior "offenses," not "convictions."

      The evidence of the 1977 offense would have been admissible even though it was not a conviction. No statute or court decision precluded evidence of the 1977 offense because no judgment of conviction was entered. Rather, the fact of a certified judgment of conviction affirmatively guarantees admissibility and proof beyond a reasonable doubt.

      The circumstances of the 1977 offense were admissible on their own merit. *See* NRS 47.020(3)(c) (Title 4 [evidence code] not applicable at sentencing); NRS 47.250(11) (disputable presumption in favor of judicial record, even if not conclusive); *Riker v. State*, 111 Nev. 1316, 1326-27 (1995) (evidence of uncharged murders admissible after any aggravating circumstance proved beyond a reasonable doubt; *Allen v. State*, 99 Nev. 485, 488 (1983) (character evidence admissible even though it is not a statutory aggravating factor).

      Thus, evidence of the 1976 conviction rendered evidence of the 1977 offense admissible. Moreover, the only reason there was not a judgment of conviction is because Rogers failed to appear for sentencing following his guilty plea. Is this situation analogous to one in which an inmate escapes while his case is on appeal, and the court declares the appeal legally abandoned?

      The failure of trial counsel to object to the 1977 "conviction" is of little consequence. An objection would have been overruled and the jury would have heard the same evidence. The closing argument and jury instructions would have been slightly different if there had been an objection. Nevertheless, it stretches credulity to argue that the jury's decision to return a verdict of death would have turned on the formality of a judgment of conviction being entered for the 1977 offense, as opposed to a mere guilty plea. Therefore, the failure of counsel to object, adequately research in Ohio, or argue more effectively during appellate or post-conviction proceedings, did not render the result unreliable or establish that the result would have been different. *See Strickland v. Washington*, 466 U.S. 668 (1984). Therefore, Claim 21 is dismissed.

Exhibit R5, pp. 977-79.

37

1    Rogers appealed from the dismissal of his third state post-conviction petition.  *See* Exhibit

2    P563.  On May 13, 2002, the Nevada Supreme Court affirmed.  Exhibit P564.  Regarding Rogers'

3    claims concerning his purported Ohio convictions, the Nevada Supreme Court stated:

4         Second, Rogers challenges the sufficiency of the evidence for the aggravating
         circumstance that he had been previously convicted of a felony involving the use or
5         threat of violence to another person.  At trial, the prosecution argued that Rogers had
         two prior felony convictions in Ohio for aggravated assault, and on direct appeal this
6         court referred to his prior felony "convictions."  [Footnote:  *Rogers*, 101 Nev. at 466,
         470, 705 P.2d at 670, 673.]  Rogers claims that this was erroneous because he had
7         only one prior conviction for aggravated assault occurring in 1976.  Although he was
         also charged with two counts of felonious assault in 1977 and pled guilty to one count
8         of aggravated assault, he later failed to appear and was never sentenced on the
         reduced charge.  Thus he contends that no conviction ever resulted because a valid
9         conviction requires that a sentence be imposed.  He cites NRS 176.105, which
         requires that a judgment of conviction set forth among other things the sentence.
10        The district court concluded that only the 1976 conviction had been entered but that
         evidence of the 1977 offense was nevertheless admissible, so trial counsel's failure to
11        challenge the evidence was of no consequence.  Also, the 1976 conviction alone was
         sufficient basis for the aggravator.  We agree with the district court's reasoning, but
12        there is a more basic reason why Rogers's claim has no merit.

13        Imposition of a sentence is not required for a conviction under NRS
         200.033(2).  Neither the district court nor the parties addressed this statute, which
14        provides that "a person shall be deemed to have been convicted at the time the jury
         verdict of guilt is rendered or upon pronouncement of guilt by a judge or judges
15        sitting without a jury."  We conclude that the trial court makes a pronouncement of
         guilt once it accepts a defendant's guilty plea as valid.  This is the point in the
16        proceedings which is equivalent to a jury's rendering of a guilty verdict.  Thus, under
         NRS 200.033(2) a valid conviction existed for Rogers's 1977 offense.

17

18   Exhibit P564, pp. 6-7.

19        In the penalty phase of the trial, the prosecution introduced, through Officer Pierson, the

20   following exhibits relative to Rogers' purported Ohio convictions:  a photograph of Rogers;[13]

21   a copy of a pre-sentence report in an Ohio criminal case identified as Case Number 76 CR 334

22   (Exhibit P309);[14] a copy of a pre-sentence report in an Ohio criminal case identified as Case Number

23   ───────────────────

24        [13] When Rogers lived in Ohio, he was known as Mark Joseph Heyduk.  In his testimony, Officer
     Pierson referred to Rogers by that name.

25
         [14] In the trial transcript, the case number is erroneously reported as 76 CR 344; the actual case
26   number was 76 CR 334.  *See* Exhibit P309 (pre-sentence report in Case Number 76 CR 334).

77 CR 250 (Exhibit P310); a copy of a written plea of guilty by Rogers in Case Number 76 CR 334 (Exhibit P311); a copy of a written plea of guilty by Rogers in Case Number 77 CR 250 (Exhibit P312); a copy of the indictment in Case Number 77 CR 250 (Exhibit P313); a copy of a bench warrant issued for Rogers' arrest for failure to appear at a pre-sentence hearing in Case Number 77 CR 250 (Exhibit P314); a copy of a court "journal entry" reflecting a bond forfeiture in which Rogers' bond in Case Number 77 CR 250 was forfeited after his failure to appear (Exhibit P315); a copy of a court journal entry, regarding Case Number 77 CR 250, reflecting the court's acceptance of Rogers' plea of guilty to one count of aggravated assault, and the court's referral of Rogers to the probation department for a pre-sentence report (Exhibit P316); and a copy of a court journal entry, regarding Case Number 76 CR 334, indicating that, in that case, Rogers received a sentence of from one to five years in prison, the sentence was suspended, and Rogers was placed on one year of probation (Exhibit P317).  *See* Exhibit V(F), pp. 13-18.  Officer Pierson testified that his probation department had prepared two pre-sentence reports regarding Rogers, and that his department had Rogers on probation for Case Number 76 CR 334.  Exhibit V(F), p. 18.  Officer Pierson also testified that there were two outstanding arrest warrants for Rogers, "one for probation violation and another for failing to appear for the pre-sentence hearing."  *Id*.  On cross-examination, defense counsel elicited some general information from Officer Pierson regarding the events that led to the Ohio criminal cases, and information regarding the probation violation.  *Id*. at 19-22.

The prosecution then called to the witness stand Ralph Nicholas Forte, a police officer from Ohio.  Exhibit V(F), p. 23.  Officer Forte testified that in 1976 Rogers was indicted for sale of hashish, and that, following that indictment, Rogers became an informant.  *Id*. at 24-25.  Officer Forte testified that he worked closely with Rogers for about seven months, and, during that time, he became close to Rogers and his wife.  *Id*. at 25.  Officer Forte testified about problems that he had with Rogers during and after the time that he was working with him as an informant:  Rogers provided drugs to Forte's wife; Rogers was found in possession of weapons and burglary tools; Rogers used drugs; Rogers "stabbed two people" and was charged with crimes over that; and Rogers

1   threatened him.  *Id*. at 25-30.  On cross-examination, defense counsel established that threats by

2   informants were not uncommon, that Rogers had been a good informant, and that Rogers never

3   acted on the threats.  *Id*. at 30-35.

