**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

MARK ROGERS,

    Petitioner,

     v.

WILLIAM GITTERE, et al.,

    Respondents.

Case No. 3:02-cv-00342-GMN-WGC

**ORDER**

Introduction

    This case is a petition for a writ of habeas corpus by Mark Rogers, a Nevada prisoner. The case is before the court with respect to the merits of certain claims remanded by the Court of Appeals for further consideration by this Court. The Court will grant Rogers habeas corpus relief on one of the remanded claims, Rogers' claim that his trial counsel rendered ineffective assistance of counsel with respect to their investigation and presentation of his defense of not guilty by reason of insanity.

Background Facts and Procedural History

    In its September 3, 1985, decision affirming Rogers' convictions and sentence, the Nevada Supreme Court described, as follows, the facts of the case as revealed by the evidence:

        On December 3, 1980, Frank and Linda Strode returned from a Thanksgiving trip to their home in an isolated part of Pershing County near Majuba Mountain, where they resided with Frank's parents, Emery and

Mary Strode, and Frank's sister, Meriam Strode Treadwell. When they entered the parents' trailer, they found the dead bodies of Emery, Mary and Meriam under a blanket in a bedroom. Emery had been shot three times and stabbed twice with a knife which was left in his chest. A pocket watch discovered in Emery's shirt pocket had been struck by one of the bullets; the hour hand of the watch was stopped at one o'clock. Mary had been stabbed in the back and shot in the chest. Meriam, whose wrists were bound with an electric cord, died from a single gunshot wound in her back. Emery and Meriam kept daily diaries. The last entry in both diaries was recorded on the morning of December 2, 1980.

On December 1, 1980, between 4:30 and 5 p.m., Robert Schott gave defendant a ride from Winnemucca to Imlay. As soon as Rogers climbed into Schott's truck, he looked nervously in both the back of the truck and the rear view mirror. Defendant introduced himself as John and claimed that he was a musician going to Reno to look for a job. At one point during the drive, defendant blurted out: "You may not believe it but I am a good American. You may not believe it but I'm on your side. I would fight for my country."

On December 2, 1980, between approximately 12:15 and 12:45 p.m., David Hartshorn, a geologist working at the Majuba Hill Mine, observed Rogers standing alongside a road near Majuba Canyon and offered him a ride. During the ride, Hartshorn gave defendant a can of Seven-Up to drink. Defendant stated that "[s]omebody is shooting rockets ... and one of these days it will hit my pyramid and blow me up." Rogers alighted at the Strode residence with the Seven-Up can in hand.

Between 12:30 and 2 p.m. that same day, Ray Horn, a mechanic at a nearby mine, was driving on a county road near Majuba Mountain. As he passed a dark metallic blue truck, a slender young man driving the truck shot at Horn several times. Between 3:30 and 4 p.m., Earl L. Smith, a highway maintenance worker saw Rogers standing on a road between Denio and Winnemucca and provided him a ride because defendant had run out of gasoline. Rogers was later observed traveling at an extremely high rate of speed in a blue truck, which was identified by its license number as the Strodes' truck.

On December 5, 1980, Rogers was refused entry into Canada. In conversing with a Canadian police officer, Rogers indicated that he was the King of North America. On January 4, 1981, defendant was arrested in Florida when he was seen riding on the bumper of a car, holding on to a luggage rack. After he was arrested, Rogers told police that God knew him and that we were all a part of mother nature. During fingerprinting, defendant refused to speak and wrote on a piece of paper that he

belonged to the government. Later at the jail, defendant claimed that he had killed the Strode family in self-defense.

Rogers' fingerprints were lifted from various items in the Strode residence, including a Seven-Up can and a glass jar found in the bedroom under the blanket with the victims' bodies. At trial, the defense presented the testimony of several expert witnesses which indicated defendant was a paranoid schizophrenic at the time of evaluation and that defendant's behavior at the time of the commission of the crimes was consistent with psychotic paranoid delusions, schizophrenia and psychosis and that Rogers could not tell right from wrong or the nature and quality of his acts. One psychologist believed that defendant, who was trained in acting, was faking his symptoms. After finding the defendant guilty of the crimes charged, the jury imposed the death penalty for the three murder convictions, and prison terms for the attempted murder and grand larceny.

*Rogers v. State*, 101 Nev. 457, 461-62, 705 P.2d 664, 667-68 (1985), *cert. denied*, 476 U.S. 1130 (1986).

Rogers appealed, and the Nevada Supreme Court affirmed his conviction and sentence on September 3, 1985. *Rogers*, 101 Nev. 457, 705 P.2d 664 (1985). The United States Supreme Court denied Rogers' petition for a writ of certiorari. *Rogers v. Nevada*, 476 U.S. 1130 (1986).

On February 26, 1986, Rogers filed a petition for post-conviction relief in the state district court. That court held an evidentiary hearing, at which Rogers testified, and then, on September 29, 1986, denied the petition. Rogers appealed, and on June 20, 1987, the Nevada Supreme Court dismissed the appeal.

On October 26, 1987, Rogers filed a petition for a writ of habeas corpus in this Court, initiating the case of *Rogers v. Whitley*, 3:87-cv-0505-ECR. Counsel was appointed to represent Rogers. On July 27, 1989, the court stayed that action so that Rogers could exhaust certain claims in state court.

On October 15, 1990, Rogers filed, in state court, a second petition for post-conviction relief, and on December 24, 1991, that petition was denied. Rogers appealed, and the Nevada Supreme Court dismissed the appeal on May 28, 1993.

On December 1, 1993, Rogers filed a second federal habeas corpus action in this Court: *Rogers v. Angelone*, 3:93-cv-0785-ECR. Rogers' first federal habeas action was then dismissed. The petition in Rogers' second federal habeas action was amended and supplemented, and Respondents answered. On March 6, 1997, the Court ordered the action dismissed, without prejudice, in order to permit Rogers to further exhaust claims in state court.

On March 24, 1997, Rogers filed, in state district court, a third petition for post-conviction relief. The state district court dismissed that petition, Rogers appealed, and the Nevada Supreme Court affirmed on May 13, 2002.

On June 25, 2002, Rogers initiated this, his third, federal habeas action, by filing a "renewed" petition for writ of habeas corpus (ECF No. 11).

On November 24, 2004, Rogers moved for a stay of these proceedings, under *Rohan ex rel. Gates v. Woodford*, 334 F.3d 803 (9th Cir.), *cert. denied*, 540 U.S. 1069 (2003), contending that he was not competent to proceed with this action (ECF No. 39). On September 21 and 22, 2005, the court held an evidentiary hearing on that motion (ECF Nos. 60, 61). The Court denied the motion on October 24, 2005 (ECF No. 58) and denied a motion to reconsider on May 18, 2006 (ECF No. 69).

On December 14, 2006, Rogers filed a first amended petition (ECF No. 75), and on December 19, 2006, he filed a second amended petition (ECF No. 77), which is the operative petition in the action.

On August 10, 2007, Respondents filed a motion to dismiss (ECF No. 85). The Court ruled on Respondents' motion to dismiss on March 24, 2008, granting it in part and denying it in part. *See* Order entered March 24, 2008 (ECF No. 108). In that order, the Court dismissed Grounds 1, 2, 4, 8, 12, 14, 15, 16, 17, 18, 22, 25, 26, 27, 28, 29, 30, 31, 32, 33, 34, 35, 36, and 37 of Rogers' second amended petition. In addition, the Court found Ground 7 to be unexhausted, and Rogers abandoned that claim on April 24, 2008 (ECF No. 109).

After Respondents answered Rogers' remaining claims, and the parties briefed those claims, the Court ruled on the claims on July 8, 2011, granting Rogers' petition in part and denying it in part. *See* Order entered July 8, 2011 (ECF No. 145). The Court denied Rogers relief with respect to Grounds 3, 5, 6, 9, 10, 11, 13, 19, 24, and 38 of his second amended petition. The Court granted Rogers relief with respect to Grounds 20, 21, and 23, concerning Rogers' death sentence, and ordered that Rogers be granted a new penalty-phase trial or that his death sentence be vacated and a non-capital sentence imposed.