4        Rogers' counsel called no witnesses and presented no evidence in the penalty phase of the

5   trial.  *See* Exhibit V(F), p. 42.

6        In his closing argument, regarding Rogers' purported Ohio convictions, the prosecutor

7   argued as follows:

8             But, first let's go through the process of the five aggravating circumstances.

9             First, it is alleged that the murders, the three murders of which the defendant
          has now been convicted of, were committed by a person who was previously
10        convicted of a felony involving the use or threat of violence to the person of another.

11            Ladies and gentlemen, you haven't yet had the opportunity to examine those
          documents but in those documents it's important that you go through them to see
12        what is contained in them.

13            We are, first of all, dealing with this individual.

14            Now, this is readily recognizable as the defendant in this matter.

15            Can there be any doubt in your mind that he has been convicted of felonies
          that involve, as the statute sets forth, threats or violence to the person of another?
16
17            You are going to find that this defendant plead guilty through documents he
          signed on two occasions in the State of Ohio where he plead guilty with one incident
          where two different people were stabbed.
18
19            Here are two pre-sentence reports, Plaintiff's Exhibits 189 and 190.

20            A pre-sentence report is a shortened life history of that man.  You are going to
          know about him.

21            I'm sure those are some of the questions you had in your minds.

22            What kind of person is that dangerous person?

23            Well, these will help you answer that question.  These set forth what
          happened to him in Ohio where he was convicted of felonies.
24
25            These documents show that beyond a reasonable doubt and even puts forth his
          version of what happened.

26

40

1

2          You are going to find a pattern running in his life as you read these and I'm
       not going to take the time to do that but it's important that you do that because it tells
       you about him from the time he was in school and up through his life and the things
3      that evolved in his life and the kind of person he is because that certainly has to do
       with some things later on that you are going to evaluate.

4          But, first of all, we have crossed the first step.

5          The State has proved to you and when you read those documents it will show
       what he was convicted of and this is categorized beyond a reasonable doubt.  There is
6      no argument there.

7   Exhibit V(F), pp. 56-57.  Defense counsel responded, in the defendant's closing argument, with

8   regard to the purported prior convictions, as follows:

9          True, he does have prior convictions and they are felonies and they are – or
       they did involve violence.
10
           But, I think as you have learned today there were some other factors involved
11     in those cases.

12         I think you are going to have to look at the fact that he was a young man.  We
       are talking about someone who was not old, twenty years old, – nineteen years old, in
13     fact when the first one occurred and twenty when the second one occurred.

14         The first incident was at a party where both people had been drinking and
       Mark suffered a broken nose and another gentleman was cut by a glass that was in
15     Mark's hand.

16         Again, I'm not saying that condones what happened.

17         I am saying that I think there is an explanation here and he was not out
       somewhere robbing a grocery store and he shot someone or something like that.
18
           This was a drunken brawl between teenagers who were at a party and that
19     should be taken into consideration when you consider that.

20                              *    *    *

21         To get back to the second incident, as the report indicated, here he was in an
       area where he shouldn't have been because those people knew or had strong
22     indications that Mark was an informant and the prosecutor kept referring to him as a
       snitch and that is a pretty low thing to be especially when you are twenty years old.
23
           That led to some type of confrontation and some people were hurt and, again,
24     I'm not offering that to say what Mark Rogers did was not a bad thing and I am not
       offering it for an answer to what Mark did as an excuse for what he did as we can't.
25
           It was a mistake and it was part of his life but, again, I don't think it's the
26     same situation as your normal criminal.

                                41

1         I don't think we have that here and I think we have a kid caught up and
2 brought up in a struggle that is so [prevalent] nowadays.

        I think that should be taken into consideration when you seriously look at this
3 case as I'm sure you will.

4 *Id*. at 69-71.  Then, in further closing argument, the prosecutor argued as follows:

5         Remember, there is only one aggravating circumstance that you have to find.

6         I don't know if you were mislead by the various numbers but you only have to
7 find one and there is more than one.

        Is there any possibility this defendant will ever be rehabilitated?
8
        Was it a mitigating circumstance that the defendant was laboring under some
9 kind of mental factor or stress factor?

10         If that's true – and I told you that you would have to answer that and here it is.

11         If that is true, why did he stab a man in Ohio?

12         Why did he cut up another man?

13         Has he been laboring under that defect since 1977?

14         If so, ladies and gentlemen, he should have been dealt with a long time ago.

15         Because, the fact is he went into a court and was put on probation after he
16 stabbed a man – you can read about it.  You can read about the facts.  I didn't make
them up.

17         If that is the defense for him now, then why did he do it then, back then, four
18 or five years ago?

        The truth is – the truth is the defendant has been a pretty mean and vicious
19 person all his life.

20 *Id*. at 99-100.

21     There was no evidence showing that Rogers was convicted in Ohio Case Number 77 CR 250.

22 *See* Exhibit V(F), pp. 12-42.  On the contrary, the evidence indicated that Rogers *had not been*

23 *convicted* in that case because he failed to appear at a pre-sentence hearing.  *See id*.  Rogers' counsel

24 apparently did not recognize this, and, remarkably, instead of calling to the attention of the jury the

25 lack of evidence of a conviction in Case Number 77 CR 250, Rogers' counsel conceded there had

26 been a conviction in that case.  *See id*. at 69-71.

42

1    Under the Fourteenth Amendment to the United States Constitution, the State may not

2 knowingly use false evidence to obtain a criminal conviction. *Napue v. Illinois*, 360 U.S. 264, 269

3 (1959); *Hayes v. Brown,* 399 F.3d 972, 978 (9th Cir.2005). Deliberate deception of a judge or jury

4 is "inconsistent with the rudimentary demands of justice." *Mooney v. Holohan*, 294 U.S. 103, 112

5 (1935). Thus, "a conviction obtained through use of false evidence, known to be such by

6 representatives of the State, must fall under the Fourteenth Amendment." *Napue*, 360 U.S. at 269

7 (citations omitted). The state violates a criminal defendant's right to due process of law even when,

8 although not soliciting false evidence, it allows false evidence to go uncorrected when it appears.

9 *Hayes*, 399 F.3d at 978, citing *Alcorta v. Texas*, 355 U.S. 28 (1957); *Pyle v. Kansas*, 317 U.S. 213

10 (1942). Rogers, however, has not shown that any evidence presented by the prosecution was false.

11 Officer Pierson did not testify that Rogers had been convicted in Case Number 77 CR 250, and none

12 of the documentary evidence presented by the prosecution indicated that he had. *See* Exhibit V(F),

13 pp. 12-23.

14    It is a closer question whether the prosecutor's argument was deceptive or misleading in this

15 regard. In his closing argument, the prosecutor artfully asked the rhetorical question: "Can there be

16 any doubt in your mind that he has been convicted of felonies that involve, as the statute sets forth,

17 threats or violence to the person of another?" Exhibit V(F), p. 56. The prosecutor there referred to

18 "felonies" – in the plural. And, a few moments later, the prosecutor again referred to felony

19 convictions, in the plural: "These set forth what happened to him in Ohio where he was convicted of

20 felonies." *Id*. at 57. Certainly, the prosecutor did nothing in his closing argument to prevent any

21 misconception that Rogers was convicted in Case Number 77 CR 250, and, by twice referring to

22 "felonies," in the plural, the prosecutor arguably helped foster such a misconception. This court,

23 however, does not find, on the evidence properly before it, that there was any deception by the

24 prosecution so great that the court can say that the Nevada courts' ruling on this part of Rogers'

25 claims was an unreasonable application of federal law, or an unreasonable determination of the facts

26 in light of the evidence presented. *See* 28 U.S.C. § 2254(d).