Respondents appealed and Rogers cross-appealed (ECF Nos. 147, 149). The Ninth Circuit Court of Appeals ruled on July 16, 2015. *See* Opinion of Court of Appeals (ECF No. 162), published as *Rogers v. McDaniel*, 793 F.3d 1036 (2015). The Court of Appeals affirmed the grant of habeas corpus relief regarding Rogers' death sentence. However, the appellate court remanded the case for further consideration of certain of Rogers' claims regarding the guilt phase of his trial, in light of potentially relevant cases decided while the case was on appeal. *See Rogers*, 793 F.3d at 1044-45. Regarding the remanded claims, the Court of Appeals stated:

Turning to Rogers's many uncertified guilt-phase claims, we expand Rogers's COA, vacate the district court's denials of relief and remand for further proceedings, because the district court did not have the benefit of many potentially relevant cases decided while Rogers's appeal was pending. *See Murray v. Schriro*, 745 F.3d 984, 1002 (9th Cir. 2014) (holding that we may issue a COA if jurists of reason could debate the correctness of district court's procedural ruling or whether petitioner has been denied a constitutional right). [Footnote: Our grant of partial habeas corpus relief moots Rogers's numerous penalty-phase claims, which we do not address.] It is appropriate that the district court address the significance, if any, of those new precedents in the first instance.

The district court held that several of Rogers's claims were procedurally barred, and dismissed them. After that order, the Supreme Court decided *Martinez v. Ryan*, [566 U.S. 1], 132 S.Ct. 1309 (2012), and we have applied *Martinez* in several cases, including *Ha Van Nguyen v. Curry*, 736 F.3d 1287, 1296 (9th Cir. 2013), *Detrich v. Ryan*, 740 F.3d 1237 (9th Cir. 2013) (en banc), and *Pizzuto v. Ramirez*, 783 F.3d 1171, 1176-78 (9th Cir. 2015). We expand the COA as to Claims 12, 14, 15, 16, 17, 18, 26, and 28, vacate the district court's dismissal of these claims, and remand them for consideration of *Martinez* and our decisions interpreting it. On remand, the district court should consider whether these claims are claims of ineffective assistance of trial or direct appeal counsel cognizable under *Martinez*, and whether Rogers can show cause and prejudice to excuse his procedural default. [Footnote: Rogers also challenges the sufficiency of the state procedural default rule applied in his case. We decline at this time to address that sufficiency issue. Rogers may raise this challenge again in a later appeal, if not rendered moot by proceedings on remand.]

The district court also denied several claims on the merits, refusing under *Cullen v. Pinholster*, [563 U.S. 170,] 131 S. Ct. 1388 (2011), to consider new evidence Rogers presented in support of his federal habeas petition. We expand the COA as to Claims 5, 9, and 10, vacate the district court's denial of these claims, and remand for the district court to consider our subsequent decision in *Dickens v. Ryan*, 740 F.3d 1302 (9th Cir. 2014) (en banc), as well as the decisions in *Martinez*, *Ha Van Nguyen*, *Detrich*, and *Pizzuto*.

Finally, the district court determined that several of Rogers's claims were barred by AEDPA's one-year statute of limitations, 28 U.S.C. § 2244(d)(1), and that Rogers was not entitled to equitable tolling on those claims. While Rogers's case was pending on appeal, we decided *Sossa v. Diaz*, 729 F.3d 1225 (9th Cir. 2014). We expand the COA as to Rogers's Claims 1, 2, and 8, vacate the district court's dismissal of those claims,

and remand to the district court to consider whether, in light of *Sossa*, Rogers is entitled to equitable tolling on those claims. If the district court concludes that equitable tolling is appropriate, it should consider in the first instance whether Rogers can show good cause for a stay and abeyance procedure under *Rhines v. Weber*, 544 U.S. 269 (2005). *See Blake v. Baker*, 745 F.3d 977, 984 (9th Cir.), *cert. denied*, 135 S. Ct. 128 (2014) (holding that a petitioner who showed ineffective assistance of counsel in initial post-conviction review proceedings had shown "good cause" for a stay and abeyance).

*Id.*

This Court then ordered the parties to file briefs stating their positions regarding the issues to be resolved on remand (ECF No. 167). Following that briefing, on March 2, 2017, the Court determined that the dismissal of Grounds 1, 2 and 8, as barred by the statute of limitations, was unaffected by the subsequent decision in *Sossa*; consequently, the Court again dismissed those claims (ECF No. 200). The Court determined, further, that an answer or supplemental answer was warranted with respect to Grounds 5, 9, 10, 12, 14, 15, 16, 17, 18, 26, and 28, and the Court set a schedule for Respondents' answer and Rogers' reply.

Respondents filed their answer, responding to Rogers' remaining claims, on May 18, 2017 (ECF No. 203). On June 7, 2017, Rogers filed a reply (ECF No. 205), along with a motion for evidentiary hearing (ECF No. 204). On July 7, 2017, Respondents filed a supplement to their answer (ECF No. 212). *See* Order entered July 11, 2017 (ECF No. 213) (granting Respondents leave of court to file supplement to answer). And, on August 9, 2017, Respondents filed a response to Rogers' reply to their answer (ECF No. 214).

In an order entered November 6, 2017, the Court dismissed Grounds 9, 10, 12, 14, 15, 17, 26 and 28, and all the claims in Grounds 16 and 18 other than claims of

ineffective assistance of trial counsel, on procedural default grounds, determining that *Martinez* and *Dickens* do not affect that outcome. *See* Order entered November 6, 2017 (ECF No. 215).

In the November 6, 2017, order, the Court granted Rogers an evidentiary hearing on Ground 5. *See id.* Rogers filed a pre-hearing brief on August 8, 2018 (ECF No. 233), and an amended pre-hearing brief on August 9, 2018 (ECF No. 237). Respondents filed a pre-hearing brief on August 23, 2018 (ECF No. 242). Rogers filed a reply pre-hearing brief on August 30, 2018 (ECF No. 244). The Court granted Rogers leave to conduct certain pre-hearing discovery. *See* Order entered July 6, 2018 (ECF No. 228); Order entered August 28, 2018 (ECF No. 243). The evidentiary hearing was held on October 22, 23, and 24, 2018. *See* Minutes of Proceedings (ECF Nos. 269, 270, 272); Transcripts of Evidentiary Hearing (ECF Nos. 275, 276, 277). Following the evidentiary hearing, on December 21, 2018, Rogers filed a post-hearing brief (ECF No. 278). Respondents filed a post-hearing brief on January 30, 2019 (ECF No. 282). Rogers filed a reply post-hearing brief on February 13, 2019 (ECF No. 284).

Rogers' claim in Ground 5 and his claims of ineffective assistance of trial counsel in Grounds 16 and 18 are now before the Court for resolution on their merits.

Ground 5

In Ground 5, Rogers claims that his federal constitutional rights were violated as a result of ineffective assistance of counsel because his trial counsel failed to adequately investigate his mental health and failed to consult with mental health experts, in order to properly present his defense of not guilty by reason of insanity (NGRI). *See* Second Amended Petition (ECF No. 77), pp. 105-17.

In his first state habeas action, Rogers asserted a claim that his trial counsel was ineffective with respect to his NGRI defense. In that claim, Rogers focused on his counsel's decision to call his mother as a witness and his counsel's alleged failure to properly prepare expert witnesses but did not cite to or present any evidence from outside the record. Later, in his third state habeas action, Rogers asserted, in state court, a more substantial claim, again similar to that in Ground 5, but that petition was ruled procedurally barred.

When this Court ruled on the claim in Ground 5 in the July 8, 2011, order, the Court, applying the law as it was at that time, looked only at the evidence presented in support of the claim in Rogers' first state habeas action, and denied the claim. *See* Order entered July 8, 2011 (ECF No. 145), pp. 12-14. The Ninth Circuit Court of Appeals reversed that ruling, and remanded the claim for reconsideration in light of *Martinez v. Ryan*, 566 U.S. 1 (2012), and *Dickens v. Ryan*, 740 F.3d 1302 (9th Cir. 2014) (en banc), both of which were decided after this Court's ruling. *See Rogers*, 793 F.3d at 1044-45. In *Dickens*, the court of appeals held that a claim has not been fairly presented in state court, and may be procedurally defaulted, if new factual allegations asserted in federal court fundamentally alter the claim as compared to the claim as considered by the state courts. *Dickens*, 740 F.3d at 1318. In *Martinez*, the Supreme Court held that lack of counsel, or ineffective assistance of counsel, in an initial state postconviction proceeding, may function as cause, to overcome a procedural default of a claim of ineffective assistance of trial counsel. *Martinez*, 566 U.S. at 18.

So, the first question to be resolved regarding Ground 5 is whether new allegations and evidence – that is, the allegations and evidence presented now, in this

case, but not presented in Rogers' first state habeas action – fundamentally alter the claim. If so, and if this claim as presented here would now be procedurally barred in state court (*see* NRS §§ 34.726, 34.800, 34.810; 28 U.S.C. § 2254(b)(1)(B)(i); *Woodford v. Ngo*, 548 U.S. 81, 92-93 (2006)), and is therefore subject to the procedural default doctrine, the question becomes whether Rogers can overcome the procedural default. *See* Order entered November 6, 2017 (ECF No. 215), p. 6.