The court comes to a different conclusion, however, with respect to Rogers' claims of ineffective assistance of counsel in Grounds 20 and 21.  Under *Strickland*, an attorney's representation of a criminal defendant is ineffective, in violation of the defendant's federal constitutional rights, if the representation falls below an objective standard of reasonableness, and if the deficient representation prejudices the defendant such that there is a reasonable probability that, but for the deficient representation, the result would have been different.  *Strickland*, 466 U.S. at 688, 694.  This court finds that Rogers' counsel acted in an objectively unreasonable manner in failing to conduct even the most basic research regarding Rogers' purported prior convictions, in failing to recognize that there was no evidence of a conviction in Ohio Case Number 77 CR 250, in failing to challenge the prosecution's assertion that there was such a conviction, and in conceding the existence of that conviction.  The performance of Rogers' counsel, in this regard, fell below any conceivable objective standard of reasonableness.  *See Strickland*, 466 U.S. at 688, 694; *see also Rompilla v. Beard,* 545 U.S. 374, 380-90 (2005) (performance of trial counsel in capital case deficient where counsel failed to examine files related to prior convictions presented by the prosecution as aggravating circumstances, which files were readily available to counsel during the trial).

Rogers proffers several new exhibits in support of his claims in Grounds 20 and 21 (including Exhibits P221 (Declaration of Ohio attorney Jeffrey Gamso), P318 (court minutes regarding Case Number 77 CR 250), P321 (letter dated January 27, 1981, from Ohio probation officer John J. Hurley to Agent Rick Cornish, of the Nevada Division of Investigation & Narcotics), P569 (*Nolle Prosequi* Order in Case Number 77 CR 250), P602 (criminal complaint relative to Case Number 77 CR 250), and P604 (police report relative to Case Number 76 CR 334)).  That evidence was not presented in state court; therefore, it is not admissible in this federal habeas corpus action.  *See Cullen*, 131 S.Ct. at 1398.  Nonetheless, this court still concludes, based upon the transcript of the penalty phase of the trial and the exhibits introduced in the penalty phase of the trial, that

1    counsel's performance was objectively unreasonable, and that the state courts' rulings to the

2    contrary were an unreasonable application of *Strickland*.

3          The Nevada Supreme Court based its ruling regarding this claim, in part, on the following:

4                Imposition of a sentence is not required for a conviction under NRS
         200.033(2).  Neither the district court nor the parties addressed this statute, which
5        provides that "a person shall be deemed to have been convicted at the time the jury
         verdict of guilt is rendered or upon pronouncement of guilt by a judge or judges
6        sitting without a jury."  We conclude that the trial court makes a pronouncement of
         guilt once it accepts a defendant's guilty plea as valid.  This is the point in the
7        proceedings which is equivalent to a jury's rendering of a guilty verdict.  Thus, under
         NRS 200.033(2) a valid conviction existed for Rogers's 1977 offense.

8

9    Exhibit P564, pp. 6-7.  However, the language in NRS 200.033(2), respecting the definition of

10   "conviction," was only added to the statute in 1997 – *more than 15 years after the crimes for which*

11   *Rogers was convicted and sentenced to death*.  *See* Statutes of Nevada 1997, ch. 356.  Whatever

12   effect that language in the current version of NRS 200.033(2) might now have on the definition of

13   "conviction" in that statute, that language was not in the statute in 1981, and it has no effect on the

14   question of the performance of Rogers' counsel at his trial.  *See Strickland*, 466 U.S. at 688-89

15   (ineffective assistance of counsel, in violation of the Sixth Amendment, is representation that falls

16   "below an objective standard of reasonableness" in light of "prevailing professional norms" at the

17   time of the representation); *see also Bobby v. Van Hook*, — U.S. —, —, 130 S.Ct. 13, 16-17 (2009).

18   Furthermore, the Nevada legislature specifically made the 1997 amendments to NRS 200.033(2)

19   applicable only to crimes committed after the passage of those amendments.  *See* Statutes of Nevada

20   1997, ch. 356, § 2.  And, moreover, any application of the 1997 amendments to NRS 200.033(2), in

21   this case, to add weight to an aggravating circumstance to support Rogers' death sentence, would

22   violate the Ex Post Facto Clause of the United States Constitution.  *See* U.S. Const. art. I, § 10, cl. 1;

23   *see also Collins v. Youngblood*, 497 U.S. 37 (1990) (law that aggravates a crime, after it was

24   committed, violates Ex Post Facto Clause); *Weaver v. Graham*, 450 U.S. 24, 30 (1981) (change in

25   sentencing procedures violates ex post facto clause "if it is both retrospective and more onerous

26   than the law in effect on the date of the offense"); *United States v. Crozier*, 777 F.2d 1376, 1383

                                              45

1   (9th Cir.1985) (Ex Post Facto Clause bars any law that "imposes a punishment for an act which was

2   not punishable at the time [the act] was committed, or any law which imposes punishment greater

3   than the punishment prescribed when the act was committed"); *see also United States v. Schram*, 9

4   F.3d 741, 742 (9th Cir.), *cert. denied*, 510 U.S. 982 (1993) (citing *Weaver*, 450 U.S. at 29) (to prove

5   Ex Post Facto Clause violation, defendant must show (1) that the law at issue disadvantages him and

6   (2) that the law is retrospective, in that it applies to events occurring before its enactment).

7       Turning to the prejudice prong of the *Strickland* analysis, the court concludes that there is a

8   reasonable probability that, had Rogers' counsel contested the existence of a conviction in Ohio

9   Case Number 77 CR 250, the result of the penalty phase of the trial would have been different.  *See*

10  *Strickland*, 466 U.S. at 688, 694. The alleged conviction in Ohio Case Number 77 CR 250

11  represented a substantial portion of the weight that the jury could properly assign to aggravating

12  circumstances; it was one of two purported prior convictions.  Beyond the prior-convictions

13  aggravating circumstance, there were no other constitutionally sound aggravating circumstances.

14  *See* discussion, *infra*, regarding depravity-of-mind aggravating circumstance.  On the other side of

15  the balance, there was a mitigating circumstance with significant weight: the evidence indicated that,

16  at the time of the murders, Rogers was mentally ill, and under the influence of extreme mental and

17  emotional disturbance.  *See* discussion regarding harmless error, *infra*.  The court finds, therefore,

18  that had Rogers' counsel performed in a reasonable manner, and informed the jury that there was no

19  conviction in Ohio Case Number 77 CR 250, there is a reasonable probability that the jury would

20  have found mitigating circumstances to outweigh aggravating circumstances, and would have found

21  Rogers ineligible for the death penalty.

22      In sum, then, the court concludes that Rogers' trial counsel was ineffective, in violation of

23  his federal constitutional rights, in not challenging the State's showing that he had been convicted in

24  Ohio Case Number 77 CR 250, and in conceding that there was a conviction in that case, Rogers

25  was thereby prejudiced, and the state courts' rulings to the contrary were an unreasonable

26  application of *Strickland*.