"A claim has not been fairly presented in state court if new factual allegations either 'fundamentally alter the legal claim already considered by the state courts,' ... or 'place the case in a significantly different and stronger evidentiary posture than it was when the state courts considered it.'" *Dickens*, 740 F.3d at 1318 (quoting *Vasquez v. Hillery*, 474 U.S. 254, 260 (1986); *Beaty v. Stewart*, 303 F.3d 975, 989-90 (9th Cir. 2002); *Aiken v. Spalding*, 841 F.2d 881, 883 (9th Cir. 1988); and citing *Nevius v. Sumner*, 852 F.2d 463, 470 (9th Cir. 1988)). In this Court's view, without question, the new allegations and evidence presented by Rogers in this case fundamentally alter the claim as compared to its presentation in Rogers' first habeas action in state court. The new evidence -- in particular the testimony of Rogers' expert witnesses at the evidentiary hearing in this Court -- places the claim in a significantly different and stronger evidentiary posture than in state court, where Rogers' presented no evidence from outside the trial court record to support the claim. Therefore, Ground 5 is subject to the procedural default doctrine, and is barred by that doctrine unless Rogers can overcome the procedural default. *See* Petitioner's Closing Brief (ECF No. 278), p. 28 ("The evidence and allegations outlined above are procedurally defaulted. Mr. Rogers can overcome that default....").

In *Coleman v. Thompson*, the Supreme Court held that a state prisoner who fails to comply with the state's procedural requirements in presenting his claims is barred by the adequate and independent state ground doctrine from obtaining a writ of habeas corpus in federal court. *Coleman v. Thompson*, 501 U.S. 722, 731-32 (1991) ("Just as in those cases in which a state prisoner fails to exhaust state remedies, a habeas petitioner who has failed to meet the State's procedural requirements for presenting his federal claims has deprived the state courts of an opportunity to address those claims in the first instance."). Where such a procedural default constitutes an adequate and independent state ground for denial of habeas corpus, the default may be excused only if "a constitutional violation has probably resulted in the conviction of one who is actually innocent," or if the prisoner demonstrates cause for the default and prejudice resulting from it. *Murray v. Carrier*, 477 U.S. 478, 496 (1986). To demonstrate cause for a procedural default, the petitioner must "show that some objective factor external to the defense impeded" his efforts to comply with the state procedural rule. *Murray*, 477 U.S. at 488. For cause to exist, the external impediment must have prevented the petitioner from raising the claim. *See McCleskey v. Zant*, 499 U.S. 467, 497 (1991). With respect to the prejudice prong, the petitioner bears "the burden of showing not merely that the errors [complained of] constituted a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire [proceeding] with errors of constitutional dimension." *White v. Lewis*, 874 F.2d 599, 603 (9th Cir. 1989), citing *United States v. Frady*, 456 U.S. 152, 170 (1982).

In *Martinez v. Ryan*, 566 U.S. 1 (2012), the Supreme Court ruled that ineffective assistance of post-conviction counsel may serve as cause to overcome the procedural

default of a claim of ineffective assistance of trial counsel. The *Coleman* Court had held that the absence or ineffective assistance of state post-conviction counsel generally could not establish cause to excuse a procedural default because there is no constitutional right to counsel in state post-conviction proceedings. *See Coleman*, 501 U.S. at 752-54. In *Martinez*, however, the Supreme Court established an equitable exception to that rule, holding that the absence or ineffective assistance of counsel at an initial-review collateral proceeding may establish cause to excuse a petitioner's procedural default of substantial claims of ineffective assistance of trial counsel. *See Martinez*, 566 U.S. at 9. The Court described "initial-review collateral proceedings" as "collateral proceedings which provide the first occasion to raise a claim of ineffective assistance at trial." *Id.* at 8. Accordingly, under the equitable rule of *Martinez*, a habeas petitioner may establish cause for the procedural default of an ineffective assistance of trial counsel claim "where the state ... required the petitioner to raise that claim in collateral proceedings, by demonstrating two things: (1) 'counsel in the initial-review collateral proceeding, where the claim should have been raised, was ineffective under the standards of [*Strickland*]' and (2) 'the underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit.'" *Cook v. Ryan*, 688 F.3d 598, 607 (9th Cir. 2012) (quoting *Martinez*, 566 U.S. at 14); *see also* Respondents' Closing Brief (ECF No. 282), pp. 8-10 (agreeing that, if the claim in Ground 5 is fundamentally altered, *Martinez* applies, and the claim may be adjudicated on its merits if Rogers shows that his initial state post-conviction counsel provided ineffective assistance with respect to the claim).

In *Strickland*, the Supreme Court propounded a two-prong test for analysis of claims of ineffective assistance of counsel: the petitioner must demonstrate (1) that the attorney's representation "fell below an objective standard of reasonableness," and (2) that the attorney's deficient performance prejudiced the defendant such that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 688, 694. A court considering a claim of ineffective assistance of counsel must apply a "strong presumption" that counsel's representation was within the "wide range" of reasonable professional assistance. *Id.* at 689. The petitioner's burden is to show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687. And, to establish prejudice under *Strickland*, it is not enough for the habeas petitioner "to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693. Rather, the errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687.

Rogers' initial state post-conviction counsel presented, in a *pro forma* manner, a claim asserting that Rogers' trial counsel was ineffective with respect to their handling of Rogers' NGRI defense. After Rogers filed a three-page *pro se* petition, initiating his first state habeas action, his appointed counsel filed a four-and-a-half-page supplemental petition. *See* Petition, ECF No. 77-6, pp. 497-500; Supplemental Petition, ECF No. 77-6, pp. 501-06. In the supplemental petition, the claim regarding trial counsel's presentation of his NGRI defense was presented, in its entirety, as follows:

Trial counsel for Petitioner called Petitioner's mother as a witness during the guilt phase contrary to Petitioner's expressed direction to not do so. Her testimony was devastating to Petitioner and counsel's doing so violated Petitioner's right to effective assistance of counsel.

Petitioner was denied effective assistance of counsel in presenting an insanity defense in that defense counsel presented the testimony of Dr. Rich who stated that it would be difficult for him to determine the mental status of Petitioner at the time of the offenses as he was not present there and had no facts or history just prior to the testimony of Dr. Pauly, who testified that he could make such a determination. (ROA, pp. 1025; 1050).

Supplemental Petition, ECF No. 77-6, p. 504. Rogers' state post-conviction counsel: did not seek to develop evidence to support the claim; failed to do any investigation; failed to meaningfully interview trial counsel; failed to consult experts regarding Rogers' mental state at the time of the killings; failed to present testimony of experts regarding that issue; failed to interview trial witnesses; failed to obtain records from Lake's Crossing Center for the Mentally Disordered Offender (Lake's Crossing), an institution where Rogers was housed and where his competence to stand trial was assessed; failed to interview Rogers' family or friends; and even failed to obtain and examine the entire trial record. *See* Deposition of Mary E. Boetsch, ECF No. 77-3, pp. 773-922. The state district court held a hearing on Rogers' petition, and Rogers' counsel called one witness: Rogers. *See* Transcript of Proceedings, September 22, 1986, ECF Nos. 122-2, 122-3. By its nature -- raising the question of Rogers' mental condition at the time of the crimes -- the claim was one that plainly called for investigation and evidentiary support from outside the trial court record, including expert witness opinions, but Rogers' counsel wholly failed to competently articulate the claim and develop and present evidence to support it. In contrast, in this federal habeas action, Rogers points

out numerous aspects of trial counsel's deficient performance, not pointed out in Rogers' first state habeas action. And, in this case, Rogers supports the claim with evidence not presented in state court, including the complete trial court record, Rogers' daily progress records from Lake's Crossing, police reports, evaluations of Rogers by mental health experts prior to his trial, declarations from relatives and friends of Rogers, testimony of trial counsel, testimony of mental health experts, and testimony of a *Strickland* expert. The evidence Rogers presents in this case, that was not presented in state court, places this claim in a completely different light, shows that Rogers' state post-conviction counsel's performance was inadequate, and substantiates his claim that his trial counsel were ineffective with respect to their handling of his NGRI defense. The Court determines that Rogers' initial state post-conviction counsel's presentation of this claim in state court fell below an objective standard of reasonableness, and Rogers was prejudiced thereby. And, as is discussed below, Rogers' claim is substantial. Under *Martinez*, Rogers shows cause and prejudice, such as to overcome the procedural default of Ground 5.

Because this claim, as now presented, was not adjudicated on its merits in state court, this Court's review of the claim is *de novo. See Cone v. Bell*, 556 U.S. 449, 472 (2009); *Porter v. McCollum*, 558 U.S. 30, 39 (2009). The standard of review imposed by 28 U.S.C. § 2254(d) does not apply.