1
<u>Ground 23 – The Depravity of Mind Aggravating Circumstance</u>

2       Rogers claims in Ground 23 that "the trial court's instruction on, and jury finding of, the

3  aggravating circumstance that the murder involved torture, depravity of mind, and mutilation, were

4  unconstitutionally vague," in violation of his constitutional rights.  Second Amended Petition,

5  pp. 211-12.

6       In the penalty phase of the trial, the jury instructions given by the court, regarding the

7  torture, depravity of mind, or mutilation aggravating circumstance, were as follows:

8              You are instructed that an aggravating circumstance of murder in the First
        Degree is where the murder involved torture, depravity of mind, or the mutilation of
9       the victim.

10                                    *     *     *

11             The essential elements of murder by means of torture are:

12             (1)     the act or acts which caused the death must involve a high degree of
        probability of death, and,
13
               (2)     the defendant must commit such act or acts with the intent to cause
14      cruel pain and suffering for the purpose of revenge, persuasion or for any other
        sadistic purpose.
15
               The crime of murder by torture does not necessarily require any proof that the
16      defendant intended to kill the deceased nor does it necessarily require any proof that
        the deceased suffered pain.
17
                                      *     *     *
18
               The condition of mind described as depravity of mind is characterized by an
19      inherent deficiency of moral sense and rectitude.  It consists of evil, corrupt and
        perverted intent which is devoid of regard for human dignity and which is indifferent
20      to human life.  It is a state of mind outrageously, wantonly vile, horrible or inhuman.

21                                    *     *     *

22             You are instructed that the term "mutilate" means to cut off or permanently
        destroy a limb or essential part of the body, or to cut off or alter radically so as to
23      make imperfect.

24

25

26

47

1   Exhibit P583, Instructions 13, 14, 15, and 16; *see also* Exhibit V(F), p. 46.[15]

2          Citing *Godfrey v. Georgia*, 446 U.S. 420 (1980), Rogers argues that the phrase "depravity of

3   mind" is unconstitutionally vague.

4          Rogers asserted this claim on his direct appeal, Exhibit P553, pp. 52-55, and the Nevada

5   Supreme Court ruled against him, as follows:

6              Rogers also claims that the aggravating circumstance set forth in NRS
       200.033(8), *i.e.*, that the murder involved torture, depravity of mind or mutilation of
7      the victim, is unconstitutionally vague. He is wrong. We have recently determined
       that NRS 200.033(8) provides adequate guidance to the jury when the district court
8      defines for the sentencing panel the terms "torture," "depravity of mind" and
       "mutilate," as that definitional language is plain and intelligible. [*Deutscher v. State*,
9      95 Nev. 669, 669, 601 P.2d 407, 407 (1979)]. In the instant case, the district court
       defined the terms for the sentencing panel with the definitions approved in *Deutscher*.
10     The statute is constitutional.

11             In *Godfrey v. Georgia*, 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980),
       the United States Supreme Court held that the application of a statute containing
12     language similar to that found in NRS 200.033(8) was unconstitutional where both
       the victims died instantaneously. *Godfrey* is distinguishable from the instant case. In
13     that case, the Court held there was insufficient evidence to prove that the victims had
       been tortured or mutilated or that the murder had been committed with depravity of
14     mind. In the instant case, however, three victims were repeatedly shot and stabbed.
       One of Emery's gunshot wounds revealed that it was a post-mortem wound, or had
15     been inflicted shortly before his death. Mary was first stabbed in the back and then
       shot in the chest at close range when she was near death. Meriam Strode Treadwell
16     was shot once in the back in an execution-type killing, in which she was kneeling and
       the gun was pressed directly against her body. Under these circumstances, the jury
17     was justified in finding the aggravating circumstance that the victims were tortured
       and the murders were committed with depravity of mind.

18

19  *Rogers v. State*, 101 Nev. 457, 467-68, 705 P.2d 664, 671-72 (1985) (footnote omitted).

20         In Rogers' first state post-conviction action, he claimed that he was denied his constitutional

21  rights "in that the aggravating circumstance that the murder involved torture and depravity of mind

22  is constitutionally inapplicable...." Exhibit P557. The state district court dismissed that claim

23

24  _____

25         [15]   The defense requested the following jury instruction, but it was not given: "The words
    depravity of mind as used here mean a degree of moral turpitude and psychical debasement surpassing
26  that inherent in the definition of ordinary legal malice and premeditation." Exhibit P583, Instruction
    H; *see also* Exhibit V(F), pp. 40-41.

1    because it had already been addressed on Rogers' direct appeal.  *See* Exhibit R7, p. 438.  Rogers

2    appealed, but did not raise the issue on the appeal.  *See* Exhibit P533.

3            In his second state post-conviction action, Rogers did not raise, before the Nevada Supreme

4    Court, the claim asserted in Ground 23 in this case.  *See* Exhibits P560, P561.

5            In Rogers' third state post-conviction action, he claimed that the aggravating circumstance of

6    torture, depravity of mind, or mutilation was unduly vague, and not supported by sufficient

7    evidence.  Exhibit P562, pp. 31-32.  The State moved to dismiss the petition on procedural grounds.

8    Exhibit R4, p. 678.  On July 13, 1999, the state district court granted that motion in part and denied

9    it in part, dismissing certain of Rogers' claims and ordering the State to answer certain of his claims.

10   Exhibit R5, p. 869.  In the July 13, 1999 order, the state district court ordered the State to answer

11   Rogers' claims regarding the aggravating circumstance of torture, depravity of mind, or mutilation.

12   *See* Exhibit R5, pp. 1, 20-24, 57.  On May 1, 2000, the state district court dismissed all Rogers'

13   remaining claims, and, in that order, stated the following about the claims regarding the torture,

14   depravity of mind, or mutilation aggravating circumstance:

15           Rogers alleges that there was insufficient evidence of torture and depravity of
         the mind and that the aggravating circumstance was unconstitutionally vague as
16       applied.  Rogers makes his best argument with regard to these claims.  Nevertheless,
         this court will not overturn the verdict of death based upon these claims.
17
         The Warden almost concedes that the jury instructions in this area were
18       constitutionally defective.  Instead, the Warden focuses on the fact that there was a
         valid aggravating factor (a prior violent felony conviction) and that the evidence
19       supported a finding of torture or depravity, as later defined by the Nevada Supreme
         Court.
20
         This court discussed the issue of the application of the change in the law
21       because of the decision in *Deutscher v. Whitley*, 884 F.2d 1152, 1162 (9th Cir. 1989),
         vacated on other grounds *Angelone v. Deutscher*, 500 U.S. 901 (1991), in the Order
22       of July 13, 1999, pp. 20-24.  The court concludes that summary dismissal is indeed
         inappropriate, regarding this issue.  The *Deutscher* decision was a new rule that
23       should be applied retroactively.  Fundamental fairness requires it in this situation, as
         opposed to that discussed in part I of this Order.  Applying *Deutscher* renders the
24       depravity instruction constitutionally infirm.

25           Nevertheless, the Nevada Supreme Court has already ruled that the evidence
         in the trial supported a finding of torture.  101 Nev. at 468.  This court will not
26       reassess a factual conclusion of the state supreme court.  That court should decide if

49

1
2
3

       the subsequent case law in this area would cause a re-evaluation of the conclusion reached in 1985.  *See Valerio v. Bayer*, Case No. 98-99033 (9th Cir. April 19, 2000) (a Nevada case in which the court upheld the Nevada Supreme Court's ability to limit the unconstitutional depravity instruction and affirm the sentence).