Rogers' trial counsel, Virginia Shane and Robert Bork, of the Nevada State Public Defender's Office (NSPD), settled on an NGRI defense immediately upon their appointment to represent Rogers in January 1981. Testimony of Virginia Shane at

Evidentiary Hearing, ECF No. 275, p. 25; Testimony of Robert Bork at Evidentiary Hearing, ECF No. 276, p. 14.

However, when the trial commenced, Shane neglected, in her opening statement, to prepare the jury to consider Rogers' NGRI defense. Though the prosecutor informed the jury that Rogers had pled not guilty by reason of insanity and that Rogers had the burden to prove that he was legally insane at the time he committed the crimes (*see* State's Opening Statement, ECF No. 138-12, pp. 30-31), Shane did not explain to the jury what had to be proven and would be proven to establish legal insanity. *See* Defendant's Opening Statement, ECF No. 138-12, p. 32 - ECF No. 138-13, p. 1. Shane discussed certain evidence that she expected the State to present, which she felt revealed Rogers' mental state, for example, that he was "paranoid" and "irrational," but she did not tell the jury what the legal standard was for the NGRI defense. *See id.* And, only to confuse matters, at the end of her opening statement, Shane told the jury that Rogers did not act with intent, malice, or premeditation, suggesting that was point of her discussion of Rogers' mental state, rather than an NGRI defense. *See id.*, ECF No. 138-13, p. 1. Essentially, when Shane was done with her opening statement, a reasonable juror would have had no idea what the requirements were for Rogers' NGRI defense and would have no idea what to look for in that regard in the evidence. When asked about her opening statement at the evidentiary hearing in this case, Shane testified as follows:

> Q.     In your opening statement, did you define for the jury the standard for legal insanity?
>
> A.     I did not. I neglected to do that.

Q.      Did you know what the standard was at the time that you gave openings?

A.      Yes. I knew that the *McNaughten* Rule was the rule that applied in the State of Nevada as well as other – most other states, and that was whether he knew what he was doing and knew the difference between right and wrong.

Q.      Do you remember a reason why you didn't share that with the jury during opening?

A.      I think it was a big mistake. I don't recall why I didn't.

Testimony of Virginia Shane at Evidentiary Hearing, ECF No. 275, p. 58. Further, at the evidentiary hearing in this case, Rogers presented expert testimony of Martin Wiener, a Nevada criminal defense attorney with extensive experience, including experience defending capital murder cases and experience presenting NGRI defenses. Wiener was knowledgeable regarding the standard of practice in such cases in Nevada in 1981, and he testified as follows regarding Rogers' trial counsel's opening statement:

Q.      And, in your opinion, did trial counsel's opening statement satisfy the standard of practice?

A.      No.

Q.      Why not?

A.      Well, it was going to be tough to prevail on the defense that Mark Rogers didn't commit these offenses. There was strong circumstantial evidence that he committed those offenses. So, the possibility of avoiding a guilty verdict all fell on the insanity defense. And yet, in Ms. Shane's opening statement, she never mentions the insanity defense. She never discusses the definition of insanity that was going to be presented to the jury at the end of the trial, so they must have wondered why are we listening to all this stuff about is it paranoid schizophrenia or is it antisocial behavior or did he malinger or didn't he, did he fake, didn't he? Why are we listening to psychiatrists?

So, it was essential to educate the jury why they were going to listen to this testimony, and it would have been quite effective if – because the standard of practice is to lay out the case you're going to present to the jury. You educate them about the law that's going to be presented to them. You educate them about the facts they are going to hear, and there was no discussion of what all these psychiatrists were going to talk about and what the conclusion was. Besides, what did it matter if the guy was acting crazy? I mean, the jury didn't find out until shortly before they were going to make a decision on this case why they had listened to all this psychiatric stuff, you know, because that was the first time the insanity test, the potential insanity verdict was ever discussed. The Judge did say the Defendant pleaded not guilty by reason of insanity, but what does that mean? So, it was a completely inept opening argument. It didn't look to the jury like the insanity defense was an issue in the case until the closing arguments, and even that wasn't argued very well. So, yes, it was far below the standard of practice for the one possibility of a not guilty verdict.

        Q.      In your opinion, was there a valid strategic reason for failing to define insanity to the jury during opening statements?

        A.      Absolutely not.

Testimony of Martin Weiner at Evidentiary Hearing, ECF No. 276, pp. 236-38. The Court finds that Rogers' trial counsel's performance, in failing to explain the NGRI defense to the jury in her opening statement, fell below an objective standard of reasonableness.

Furthermore, despite the fact that numerous mental health professionals had evaluated Rogers at Lake's Crossing, Rogers' counsel only asked one expert to opine on the question of Rogers' sanity at the time of the crimes, and counsel did not do that until October 1981, less than two weeks before the trial commenced. *See* Testimony of Dr. Pauly at Evidentiary Hearing, ECF 276, pp. 60-64. The one doctor that Rogers' trial counsel called to testify regarding Rogers' sanity at the time of the crimes was Dr. Ira Pauly. Dr. Pauly concluded that Rogers was schizophrenic and at the time of the crimes was incapable of knowing the nature and quality of his acts or that his acts were wrong. *See* Trial Testimony of Dr. Pauly at Evidentiary Hearing, ECF No. 234-1, p. 23 –

ECF No. 234-3, p. 26. However, because he had not been properly prepared for his testimony, Dr. Pauly was subject to unnecessarily damaging cross-examination. *See id.* at ECF No. 234-2, p. 26 – 234-3, p. 23. For example, on cross-examination, Dr. Pauly testified: that he had not read the Lake's Crossing daily progress notes regarding Rogers; that he had not been informed about a conversation Rogers had with a witness on December 1, 1989, the day before the offenses; that he did not know that Dr. Richnak had been misled by Rogers' regarding Rogers' memory; and that he did not know what information came from the State and what information came from the defense investigator. *See id.*, ECF No. 234-3, pp. 4-5, 7, 10-11, 15. Dr. Pauly was not properly prepared for his testimony because Rogers' trial counsel never met with him in person, never discussed with him the materials he relied upon in reaching his opinions, never discussed with him reports from Lake's Crossing psychologist Martin Gutride that contradicted his conclusions, never provided him the Lake's Crossing daily progress notes, and never discussed with him how Rogers' violent behavior during his adolescence was related to his schizophrenia. *See* Testimony of Dr. Pauly at Evidentiary Hearing, ECF No. 276, pp. 90-91, 99, 101, 104-08, 113-14. Asked if she provided Lake's Crossing daily progress notes to Dr. Pauly, Shane testified:

> You know, I don't know why I wouldn't have. However, at trial, he said that he had not received those from me. So if I failed to do that, it was definitely a mistake on my part. I thought I had and I evidently had not.

Testimony of Virginia Shane at Evidentiary Hearing, ECF No. 275, p. 90. In short, the evidence at the evidentiary hearing showed that Rogers' counsel did not adequately prepare Dr. Pauly – the defense's most important witness -- for his trial testimony.

In addition to Dr. Pauly, Rogers' trial counsel chose as testifying experts Dr. Louis Richnak and Dr. Phillip Rich, two psychiatrists whom the trial court had appointed to evaluate Rogers' competence to stand trial. *See* Testimony of Virginia Shane at Evidentiary Hearing, ECF No. 275, pp. 68-71, 81-82, 85. Rogers' trial counsel did not retain Drs. Richnak and Rich to testify on the critical issue in the case, Rogers' sanity at the time of the crimes, and did not provide them with the information they would have needed to form an opinion on that issue and did not discuss that issue with them at all. Rather, trial counsel retained Drs. Richnak and Rich to testify only that they diagnosed Rogers as suffering from schizophrenia. *Id.* And, trial counsel admitted at the evidentiary hearing that she could not remember doing anything at all to prepare Dr. Richnak or Dr. Rich to testify. *Id.* at 67, 69, 70, 72, 77 ("I don't recall discussing anything with Dr. Richnak."), 78, 84 ("I don't recall preparing [Dr. Rich], no."). As a result of trial counsel's narrow use of Drs. Richnak and Rich and her failure to prepare them for their testimony, when the prosecutor asked Drs. Richnak and Rich on cross-examination for their opinions regarding Rogers' sanity at the time of the crimes -- without any objection from Rogers' counsel -- both said they believed Rogers to know right from wrong when they examined him, but both were unable to render any opinion as to his sanity at the time of the crimes. *See* Trial Testimony of Dr. Richnak, ECF No. 139-10, pp. 4-5, 8-10; Trial Testimony of Dr. Rich, ECF No. 234-1, pp. 13, 20-21. This testimony by Drs. Richnak and Rich, under cross-examination, contrasted sharply with the testimony of Dr. Pauly, who opined that Rogers was not sane when he committed the crimes.