4
5
6

       Moreover, since this court has already upheld an aggravating factor, it is not necessary for it to reach the ultimate conclusion on this issue.  The court notes, however, that all of the evidence related to torture and depravity was admissible.  The likelihood that a different result would have been reached (no verdict of death) if a properly worded jury instruction had been given, is remote.  Therefore, the harmless error analysis offered by the Warden is correct.  Claims 25 and 26 are dismissed.  NRS 34.770(2).

7

8    Exhibit R5, pp. 979-81.  Rogers appealed.  *See* Exhibit P563.  On May 13, 2002, the Nevada

9    Supreme Court affirmed.  Exhibit P564.  The Nevada Supreme Court affirmed, on procedural

10   grounds, the dismissal of Rogers' claims regarding the torture, depravity of mind, or mutilation

11   aggravating circumstance, and did not address the merits of those claims.  *Id*. at 2-5.

12          In *Godfrey*, the Supreme Court held unconstitutional an aggravating-circumstances jury

13   instruction that permitted the jury to impose the death penalty if it found the murder "'was

14   outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind, or

15   an aggravated battery to the victim.'" *Godfrey*, 446 U.S. 420, 428-29 (quoting state statute).  The

16   Supreme Court explained that the instruction resulted in "standardless and unchanneled imposition

17   of death sentences in the uncontrolled discretion of a basically uninstructed jury." *Id*. at 429; *see*

18   *also Maynard v. Cartwright*, 486 U.S. 356, 363-64 (1988) (holding unconstitutionally vague, under

19   the reasoning of *Godfrey*, an aggravating-circumstances instruction directing jurors to determine

20   whether the murder was "especially heinous, atrocious, and cruel").

21          Plainly, under *Godfrey*, the instruction at issue in this case, providing for a depravity-of-mind

22   aggravating circumstance, was unconstitutionally vague.  *See Valerio v. Crawford*, 306 F.3d 742,

23   747 (9th Cir.2002) (en banc), *cert. denied*, 538 U.S. 994 (2003) (holding the same Nevada

24   aggravating circumstance unconstitutionally vague, under *Godfrey*); *Deutscher v. Whitley*, 884 F.2d

25   1152, 1162 (9th Cir.1989), vacated on other grounds sub nom. *Angelone v. Deutscher*, 500 U.S. 901

26   (1991) (same); *see also McKenna v. McDaniel*, 65 F.3d 1483, 1487-90 (9th Cir.1985) (holding a

1   similar Nevada aggravating circumstance unconstitutionally vague, under *Godfrey*).  The Nevada

2   Supreme Court's holding, on Rogers' direct appeal, that Nevada's torture, depravity of mind, or

3   mutilation aggravating circumstance was constitutional, was an unreasonable application of

4   *Godfrey*.

5        When, as in this case, a defendant is sentenced to death based in part on an unconstitutionally

6   vague aggravating circumstance, the state appellate court may cure the error, and affirm the

7   sentence, in one of three ways.  *See Valerio*, 306 F.3d at 756-60.  First, the state appellate court can

8   find the error harmless under *Chapman v. California*, 386 U.S. 18, 24 (1967).  *Valerio*, 306 F.3d at

9   756.  "Under *Chapman*, the state appellate court can affirm if it finds beyond a reasonable doubt that

10  the same result would have been obtained without relying on the unconstitutional aggravating

11  circumstance.  *Id*., citing *Clemons v. Mississippi*, 494 U.S. 738, 752-53 (1990) (approving *Chapman*

12  harmless error analysis as method for curing unconstitutional jury instruction).

13       Second, the state appellate court can cure the error by means of a "*Walton* analysis,"

14  whereby the appellate court "provides a narrowed construction of the unconstitutional aggravating

15  circumstance, and then itself performs a *de novo* evaluation of the evidence to determine if the

16  aggravating circumstance exists."  *Valerio*, 306 F.3d at 756, citing *Walton v. Arizona*, 497 U.S. 639

17  (1990), and *Lewis v. Jeffers*, 497 U.S. 764 (1990).  The *Walton* analysis, however, is not available

18  when the penalty-phase factfinder was a jury, as it was in this case.  *See Valerio*, 306 F.3d at 758-59.

19       Third, "a state appellate court can cure a penalty-phase instructional error by 'reweighing'

20  aggravating and mitigating circumstances under [*Clemons*, 494 U.S. at 748]."  *Valerio*, 306 F.3d at

21  757.  To do so, the state appellate court disregards the aggravating circumstance found under an

22  invalid jury instruction, and reweighs the remaining valid aggravating circumstances and the

23  mitigating circumstances.  *Id*.

24       In this case, on Rogers' direct appeal – the only state court proceeding in which the Nevada

25  Supreme Court addressed the merits of Rogers' claims regarding the depravity-of-mind aggravating

26  circumstance – the Nevada Supreme Court did not perform a harmless error analysis under

51

1  *Chapman*, and it did not reweigh aggravating and mitigating circumstances under *Clemons*.

2  Rather, the Nevada Supreme Court held that the torture, depravity of mind, or mutilation

3  aggravating circumstance was constitutional, and, finding no error, had no reason to perform a

4  harmless error analysis, or to reweigh aggravating and mitigating circumstances.  *See Rogers*, 101

5  Nev. at 467-68, 705 P.2d at 671-72.  Furthermore, the Nevada Supreme Court could not have cured

6  the constitutional error by means of a *Walton* analysis, as the penalty-phase factfinder in Rogers'

7  case was a jury.  *See Valerio*, 306 F.3d at 758-59.

8      This court determines, therefore, that the depravity-of-mind aggravating circumstance was

9  unconstitutionally vague, that the Nevada courts' rejection of this claim was an unreasonable

10  application of *Godfrey,* and that the Nevada courts did not cure the error.  The remaining question,

11  then, is whether the error was harmless.

12                      Harmless Error Analysis

13      In conducting the harmless-error analysis, the court considers, together, the effect of the error

14  regarding the prior-felonies aggravating circumstance (Grounds 20 and 21) and the error regarding

15  the torture, depravity of mind, or mutilation aggravating circumstance (Ground 23), as each of those

16  errors affected the balance of the aggravating and mitigating circumstances.

17      Constitutional error is not harmless if it has a "substantial and injurious effect or influence in

18  determining the jury's verdict."  *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (quoting

19  *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)).  The State bears the "risk of doubt" in the

20  harmless-error analysis.  *See O'Neal v. McAninch*, 513 U.S. 432, 439 (1995).  The State must

21  provide "fair assurance" that there was no substantial and injurious effect on the verdict.  *Gray v.*

22  *Klauser*, 282 F.3d 633, 651 (9th Cir.2002); *see also O'Neal*, 513 U.S. at 443 ("the State normally

23  bears responsibility for the error that infected the initial trial"); *Payton v. Woodford*, 299 F.3d 815,

24  828 (9th Cir.2002) (en banc) ("Only if the State has persuaded us that there was no substantial and

25  injurious effect on the verdict do we find the error harmless.").