The Court finds that Rogers' trial counsel performed unreasonably in not adequately preparing Dr. Pauly, Dr Richnak and Dr. Rich to testify at trial. *See Smith v. Stewart*, 189 F.3d 1004, 1012 (9th Cir. 1999) ("A lawyer who should have known but does not inform his expert witnesses about essential information going to the heart of the defendant's case for mitigation does not function as 'counsel' under the Sixth Amendment."); *Wallace v. Stewart*, 184 F.3d 1112, 1118 (9th Cir. 1999) (ineffective assistance of counsel may be shown where trial counsel do not fulfill "duty to seek out [evidence concerning defendant's background] and bring it to the attention of the experts"); *Caro v. Calderon*, 165 F.3d 1223, 1228 (9th Cir. 1999) (trial counsel may be ineffective where he "failed to provide those who did examine [the defendant] with the information that he had"); *Bean v. Calderon*, 163 F.3d 1073, 1080 (9th Cir. 1998) (Ineffective assistance of trial counsel "resulted from inadequacies in rudimentary trial preparation and presentation: providing experts with requested information, performing recommended testing, conducting an adequate investigation, and preparing witnesses for trial testimony. These were not alien concepts in 1981, but were an integral thread in the fabric of constitutionally effective representation."). Regarding Dr. Pauly, this failure exposed him to damaging cross-examination, unnecessarily undermining his testimony. Regarding Dr. Richnak and Dr. Rich, this failure left them unable to opine whether Rogers was insane at the time he committed the offenses. Weiner testified at the evidentiary hearing that "if [trial counsel] had given [Drs. Richnak and Rich] all the reports, they would have been prepared to testify" and "the only reason [Drs. Richnak and Rich] couldn't express an opinion [on Rogers' sanity at the time of the offenses] was their only source of a possible opinion would have been from what Mr. Rogers told

them. But there was abundant other material available that didn't require Mr. Rogers to say anything about the event." Testimony of Martin Wiener at Evidentiary Hearing, ECF No. 276, p. 226; *see also* Testimony of Virginia Shane at Evidentiary Hearing, ECF No. 275, pp. 85-86 (recalling no reason why she did not ask Dr. Rich about his opinion as to whether Rogers was sane at the time of the offenses). Wiener testified, further, regarding the effect of this failure on the part of trial counsel:

> Q.     Mr. Wiener, I believe you mentioned somewhere in there that Drs. Rich and Richnak had testified that they couldn't give an opinion on his mental state due to his failure to discuss it. In your opinion, did this testimony from Drs. Rich and Richnak that they couldn't give that opinion undermine Dr. Pauly's later testimony that he could?
>
> A.     I think absolutely. The standard of practice would not be to put on a witness who, at the most, was neutral in terms of what they would provide to the jury, but would be harmful when compared or when the juror would have some comparison between their testimony and Dr. Pauly's. They undermined Dr. Pauly's credibility because what they were basically saying is, it was impossible to reach an opinion about the mental state of Mark Rogers at the time of the event. And Dr. Pauly was testifying it was possible and he had an opinion.
>
> And so, the fact that two competent psychiatrists couldn't render an opinion could very easily be misunderstood because of a lack of background information, could very well be misunderstood to undermine the fact that Dr. Pauly had an opinion and these two psychiatrists didn't. So, what's the value of Pauly's opinion if he's so isolated in his conclusions?

Testimony of Martin Wiener at Evidentiary Hearing, ECF No. 276, pp. 227-28.

Indeed, the trial judge commented on this in the presence of the jury. After Rogers' trial counsel's direct examination of Dr. Richnak went on for some time, the trial judge interrupted, and the following exchange occurred:

> THE COURT:  Well, I think we are at the point, Mrs. Shane, that we need to ask this witness that the defendant is accused of committing five separate offenses on December 2nd, 1980, and describe hypothetically

what the facts have been shown to this jury and we need to know if this man has an opinion on that date what the mental condition or capacity was of Mark Rogers.

MRS. SHANE:  Your Honor, --

THE COURT:   He can state if he does have an opinion and he can state what it is and tell us why he has that opinion and you can go into his examination and reports.

But, we are not getting anywhere at this point.

MRS. SHANE:  Your Honor, Dr. Richnak was not appointed to address that issue. His issue is strictly competency.

THE COURT:   Then why are we going into it? We have spent over a half hour and he doesn't have an opinion on the December 2nd, 1980?

Trial Testimony of Dr. Richnak, ECF No. 139-9, pp. 28-29. Then, after Shane told the judge that Dr. Pauly would testify on that issue, the prosecutor objected to Dr. Richnak's further testimony as having "no bearing on the issue," and the trial judge told Rogers' trial counsel she needed to present evidence of insanity at the time of the crimes, because the defense raised that issue. *Id.* at 29. Rogers' trial counsel then explained that Dr. Pauly would testify on the insanity issue, not Dr. Richnak or Dr.Rich. *Id.* at 29-30. But then, inexplicably, when the prosecutor, in his cross-examinations, asked Drs. Richnak and Rich their opinions regarding the insanity issue, Rogers' trial counsel failed to object, and both Dr. Richnak and Dr. Rich testified that they could not state an opinion on that issue. *See* Trial Testimony of Dr. Richnak, ECF No. 139-10, pp. 4-5, 8-10; Trial Testimony of Dr. Rich, ECF No. 234-1, pp. 13, 20-21. It was apparently obvious to the trial court -- as it is obvious to this Court now -- that Rogers' trial counsel's presentation of Drs. Richnak and Rich, unprepared to offer opinions as to Rogers' sanity at the time of the offenses, was mostly pointless, and worse, it was

damaging to Rogers' NGRI defense, as the inability of Drs. Richnak and Rich to state opinions on the issue of Rogers' sanity at the time of the crimes contradicted the testimony of Dr. Pauly, who did state an opinion on that issue. The Court finds that the performance of Rogers' trial counsel fell below an objective standard of reasonableness in this regard.

An expert that was an obvious choice to present at trial, but whom trial counsel did not present, was Dr. Donald Molde. The trial court appointed Dr. Molde in January 1981 to assess Rogers' competence to stand trial *as well as his mental state at the time of the crimes*. Testimony of Virginia Shane at Evidentiary Hearing, ECF No. 275, p. 30. Dr. Molde was the first to evaluate Rogers; he evaluated Rogers no less than five times and concluded that Rogers was schizophrenic. Testimony of Dr. Molde at Evidentiary Hearing, ECF No. 276, pp. 146, 154. However, despite the scope of Dr. Molde's appointment, and his extensive knowledge regarding Rogers' condition, the evidence indicates that trial counsel *never even spoke with Dr. Molde. See* Testimony of Virginia Shane at Evidentiary Hearing, ECF No. 275, p. 38; Testimony of Robert Bork at Evidentiary Hearing, ECF No. 276, p. 33; Testimony of Dr. Molde at Evidentiary Hearing, ECF No. 276, pp. 166, 176, 178-79 ("My recollection, I've never spoken ever with them."). Shane testified as follows regarding this failure:

> Q. Did you ever ask Dr. Molde what his opinion was on NGRI before trial?
>
> A. Dr. Molde?
>
> Q. Correct.
>
> A. No.

Q.      Do you remember why?

A.      I dropped the ball. I mean, he was there. He was already paid by the court. I should have brought him in because his opinion was consistent. His was that he was paranoid schizophrenia of a substantial degree and, in fact, he had reviewed everything that the court had asked him to review.

Testimony of Virginia Shane at Evidentiary Hearing, ECF No. 275, p. 94; *see also id*. at 93-94 ("I made a big mistake."). Trial counsel's failure in this regard was especially egregious given that Dr. Molde had recently testified in support of an insanity defense presented by attorneys from the NSPD, and his potential value to Rogers' defense should have been well known to Rogers' counsel. *See* Testimony of Martin Wiener at Evidentiary Hearing, ECF No. 276, pp. 209-11. It is plain from Dr. Molde's testimony at the evidentiary hearing in this case that he would have been an effective expert witness in support of Rogers' NGRI defense. *See, e.g.*, Testimony of Dr. Molde at Evidentiary Hearing, ECF No. 276, pp. 160-62 (Dr. Molde disagreed with Dr. Gutride's opinion that Rogers was malingering.); pp.167-74 (Dr. Molde saw many indications of schizophrenia in records regarding Rogers and diagnosed Rogers as schizophrenic.); 174-75 (Dr. Molde disagreed with Dr. Gutride's diagnosis of ASPD – "[I]t has nothing to do with this case."); 175 (Dr. Molde believed diagnoses of schizophrenia and ASPD to be mutually exclusive.); 183-84 (Dr. Molde believed the culture among the staff at Lake's Crossing contributed to improper and premature judgments and diagnoses.) And, at the evidentiary hearing, Dr. Molde testified as follows on the most important issue, the issue of Rogers' sanity at the time of the crimes:

Q.      Did you reach an opinion as to Mr. Rogers' mental state at the time of the offense?

A.     Yes. I believe that he was not – I believe that he did not know right from wrong or know the nature and quality of his act, that he was not competent at the time of the crime to know those things due to his schizophrenic disorder which I believe was quite active and intense and interfered with that ability.