26

1    Under Nevada law, as reflected by the jury instructions given at Rogers' trial, for a finding of

2  "torture," there had to be evidence that the defendant acted "with the intent to cause cruel pain and

3  suffering for the purpose of revenge, persuasion or for any other sadistic purpose."  Exhibit P583,

4  Instruction 14; see also Exhibit V(F), p. 46. "Mutilate" was defined for the jury as follows: "to cut

5  off or permanently destroy a limb or essential part of the body, or to cut off or alter radically so as to

6  make imperfect."  Exhibit P583, Instruction 16; *see also* Exhibit V(F), p. 46.  The prosecutor in

7  Rogers' case, in his closing argument, conceded that there was no basis for a finding of torture or

8  mutilation.  *See* Exhibit V(F), pp. 58-59 ("There are three different definitions involved in this

9  particular thing that you should watch and that is, first, torture, depravity of mind or the mutilation

10  of the victims.  Two of them probably do not really comply [sic] in this case and it is hard to tell if

11  the torture, itself, could fit into the definition as you read that.").  The court has carefully examined

12  the transcript of Rogers' trial, and finds that the prosecutor's concession was warranted; there was

13  no substantial evidence supporting a finding of torture or mutilation.  To the extent that the Nevada

14  Supreme Court's ruling, on Rogers' direct appeal, can be read to include a determination that error

15  resulting from the depravity-of-mind aggravating circumstance was harmless because there was a

16  showing of torture or mutilation, this court finds that such was an unreasonable determination of the

17  facts in light of the evidence.  *See* 28 U.S.C. § 2254(d)(2).  Without the unconstitutionally vague

18  "depravity of mind" factor in the jury instructions, there would have been little chance of the jury

19  finding established the torture, depravity of mind, or mutilation aggravating circumstance.

20    The other aggravating circumstance found established by the jury was that "[t]he murder was

21  committed by a person who was previously convicted of a felony involving the use or threat of

22  violence to the person of another."  Exhibit P592.  As is discussed above, the jury's finding of this

23  aggravating circumstance, too, was marred by constitutional error.  If Rogers' counsel had

24  performed in a reasonably effective manner, the jury would have been alerted to the fact that there

25  was no conviction of Rogers in Ohio Case Number 77 CR 250.  Instead of two prior convictions in

26

1    the balance under the heading of this aggravating circumstance, there should have been only one, the

2    conviction in Ohio Case Number 76 CR 334.

3         Rogers' conviction in Case Number 76 CR 334 was for aggravated assault, which, in Ohio,

4    was an assault committed while "under the influence of sudden passion or in a sudden fit of rage,

5    either of which is brought on by serious provocation occasioned by the victim that is reasonably

6    sufficient to incite the person into using deadly force."  *See* Ohio Rev. Code Ann. § 2903.12.  The

7    presentence report from that case, which was introduced as an exhibit in the penalty phase of

8    Rogers' trial, indicated that the assault occurred during a fight at a party, when Rogers was 19 years

9    old, where both Rogers and the other combatant had been drinking alcohol, and where both were

10   injured.  *See* Exhibit P309; *see also* Exhibit V(F), p. 69-70 (closing argument for defense).

11   According to the presentence report, Rogers said that "he was only trying to protect himself, that he

12   did not want to fight."  Exhibit P309, p. 6.  "He stated the victim was under the influence of drugs

13   and alcohol."  *Id*.  A "Journal Entry" introduced into evidence in the penalty phase of Rogers' trial

14   indicated that Rogers received a sentence of probation in Case Number 76 CR 334.  *See* Exhibit

15   P317.

16        On the mitigation side, there was substantial evidence showing that Rogers was mentally ill,

17   and was in an extremely disturbed and paranoid state at the time of the Strode murders.  Nevada law

18   provides specifically that it is a mitigating circumstance if "[t]he murder was committed while the

19   defendant was under the influence of extreme mental or emotional disturbance."  *See* Exhibit P583,

20   Instruction 18.

21        Robert Schott testified that, on December 1, 1980, the day before the Strode killings, he gave

22   Rogers a ride, and as soon as Rogers climbed into his truck, Rogers looked nervously in the back of

23   the truck and in the rear view mirror.  Exhibit IV(G), pp. 461-62, 465-66.  Schott testified that

24   Rogers' conversation was "erratic," and that Rogers made him very uneasy.  *Id*. at 462-63, 466-67.

25   Schott testified that Rogers spontaneously said to him: "you may not believe it but I'm a good

26   American," "I'm on your side," and "I would fight for my country."  *Id*. at 467.

1    On December 2, 1980, the day of the killings, David Hartshorn, a geologist, observed Rogers

2  standing alongside a road and offered him a ride.  *Id*. at 471-72.  According to Hartshorn's

3  testimony, Rogers introduced himself as "Teepee," and said that he lived in a pyramid.  *Id*.

4  Hartshorn testified that Rogers asked him if he had seen the pyramid*,* and when Hartshorn said no,

5  Rogers pointed north and said, "it's up there." *Id*. at 472.  Hartshorn testified that he told Rogers,

6  "no, that's Majuba," and Rogers became irritated and said, "no, that's Mount Olympus." *Id*.

7  According to Hartshorn, Rogers then asked him if he was the one shooting rockets off of Mount

8  Olympus, and Hartshorn told he he was not.  *Id*.  Hartshorn testified that Rogers then said:

9  "Somebody is shooting rockets off of Mount Olympus and one of these days it will hit my pyramid

10 and blow me up." *Id*.  Hartshorn asked Rogers where he was from, and Rogers said "This is my

11 land.  I own it all." *Id*.  When Hartshorn dropped Rogers off, Rogers said: "This isn't a set up, is it?"

12 *Id*. at 473-74.

13    On December 5, 1980, three days after the killings, Rogers was refused entry into Canada.

14 *See* Exhibit V(B), pp. 698-722.  In conversing with Canadian officers at the border, Rogers indicated

15 that he was the emperor, or king, of North America.  *Id*. at 705, 714.  Rogers also told Canadian

16 officers that there was a contract on his life, and he mentioned the FBI, CIA, motorcycle gangs, and

17 the mafia.  *Id*. at 706, 714.

18    On January 4, 1981, Rogers was arrested in Florida when seen riding on the bumper of a car,

19 holding on to a luggage rack.  *See* Exhibit V(C), pp. 813-29.  After he was arrested, Rogers told a

20 police officer that God knew him and that we are all a part of mother nature.  *Id*. at 817.  During

21 fingerprinting, Rogers refused to speak and wrote on a piece of paper that he belonged to the

22 government.  *Id* at 826.

23    In addition to the testimony regarding Rogers' bizarre behavior, there was testimony at trial

24 by psychiatrists indicating that Rogers likely suffered from mental illness at the time of the murders.

25 *See* Exhibit V(D), pp. 956-1003 (testimony of Louis Richnak, Jr., M.D.), 1007-25 (testimony of

26

1   Phillip Andrew Rich, M.D.), 1026-79 (testimony of Ira B. Pauly, M.D.).  Dr. Ira B. Pauly concluded

2   as follows:

3          My opinion is that Mark Rogers was so virtually psychotic at the time of the
       crime, that he was suffering from paranoid delusions, that he had been under
4      considerable stress probably in terms of exposure the night before and somewhat
       because of his dietary intake and given his emotional status, that he was actively
5      psychotic and under that influence of being paranoid, that he was incompetent and
       unable to distinguish between right and wrong.