Q.     And what do you base that opinion on?

A.     Well, the totality of the record. Including heavily leaning upon the accounts and witnesses who saw him and interacted with him immediately before and immediately after the crime, the time of the crime, and the preceding information from Mr. Morrison and others that I think clearly establish the onset date, the onset of when his condition began, all of which is quite consistent with what we know about the condition. So all of that information, what I was able to see in and around the time of the crime, and then of course since then the persistent, relentless continuation of his mental status abnormalities that have persisted to the present day. So that all to me is just a rock-solid case.

Q.     Is it possible for someone to suffer from schizophrenia and still understand the nature and quality of her actions?

A.     Yes.

Q.     And so why do you think that Mr. Rogers did not understand the nature and quality of his actions at the time of the offense?

A.     I think they're – because he had – some of the symptoms he had, in my experience, are ... signs and symptoms of the most active state of schizophrenia. The intense delusional activity that he had all the way from thinking he was God and the king, and owning land, and the FBI was after him, and all of that sort of thing to his odd verbal comments, to the hieroglyphics and the pyramid stuff, and all of that, including his muteness, the posturing that he did when I first – all of that to me are the most intense – signs of the most intense presence of the disease, if you will. And so that's why I believe that he was not competent. That all of those things, to me, indicate that he was in an acute phase of the illness when everything was its most intense and at its highest level. And he had enough of all of that to clearly indicate that he had some pretty strange ideas and, therefore, in my opinion, was not competent to clearly know what he was doing.

*     *     *

Q.     Did trial counsel ever ask you to testify at trial?

26

A.    No.

Q.    If they had called you, would you have agreed to testify in 1981 that Mr. Rogers was insane at the time of the offense?

A.    I'm quite sure I would have. Although I would have probably needed to look at some more records. But, yes, if they had called and asked from me to see if I could render that opinion, I certainly would have considered it, yes.

*Id.* at 180-82. Wiener testified as follows regarding trial counsel's failure to take

advantage of the trial court's appointment of Dr. Molde to render an opinion regarding

Rogers' sanity at the time of the crimes:

Q.    -- and in your opinion, did their failure to take advantage of that order fall below the standard of practice at the time in 1981?

A.    Yes. And I have a reason for that opinion, but I'll –

Q.    What was the reason?

A.    -- well, I think there were multiple reasons. One of them showed up in the trial transcript itself, that at Mr. rogers' trial the prosecutor's closing argument tried to discredit Dr. Pauly's testimony not only by saying it was the only, you know, psychiatrist out of 11 or 12 who actually testified about insanity and yet, Dr. Pauly's report and his opinion here is that his diagnosis of paranoid schizophrenia inevitably led to a determination that the insanity test was met.

And so, this sort of statistical attack on Dr. Pauly would really have been helped by having a second psychiatrist testify about whether – about the – the mental state of Mr. Rogers. And we heard from Dr. Molde that he would have testified in that way. That's what his report and his testimony says to me. He would have been a second psychiatrist testifying on the issue of insanity, finding that the insanity test was met by Mr. Rogers. So, now you have two psychiatrists instead of one.

Further, the closing argument of the prosecutor was that Dr. Pauly was a hired gun. Hired gun because he was allegedly being paid by the Public Defender's Office. Of course, we know he wasn't. He was paid by the county, but he was chosen by the Public Defender's Office so that was

used to further discredit his testimony. Whereas, if Dr. Molde had testified, they couldn't say that about him because not only was he being paid by the county, but he was also chosen by the Judge.

So, those were a couple of the reasons why it was just a squandering of available resources that could have made a big difference in this case if Dr. Molde had been used as a defense witness on the issue of insanity.

Q.      And, in your opinion, again, having reviewed the transcripts and listened to the testimony of the witnesses, was there a valid strategic reason for trial counsel's failure to consult with Dr. Molde?

A.      None. None that I could possibly imagine.

Testimony of Martin Weiner at Evidentiary Hearing, ECF No. 276, pp. 223-24; *see also id.*, ECF No. 277, pp. 17-19. In this Court's view, trial counsel plainly performed unreasonably in not acting upon the trial court's appointment of Dr. Molde to render an opinion as to Rogers' sanity at the time of the offenses, in not ascertaining Molde's opinion on that issue, and in not preparing him, and calling him, to testify at trial.

Rogers' trial counsel also failed to adequately investigate Rogers' background in order to fully prepare defense expert witnesses to testify, and the Court finds that counsel's performance in this regard was objectively unreasonable as well. Trial counsel knew that the prosecution's theory was that Rogers was an actor, was not severely mentally ill, and was malingering, and counsel knew that Rogers' background was an important factor in the diagnosis of him as schizophrenic. *See* Testimony of Virginia Shane at Evidentiary Hearing, ECF No. 275, pp. 50-51, 55-56. But, despite knowing the importance of Rogers' background, trial counsel did not investigate his childhood. *Id.* at 55. After exhausting their initial funding for their investigation, trial counsel sought funding for further investigation, but only for investigation related to the

penalty phase of the trial, and that was denied as premature. *Id.* at 42-44, 56-57.

Moreover, trial counsel did not seek help from an in-house investigator available at the

NSPD office, where they were employed. *Id.* at 44. Consequently, trial counsel

proceeded to trial without the ability to provide their experts with important information

about Rogers' background and without any opportunity to discuss such information with

their experts to prepare them to testify. *See*, *e.g.*, Testimony of Dr. Pauly at Evidentiary

Hearing, ECF No. 276, pp. 99-101.

      The State's expert witness at trial was Dr. Martin Gutride, a psychologist at

Lake's Crossing. Dr. Gutride testified that, in his opinion, Rogers was not schizophrenic

or otherwise severely mentally ill, but rather had an antisocial personality disorder

(ASPD). *See* Trial Testimony of Dr. Gutride, ECF No. 234-4, pp. 8-9. Dr. Gutride also

testified that he believed Rogers was malingering -- that is, faking symptoms of

schizophrenia. *See id.* at 9-12. Furthermore, Dr. Gutride testified that Dr. Richnak had

told him that he, Dr. Richnak, had been fooled for a time by Rogers about Rogers'

memory, buttressing the notion that Rogers was an actor who was able to falsely

convince people that he was schizophrenic. *See id.* at 11. Dr. Gutride also questioned

the ability of experts to determine Rogers' sanity at the time of the offenses. *See id.* at

6-8. The Court finds that Rogers' trial counsel unreasonably failed to challenge the

testimony of Dr. Gutride. *See Harris ex rel. Ramseyer v. Wood*, 64 F.3d 1432, 1438

(9th Cir. 1995) (trial counsel ineffective, in part, for failing to challenge prosecution

expert). During her cross-examination of Dr. Gutride, Shane: failed to point out

that Dr. Gutride lacked sufficient information to diagnose ASPD; failed to point out

that a diagnosis of schizophrenia would preempt a diagnosis of ASPD; failed to

effectively confront Dr. Gutride with information that supported a schizophrenia

diagnosis rather than an ASPD diagnosis; failed to effectively confront Dr. Gutride with

information that undermined his opinion that Rogers was malingering; and failed to point

out inconsistencies in Dr. Gutride's own reports. *See id.* at 12-23. Rogers' trial counsel

also failed to offer affirmative testimony from Rogers' own experts to undermine

Dr. Gutride's testimony. Wiener testified that "any reasonable defense attorney at that

time would have anticipated Dr. Gutride [was] going to be called by the prosecution"

based on Dr. Gutride's reports, his testimony at the competency hearing, and the

prosecutor's questioning of Dr. Richnak. *See* Testimony of Martin Wiener at Evidentiary