6                                        *     *     *

7
          That he was psychotic and he was in a very frightened and paranoid state
8      which is clearly documented by witnesses who saw him immediately before and
       others who described his behavior immediately after the murders and that this is
9      consistent with my reevaluation of him several months later and that this is the
       description of a psychotic paranoid schizophrenic and on the basis of that diagnosis
10     I'm saying that he was delusional and, therefore, unable to distinguish between right
       and wrong at that time.

11

12   Exhibit V(D), pp. 1050-51.

13          A psychologist, Martin E. Gutride, Ph.D., testified for the prosecution (Exhibit V(D),

14   pp. 1080-1103), and stated that it was his opinion that Rogers had an antisocial personality disorder

15   and a "schizo type" personality disorder, rather than a mental illness.  Exhibit V(D), pp. 1087-88.

16   Beyond that, though, Dr. Gutride believed that Rogers was malingering, pretending to be mentally

17   ill.  *Id*. at 1088-90.

18          In view of the totality of the evidence, the court determines that Rogers' mental illness,

19   and mental and emotional disturbance, at the time of the crimes was a substantial mitigating

20   circumstance.  With the aggravating circumstances reduced to just the one conviction, in Ohio Case

21   Number 76 CR 334 – for a provoked assault in a drunken fight at a party when Rogers was 19 years

22   old, where both Rogers and the other combatant were injured, and for which Rogers received

23   probation – and with a significant mitigating circumstance weighing against it, there is a strong

24   possibility that the jury would not have found the aggravating circumstances to outweigh the

25   mitigating circumstances, and would not have found Rogers eligible for the death penalty.

26

56

1      In state court, with regard to both the depravity-of-mind aggravator and the prior-convictions

2  aggravator, the courts determined that any error was harmless, because evidence regarding Rogers'

3  purported "depravity of mind," and evidence regarding the events underlying Ohio Case Number

4  77 CR 250, would have been admissible in the penalty phase of the trial regardless of whether or not

5  that evidence supported a valid aggravating circumstance. *See* Exhibit R5, pp. 977-81 (May 1, 2000

6  order of state district court, in Rogers' third state post-conviction action, regarding evidence related

7  to both the prior-conviction aggravating circumstance and the torture, depravity of mind, or

8  mutilation aggravating circumstance); Exhibit P564, pp. 6-7 (May 13, 2002 decision of Nevada

9  Supreme Court, in Rogers' third state post-conviction action, regarding evidence related to Ohio

10  Case Number 77 CR 250).  This court finds this analysis to be faulty.  Nevada is a "weighing" state.

11  *See McKenna*, 65 F.3d at 1489.  In a capital case, a Nevada jury is instructed to weigh aggravating

12  against mitigating circumstances, and the jury may return a verdict of death "only if one or more

13  aggravating circumstances are found and any mitigating circumstance or circumstances which are

14  found do not outweigh the aggravating circumstance or circumstances." NRS 200.030(4)(a); *see*

15  *also* NRS 175.554.  This court recognizes that, in Nevada, evidence of a capital defendant's prior

16  crimes, though not amounting to valid aggravating circumstances, may be admissible, and may be

17  considered as part of the ultimate sentencing decision.  *See*, *e.g.*, *Riker v. State*, 111 Nev. 1316,

18  1326-28, 905 P.2d 706, 712-13 (1995).  However, such evidence does not factor into the weighing

19  of aggravating and mitigating circumstances; only the valid aggravating circumstances are part of

20  that weighing.  As the Nevada Supreme Court stated in *Gallego v. State*, 101 Nev. 782, 711 P.2d 856

21  (1985):

22        *If the death penalty option survives the balancing of aggravating and mitigating
          circumstances*, Nevada law permits consideration by the sentencing panel of other
23        evidence relevant to sentence.

24  *Gallego*, 101 Nev. at 791, 711 P.2d at 863 (citing NRS 175.552) (emphasis added); *see also Crump*

25  *v. State*, 102 Nev. 158, 160-62, 716 P.2d 1387, 1388-90 (1986).  Therefore, in conducting the

26  harmless error analysis, analyzing the weighing of aggravating and mitigating circumstances without

1   the erroneous factors in the balance, evidence regarding Rogers' purported "depravity of mind" and

2   evidence regarding the events underlying Ohio Case Number 77 CR 250 is not part of the calculus,

3   regardless of whether or not it was admissible in the penalty phase of the trial with respect to the

4   ultimate sentencing decision.

5          The court concludes that the constitutional errors regarding the aggravating circumstances

6   found by the jury, those errors asserted by Rogers in Grounds 20, 21, and 23 of Rogers' second

7   amended petition, had a "substantial and injurious effect or influence in determining the jury's

8   verdict," as the errors significantly skewed the weighing of aggravating and mitigating

9   circumstances, by which the jury found Rogers eligible for the death penalty.  *See Brecht*, 507 U.S.

10   at 637.  In finding these errors harmless, the state courts' rulings were an unreasonable application

11   of clearly established federal law as determined by the Supreme Court, and were based on an

12   unreasonable determination of the facts in light of the evidence presented.  *See* 28 U.S.C. § 2254(d).

13          The court will, therefore, grant Rogers habeas corpus relief, with respect to his death

14   sentence, on Grounds 20, 21, and 23.

15          <u>Ground 24</u>

16          In Ground 24, Rogers claims that "the trial court violated the Eighth and Fourteenth

17   Amendments ... by instructing the jury regarding the availability of clemency."  Second Amended

18   Petition, pp. 213-14.

19          The jury instructions placed at issue by Rogers in this claim are the following:

20                  The punishment of death may be imposed only if one or more aggravating
        circumstances are found and any mitigating circumstance or circumstances which are
21      found do not outweigh the aggravating circumstance or circumstances.

22                  Otherwise, the punishment imposed shall be imprisonment in the state prison
        for life with or without the possibility of parole.
23
                    You are instructed that the sentence of life imprisonment without the
24      possibility of parole does not exclude executive clemency.

25

26

1           If the punishment is fixed at life imprisonment with the possibility of parole,
2    eligibility for parole begins when a minimum of ten years has been served.

                                   *   *   *

3
4           Executive clemency involves a decision by the State Board of Pardon
Commissioners to commute or reduce a defendant's sentence from life without
5    possibility of parole to life with possibility of parole.

6           Executive clemency may also involve a decision by the State Board of Pardon
Commissioners to shorten the time a defendant is eligible for parole.

7           The State Board of Pardon Commissioners consists of the Governor, the
Attorney General, and the five Justices of the Supreme Court of the State of Nevada.
8    The Board can change a sentence only by a majority vote, and only if the Governor is
in the majority voting to change the sentence.
9

10   Exhibit P583, Instructions 5 and 6; *see also* Exhibit V(F), pp. 44-45.

11          Rogers asserted a similar claim on his direct appeal.  *See* Exhibit P553, pp. 55-56; Exhibit

12   P554, pp. 17-22.  The Nevada Supreme Court ruled as follows:

13          Defendant argues that the jury instruction on the possibility of executive
clemency diverted the jury's attention from the consideration required by the Eighth
14   Amendment and instead caused the jury to speculate about the possibility of his
release.  While viewing the court's instruction as troubling, it does not constitute
15   reversible error since Rogers' trial antedated our holding in *Petrocelli v. State*, 101
Nev. 46, 692 P.2d 503 (1985).  In *Petrocelli*, this Court made it clear that Nevada's
16   juries who are instructed on the clemency provisions peculiar to Nevada's
constitutional and statutory law, are to be fairly informed.  Accordingly, we provided
17   an instruction that is to be exclusively used when counsel requests that the jury be
instructed on that subject.  Since the *Petrocelli* ruling operated prospectively, the
18   instruction provided in the instant case was validated by the decision of *California v.
Ramos*, 103 S.Ct. 3446 (1983).
19

20   *Rogers v. State*, 101 Nev. 457, 468-69, 705 P.2d 664, 672 (1985) (footnote setting forth text of jury

21   instructions omitted).