Hearing, ECF No. 276, p. 232. Wiener continued: "So, Dr. Gutride totally escaped

because of a lack of preparation by the defense counsel, and the standard of practice is

you've got to figure out where the prosecution is going to come at you and get ready for

that." *Id.* at 233. Dr. Gutride's opinions were questionable and should have been

challenged more fully and competently. It is well accepted, and was in 1981, that a

diagnosis of schizophrenia precludes a diagnosis of ASPD, and there was a plethora of

evidence available, already in the trial record when Dr. Gutride testified, supporting a

schizophrenia diagnosis. Furthermore, there was strong evidence available to cast

doubt on Dr. Gutride's opinion that Rogers was malingering; for example, there was

evidence that Rogers exhibited obvious signs of schizophrenia before the crimes were

committed. Trial counsel had available the DSM-III, Dr. Gutride's reports, police reports,

and reports from multiple psychiatrists who disagreed with Dr. Gutride's opinions, but

she failed to use those materials to effectively cross-examine Dr. Gutride. As Wiener

testified: "[T]here's an obligation to go seek that kind of evidence, but it was all there in front of the defense counsel and it wasn't used." Testimony of Martin Wiener at Evidentiary Hearing, ECF No. 276, p. 235. Furthermore, Rogers' trial counsel could have, but did not, prepare defense experts to point out inconsistencies in Dr. Gutride's reports, to show that his ASPD diagnosis was not in line with DSM-III requirements, and to explain that the ASPD diagnosis was precluded by the stronger schizophrenia diagnosis, and she stated no strategic reason for not doing so. *See id.* at 232-34; *see also* Testimony of Virginia Shane at Evidentiary Hearing, ECF No. 275, pp. 77-78, 80. At the evidentiary hearing, Shane acknowledged that Dr. Gutride's report was "very bad for our defense," but admitted that she simply was not prepared for his testimony. *See id.* at 73, 76, 84, 95 ("I didn't have trial preparation for him.").

Both of Rogers' trial attorneys, Shane and Bork, were relatively inexperienced and had heavy caseloads. Shane graduated from law school in the spring of 1980, took the Nevada bar exam in July of 1980, and was assigned to represent Rogers in this capital triple-murder case in January of 1981. *See* Testimony of Virginia Shane at Evidentiary Hearing, ECF No. 275, pp. 13-14, 18-19, 24-27. Bork had been a lawyer for about four years at the time of Rogers' trial, had only worked at the NSPD for two years, and had never defended a capital case. *See* Testimony of Robert Bork at Evidentiary Hearing, ECF No. 276, pp. 7-11. While handling Rogers' case, Shane and Bork both carried caseloads of more than eighty cases. *See* Testimony of Virginia Shane at Evidentiary Hearing, ECF No. 275, pp. 16-17, 28; Testimony of Robert Bork at Evidentiary Hearing, ECF No. 276, p. 10. Neither had ever presented an NGRI defense. *See* Testimony of Virginia Shane at Evidentiary Hearing, ECF No. 275, p. 27; Testimony

of Robert Bork at Evidentiary Hearing, ECF No. 276, pp. 11, 14. At the evidentiary hearing, Wiener concluded that Rogers' trial counsel "absolutely" did not satisfy the standard of practice in their investigation and presentation of Rogers' NGRI defense. *See* Testimony of Martin Wiener at Evidentiary Hearing, ECF No. 276, p. 239.

The Court finds that Rogers' trial counsel's performance, with respect to their investigation and presentation of Rogers' NGRI defense, fell below an objective standard of reasonableness. There was ample evidence that Rogers had acted in a bizarre manner both before and after the crimes, and it was obvious that an NGRI defense was called for, but, in this Court's view, because of trial counsel's inept presentation of the NGRI defense, there was no chance of that defense prevailing. The Court finds that there is a reasonable probability that, but for counsel's objectively unreasonable investigation and presentation of Rogers' NGRI defense, Rogers would have been found not guilty by reason of insanity. Trial counsel's blatant mishandling of the NGRI defense deprived Rogers of a fair trial. The result of Rogers' trial, with regard to the jury's rejection of his NGRI defense, was not reliable.

Regarding Ground 5, then, the Court determines that Rogers' federal constitutional right to effective assistance of counsel was violated, and habeas corpus relief is warranted. The Court will grant Rogers habeas corpus relief with respect to Ground 5.

Ground 16

In the remaining part of Ground 16, Rogers claims that his federal constitutional rights were violated as a result of ineffective assistance of counsel because his trial counsel failed to object to the trial court's instruction to the jury that, if found guilty by

reason of insanity, Rogers would be committed to a state hospital until "regularly

discharged therefrom in accordance with state law." *See* Second Amended Petition

(ECF No. 77), p. 189.

This claim was dismissed as procedurally defaulted on March 24, 2008 (ECF No.

108) and is one of the claims remanded by the Court of Appeals for reconsideration in

light of *Martinez. See Rogers v. McDaniel*, 793 F.3d 1036, 1045 (2015).

The jury instruction at issue here was the following:

Where on a trial a defense of insanity is interposed by the
defendant and he is acquitted by reason of that defense, the finding of the
jury shall have the same force and effect as if he were regularly adjudged
insane as now provided by law, and the judge thereupon shall forthwith
order that the defendant be committed to the custody of the Administrator
of the Mental Hygiene and Mental Retardation Division of the Department
of Human Resources until he is regularly discharged therefrom in
accordance with law.

Jury Instructions, ECF No. 77-6, p. 854. Rogers asserts, as follows, that this jury

instruction was erroneous:

The instruction misled the jury because it informed them that, were
they to find him not guilty by reason of insanity, he could easily be
released as a matter of course. It is a violation of state and federal due
process to allow a jury to consider and be informed of the consequences
of their verdict, which is an open invitation to decide the issue on matters
not adduced as evidence at trial. Moreover, this erroneous instruction
invited the jury to reject Mr. Rogers' defense because of their fear he
might be allowed release ....

Second Amended Petition (ECF No. 77), p. 189. Rogers asserts that his trial counsel

was ineffective for failing to object to this jury instruction. *Id.*

Respondents argue that this claim is procedurally defaulted, that Rogers does

not show cause and prejudice under *Martinez* to overcome the procedural default, and

that the claim should be dismissed on that ground. *See* Answer (ECF No. 203), pp. 39-40. Rogers responds that he can overcome the procedural default, under *Martinez*, by showing ineffective assistance of his first state post-conviction counsel in not asserting the claim. *See* Reply (ECF No. 205), pp. 28-29. The issues raised by the parties' arguments, then, distill down to the question whether this claim of ineffective assistance of trial counsel has any merit. The Court determines that it does not.

Nevada courts have long approved of jury instructions like the one at issue here. *See Blake v. State*, 121 Nev. 779, 792-93, 121 P.3d 567, 575-76 (2005) (trial court erred in refusing to instruct jury regarding consequences of verdict of not guilty by reason of insanity, but reversal not warranted); *Harris v. State*, 106 Nev. 667, 670, 799 P.2d 1104, 1106 (1990) (trial court committed reversible error in refusing to instruct jury regarding consequences of verdict of not guilty by reason of insanity); *Bean v. State*, 81 Nev. 25, 33-34, 398 P.2d 251, 256-57 (1965) (trial court erred in refusing to instruct jury regarding consequences of verdict of not guilty by reason of insanity, but reversal not warranted); *Kuk v. State*, 80 Nev. 291, 299-300, 392 P.2d 630, 634-35 (1964) ("The purpose of the instruction is to inform the jurors that if they find the defendant insane, and acquit, he will not walk out of the courtroom a free man, but will be confined for medical treatment."). In view of the Nevada precedent – *Bean* and *Kuk* were decided long before Rogers' trial -- there was no basis under state law for Rogers' trial counsel to object to the jury instruction, and there was no reason for Rogers' first state post-conviction counsel to raise this issue.

In his Reply, Rogers recognizes the Nevada Supreme Court's holding in *Kuk*, but he argues that "[t]hat opinion did not, however, consider the impact of the instruction on

a defendant's right to a fair trial under the federal constitution," and that "trial counsel have an obligation to argue for changes in the law when existing law is prejudicial to their client."  Reply (ECF No. 205), p. 34. Rogers does not, however, cite any authority supporting the contention that the subject instruction violated Rogers' federal constitutional right to due process of law, and he does not articulate any reason to believe that an argument for a change in the Nevada law would have been successful.

Rogers' trial counsel was not ineffective for not objecting to the jury instruction at issue here, and Rogers' first state post-conviction counsel was not ineffective for not asserting this claim. The claim of ineffective assistance of trial counsel in Ground 16 is procedurally defaulted, and Rogers has not shown cause and prejudice to overcome the procedural default. The claim of ineffective assistance of trial counsel in Ground 16 will be denied on that ground.

Ground 18

In the remaining part of Ground 18, Rogers claims that his federal constitutional rights were violated as a result of ineffective assistance of counsel because his trial counsel failed to object to the trial court's comments to the jury minimizing the State's burden of proof. *See* Second Amended Petition (ECF No. 77), pp. 191-94.