22          Rogers did not raise this claim in his first state post-conviction action or his second state

23   post-conviction action.  *See* Exhibits P533, P556, P557, P560, P561.

24          In Rogers' third state post-conviction action, he claimed that "[t]he jury was improperly

25   instructed on the availability of executive clemency and parole."  Exhibit P562, p. 32.  That claim

26

1   was dismissed on procedural grounds, *see* Exhibit R5, pp. 870, 884-87, 925, and that ruling was

2   affirmed on appeal.  *See* Exhibit P564.

3        Rogers claims that the jury instructions regarding clemency were inaccurate because

4   "[a] Nevada statute would have precluded Mr. Rogers' parole before twenty years, and another

5   would make it unlikely that he would be paroled at all."  Second Amended Petition, p. 213.

6   However, in support of that argument, Rogers cites only "NRS 213.1099-4," apparently referring

7   to NRS 213.1099(4)), which provides:

8        4.   Except as otherwise provided in NRS 213.1215, the Board may not release on
     parole a prisoner whose sentence to death or to life without possibility of parole has
9     been commuted to a lesser penalty unless it finds that the prisoner has served at least
     20 consecutive years in the state prison, is not under an order to be detained to answer
10    for a crime or violation of parole or probation in another jurisdiction, and that the
     prisoner does not have a history of:

11    (a) Recent misconduct in the institution, and that the prisoner has been recommended
12    for parole by the Director of the Department of Corrections;

13    (b) Repetitive criminal conduct;

14    (c) Criminal conduct related to the use of alcohol or drugs;

15    (d) Repetitive sexual deviance, violence or aggression; or

16    (e) Failure in parole, probation, work release or similar programs.

17  NRS 213.100(4).  This statutory provision, however, *did not exist in 1981*, when Rogers was tried.

18  *See Smith v. State*, 106 Nev. 781, 802 P.2d 628 (1990) (construing NRS 213.1099(4), and discussing

19  its enactment); *see also* Exhibit V(F), p. 895 (state district court, stating that "the 1981 amendment

20  became effective if approved and ratified by the people at the 1982 general election, and on the day

21  following canvass of the returns by the supreme court").  Therefore, Rogers' argument based on

22  NRS 213.1099(4) is premised on an erroneous view of Nevada's statutory law at the time of Rogers'

23  trial, and is without merit.  Petitioner does not point to any inaccuracy in the jury instructions

24  regarding clemency, either in general or as applied to him.

25        In *California v. Ramos*, 463 U.S. 992 (1983), the Supreme Court upheld the constitutionality

26  of a jury instruction concerning the possibility of executive clemency as a factor for a jury to take

60

1    into consideration in the penalty phase of a capital trial.  The Court in *Ramos* emphasized that the

2    instruction must be accurate:

3           Finally, we emphasize that informing the jury of the Governor's power to
            commute a sentence of life without possibility of parole was merely an accurate
4           statement of a potential sentencing alternative.  To describe the sentence as "life
            imprisonment *without possibility* of parole" is simply inaccurate when, under state
5           law, the Governor possesses authority to commute that sentence to a lesser sentence
            that includes the possibility of parole.  The Briggs Instruction thus corrects a
6           misconception and supplies the jury with accurate information for its deliberation in
            selecting an appropriate sentence.

7

8    *Ramos*, 463 U.S. at 1009 (emphasis in original; footnote omitted); *see also Sechrest v. Ignacio*,

9    549 F.3d 789 (9th Cir.2008) (ruling jury instruction on possibility of executive clemency

10   misleading, because the defendant was on probation when offenses committed, making him

11   ineligible for parole under NRS 213.1099(4)(e)); *Gallego v. McDaniel*, 124 F.3d 1065, 1074-77 (9th

12   Cir.1997) (ruling jury instruction on possibility of executive clemency misleading, because the

13   defendant was under sentence of death in another jurisdiction, making him ineligible for parole).

14        In this case, because Rogers does not show that the jury instructions regarding the possibility

15   of clemency were inaccurate, he has not made any showing that the ruling of the Nevada Supreme

16   Court on this claim was contrary to, or an unreasonable application of, *Ramos,* or any other

17   applicable Supreme Court precedent.  The court will deny habeas relief with respect to Ground 24.

18        Ground 38

19        In Ground 38, Rogers claims that his conviction and sentence are unconstitutional because of

20   the cumulative effect of errors described in his other claims for relief.  Second Amended Petition,

21   p. 263.  As is discussed above, the court finds there to have been constitutional error only with

22   respect to the claims in Grounds 20, 21, and 23.  The court has considered the cumulative effect of

23   those errors, as is discussed above, and grants relief on those claims.  Ground 38 does not appear to

24   state a separate, cognizable claim for federal habeas corpus relief.

25

26

Certificate of Appealability

In the event that Rogers appeals from this court's judgment, the court has *sua sponte* evaluated his claims with respect to the issuance of a certificate of appealability.  *See* 28 U.S.C. § 2253(c); *see also* Rule 11(a), Rules Governing Section 2254 Cases in the United States District Courts; Fed. R. App. P. 22(b).

"A certificate of appealability may issue ... only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. §2253(c)(2).  The Supreme Court has interpreted 28 U.S.C. §2253(c) as follows:

> Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong.

*Slack v. McDaniel*, 529 U.S. 473, 484 (2000); *see also James v. Giles*, 221 F.3d 1074, 1077-79 (9th Cir. 2000).

The court finds that reasonable jurists could not debate its resolution of the issues set forth in Grounds 3, 5, 6, 9, 10, 11, 13, 19, 24, and 38, of Roger's second amended petition.  The court will therefore deny Rogers a certificate of appealability, for the reasons stated in the discussion of those claims, above.

///

///

///

///

///

///

///

///

///

62

1    **IT IS THEREFORE ORDERED** that petitioner's second amended petition for writ of

2   habeas corpus (docket #77) is **GRANTED IN PART AND DENIED IN PART**.  The second

3   amended petition for writ of habeas corpus is **GRANTED** with respect to Grounds 20, 21, and 23,

4   as is specified below, and the second amended petition for writ of habeas corpus is **DENIED** with

5   respect to all other claims.

6    **IT IS FURTHER ORDERED** that, within **120 days** of the date of entry of this order, the

7   State of Nevada shall either (1) grant petitioner a new penalty-phase trial, and initiate proceedings

8   relative to that new penalty-phase trial, or (2) vacate petitioner's death sentence and impose upon

9   him a non-capital sentence, consistent with law.

10    **IT IS FURTHER ORDERED** that petitioner is denied a certificate of appealability.

11    **IT IS FURTHER ORDERED** that the Clerk of the Court shall enter judgment accordingly.

12

13    Dated this  8th     day of July, 2011.

14

15    _____

16    UNITED STATES DISTRICT JUDGE

17

18

19

20

21

22

23

24

25

26