Like the remaining part of Ground 16, this claim was dismissed by this Court as procedurally defaulted on March 24, 2008 (ECF No. 108), and it is one of the claims remanded by the Court of Appeals for reconsideration in light of *Martinez. See Rogers v. McDaniel*, 793 F.3d 1036, 1045 (2015).

Rogers alleges that Judge Llewellen Young, who presided over the first seven days of jury selection but who was replaced, because of illness, for the remainder of the

trial by Judge Robert Legakes, made comments to the prospective jurors during jury selection minimizing the State's burden of proof. *See* Second Amended Petition (ECF No. 77), pp. 191-94. Rogers points to the following explanation of the State's burden of proof, given to the prospective jurors by Judge Young during jury voir dire (*see id.*):

> Another concept, the State has the burden of proving the case beyond a reasonable doubt. You will get more of that here a little later on reasonable doubt, but when you have a scale here like we have here in front of me, the -- they start out with the presumption of innocence and then the State has to put on evidence to overcome that presumption of innocence, and the scale -- if they put on enough evidence, why it weighs the scale down and if it's over here the presumption would come up (indicating), or beyond a reasonable doubt, then and only then could you find the defendant guilty.

> *   *   *

> Probable cause is a concept we use with grand jurors and in the justice court. This means is there any scintilla really of evidence. There just would be enough to maybe think that a crime had been committed and perhaps the defendant had committed the crime.

> On a scale from zero to ten this would probably be down about one. It doesn't take much evidence. It's really not much evidence at all, but somebody thinks something's happened so they decide they want it to come to the district court for a trial.

> *   *   *

> Now we have beyond a reasonable doubt. That's what -- that's the scale we have in criminal matters.

> That is more evidence than preponderance but it isn't clear up to ten. It's someplace between 50 percent [and] 100 percent. It's a judgment call that you, the jury, has to make, and when the State has evidence that triggers the balance here or the lever over here on this side to come up to beyond a reasonable doubt and then that's when you would bring in a guilty verdict.

> Now, if the State does not bring the evidence up to beyond a reasonable doubt, then you would still bring in a not guilty verdict.

36

Now, as I say, this is a judgment call but I hope it's been more fully explained. I am just giving you some broad concepts here now.

* * *

There again, I told you the differences between the trials. The grand jury is probable cause; that's about one on the scale of evidence, zero to ten. In a civil or criminal trial it is 50 percent. That's preponderance of the evidence. And then again in the criminal case, why, it's beyond a reasonable doubt which is someplace between 50 percent and 100 percent but not quite 100 percent.

* * *

If I were to instruct you a reasonable doubt is one based on reason; it is not a mere possible doubt, but is such a doubt as would govern or control a person in the more weighty affairs of life, and if the minds of the jurors after the entire comparison and consideration of all the evidence are in such condition that they can say they feel an abiding conviction of the truth of the charge there is not a reasonable doubt.

Doubt, to be reasonable, must be actual and substantial, not mere possibility or speculation.

Transcript of Trial, October 20, 1981, ECF No. 136-2, pp. 22-32. Judge Young reiterated this explanation of the burden of proof, in essentially these same terms, several times, as individual prospective jurors were called upon to be examined. *See*, *e.g.*, Transcript of Trial, October 28, 1981, ECF No. 137-2, p. 112; Transcript of Trial, October 28, 1981, ECF No. 137-3, pp. 14, 195; Transcript of Trial, October 29, 1981, ECF No. 137-4, pp. 4-5, 42, 59, 73, 108, 113-14; Transcript of Trial, October 29, 1981, ECF No. 137-4, pp. 3-4.

Respondents concede that it was error under Nevada law for Judge Young to attempt in this manner to explain the State's burden of proof. *See* Answer (ECF No. 203), p. 42. However, Respondents argue – and this Court agrees – that there was not ineffective assistance of trial counsel, under *Strickland*, on account of trial counsel's

failure to object, because, under the circumstances, there is not a reasonable probability that, but for counsel's failure to object, the result of the trial would have been different. *See Strickland*, 466 U.S. at 688, 694.

During jury voir dire, along with his improper commentary, Judge Young stated to the jury the proper jury instruction regarding the burden of proof. *See* Transcript of Trial, October 20, 1981, ECF No. 136-2, p. 32 ("If I were to instruct you ...."). And, most importantly, at the end of the trial, just before the jury went out to deliberate, Judge Legakes properly instructed the jurors as follows:

> A reasonable doubt is one based on reason. It is not mere possible doubt, but is such a doubt as would govern or control a person in the more weighty affairs of life. If the minds of the jurors, after the entire comparison and consideration of all the evidence, are in such a condition that they can say they feel an abiding conviction of the truth of the charge, there is not a reasonable doubt. Doubt to be reasonable must be actual and substantial, not mere possibility or speculation.

Jury Instructions, ECF No. 77-6, p. 835. Judge Young's improper comments during jury voir dire were not so erroneous, and they were not such as to have such an impact, as to deprive Rogers of a fair trial or render the result of his trial unreliable. *See Strickland*, 466 U.S. at 687.

Rogers first state post-conviction counsel was not ineffective for not asserting this claim. The claim of ineffective assistance of trial counsel in Ground 18 is procedurally defaulted, and Rogers has not shown cause and prejudice to overcome the procedural default. The claim of ineffective assistance of trial counsel in Ground 18 will be denied on that ground.

Certificate of Appealability

The standard for the issuance of a certificate of appealability requires a "substantial showing of the denial of a constitutional right." 28 U.S.C. §2253(c). The Supreme Court has interpreted 28 U.S.C. § 2253(c) as follows:

> Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong. The issue becomes somewhat more complicated where, as here, the district court dismisses the petition based on procedural grounds. We hold as follows: When the district court denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claim, a COA should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling.

*Slack v. McDaniel*, 529 U.S. 473, 484 (2000); *see also James v. Giles*, 221 F.3d 1074, 1077-79 (9th Cir. 2000). The Court finds that, with respect to the claims in Grounds 16 and 18 addressed in this order, and the other remanded claims on which the Court denies Rogers relief, applying the standard articulated in *Slack*, a certificate of appealability is unwarranted.

Conclusion

**IT IS THEREFORE ORDERED** that upon reconsideration of the claims in Petitioner's Second Amended Petition for Writ of Habeas Corpus (ECF No. 73) remanded to this Court by the Ninth Circuit Court of Appeals, the Court grants Petitioner habeas corpus relief with respect to Ground 5. The Court denies Petitioner relief with respect to the other remanded claims.

**IT IS FURTHER ORDERED** that Respondents shall either (1) within 90 days from the date of this order, vacate Petitioner's judgment of conviction and adjudge him not guilty by reason of insanity, and adjust his custody accordingly, consistent with Nevada law, or (2) within 90 days from the date of this order, file a notice of the State's intent to grant Petitioner a new trial, and, within 180 days from the date of this order, commence jury selection in the new trial.

**IT IS FURTHER ORDERED** that Petitioner is denied a certificate of appealability with respect to the claims on which he is not granted habeas corpus relief.

**IT IS FURTHER ORDERED** that the judgment in this action will be stayed pending the conclusion of any appellate or certiorari review in the Ninth Circuit Court of Appeals or the United States Supreme Court, or the expiration of the time for seeking such appellate or certiorari review, whichever occurs later.

**IT IS FURTHER ORDERED** that the Clerk of the Court is directed to enter an Amended Judgment in this action, as follows:

IT IS ORDERED AND ADJUDGED that Petitioner's Second Amended Petition for Writ of Habeas Corpus (ECF No. 77) is GRANTED IN PART AND DENIED IN PART. The Second Amended Petition for Writ of Habeas Corpus is GRANTED with respect to Grounds 5, 20, 21, and 23, and the Second Amended Petition for Writ of Habeas Corpus is DENIED with respect to all other claims.

IT IS FURTHER ORDERED AND ADJUDGED that Respondents shall either (1) within 90 days from the date of this order, vacate Petitioner's judgment of conviction and adjudge him not guilty by reason of insanity, and adjust his custody accordingly, consistent with Nevada law, or (2) within 90 days from the date of this order, file a notice of the State's intent to grant Petitioner a new trial, and, within 180 days from the date of this order, commence jury selection in the new trial.

IT IS FURTHER ORDERED AND ADJUDGED that petitioner is denied a certificate of appealability with respect to the claims on which he is not granted habeas corpus relief.

IT IS FURTHER ORDERED AND ADJUDGED that this judgment will be stayed pending the conclusion of any appellate or certiorari review in the Ninth Circuit Court of Appeals or the United States Supreme Court, or the expiration of the time for seeking such appellate or certiorari review, whichever occurs later.

DATED THIS 23 day of _____September_____, 2019.

_____
GLORIA M. NAVARRO,
UNITED STATES DISTRICT JUDGE